ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

RICKEY D. TURNER, JR. (CO Bar No. 38353)
Senior Trial Attorney
Wildlife & Marine Resources Section
999 18th Street, North Terrace Suite 600
Denver, CO 80207
(202) 532-3073
rickey.turner@usdoj.gov

EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(202) 305-5689
emma.hamilton@usdoj.gov

*Counsel for Federal Defendants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SAVE THE SOUTH FORK SALMON; IDAHO CONSERVATION LEAGUE; IDAHO RIVERS UNITED; EARTHWORKS; CENTER FOR BIOLOGICAL DIVERSITY; and AMERICAN RIVERS, | ) | Case No. 1:25-CV-00086-AKB |
| Plaintiffs, | ) | FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF |

| | | |
|---|---|---|
| v. | ) | CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| U.S. FOREST SERVICE; U.S. FISH AND WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE; U.S. DEPARTMENT OF AGRICULTURE; U.S. DEPARTMENT OF THE INTERIOR; U.S. DEPARTMENT OF COMMERCE; BROOKE ROLLINS, in her official capacity as U.S. Secretary of Agriculture; DOUG BURGUM, in his official capacity as U.S. Secretary of the Interior; and HOWARD LUTNICK, in his official capacity as U.S. Secretary of Commerce, | ) | |
| Federal Defendants, | ) | |
| and | ) | |
| PERPETUA RESOURCES IDAHO, INC. | ) | |
| Defendant-Intervenor | ) | |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. Legal Background ..... 2

1. Mining Law of 1872, Forest Service Organic Act of 1897, and Part 228A Regulations ..... 2

2. National Forest Management Act ..... 3

3. National Environmental Policy Act ..... 3

4. Endangered Species Act ..... 5

B. Factual Background ..... 5

III. STANDARD OF REVIEW ..... 7

IV. ARGUMENT ..... 8

A. The Forest Service Authorized the Project Under the Proper Legal Authorities ..... 8

1. The agency properly analyzed the Burntlog Route under Part 228 Subpart A. ..... 8

a. The Burntlog Route is the sole selected access route for the Project. ..... 9

b. The 228A regulations expressly govern access for mining operations. ..... 10

c. Nothing in *Rosemont* renders Part 228A inapplicable to access routes. ..... 12

2. The Forest Service properly analyzed construction of borrow sites along the Burntlog Route as part of Project operations. ..... 13

3. The FEIS assessed the effects of a special use authorization for Idaho Power Company's transmission line but the permit has not issued. ..... 15

4. The Idaho Roadless Rule's exception for mineral activities applies to the Forest Service's approval of Project activities. ..... 16

B. The Project Complies with NFMA. ..... 17

1. Plaintiffs mischaracterize the Forest Service's obligations under NFMA. .......... 18

2. The Project is consistent with MIST08. .......... 19

a. The agency reasonably concluded the Project could not locate all structures, facilities, and roads outside RCAs. .......... 20

b. The Forest Service reasonably concluded the Project is consistent with MIST08's mitigation requirements for roads and facilities in RCAs. .......... 22

3. The Project is consistent with MIST09. .......... 23

4. The Burntlog Route is consistent with the Forest Plan roadless provisions. .......... 24

C. The FEIS Complies with NEPA. .......... 25

1. The FEIS considered a reasonable range of alternatives. .......... 25

2. The FEIS reasonably assessed the Project's potential impacts. .......... 30

D. Federal Defendants Complied with the ESA. .......... 32

1. FWS's BiOp appropriately analyzed all relevant wolverine impacts and reasonably concluded "no jeopardy." .......... 33

2. FWS's BiOp survives Plaintiffs' wolverine critiques. .......... 34

a. The BiOp's conclusions are consistent and supported. .......... 34

b. The BiOp appropriately accounts for wolverine population size. .......... 35

c. The BiOp appropriately added Project effects to a climate-informed baseline. .......... 36

d. The wolverine ITS is reasonable and appropriate. .......... 38

i. The ITS's monitoring and reporting is tied to the take surrogate. .......... 38

ii. The ITS appropriately captures all take via the Project's environmental design features and FWS's den-based surrogate. .......... 39

iii. The RPMs and T&Cs are present and enforceable. .......... 40

3. FWS's BiOp appropriately analyzed all whitebark pine effects and reasonably concluded "no jeopardy." ... 42

4. FWS's BiOp appropriately analyzed all bull trout effects and reasonably concluded "no jeopardy." ... 43

a. The BiOp considered all bull trout effects. ... 44

b. The BiOp adequately considered climate change effects to bull trout. ... 45

c. The bull trout ITS is reasonable and appropriate. ... 47

i. The RPMs and T&Cs are present and enforceable. ... 47

ii. The ITS's temperature take limit is appropriate and reasonable. ... 48

5. The Forest Service did not breach terms in its Forest Plan BiOp. ... 49

V. CONCLUSION ... 50

## TABLE OF AUTHORITIES

### Cases

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F3d 1105 (9th Cir. 2018) ... 3
*Alliance for the Wild Rockies v. Marten,*
585 F. Supp. 3d 1252 (D. Mont. 2021) ... 50
*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
273 F.3d 1229 (9th Cir. 2001) ... 33, 34, 44, 46
*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
--- F.4th ---, 2025 WL 2460946 (9th Cir. Aug. 27, 2025) ... 4, 32
*City of Los Angeles v. FAA*,
63 F4th 835 (9th Cir. 2023) ... 27, 28, 29
*Council v. U.S. Forest Serv.*,
136 F.4th 816 (9th Cir. 2025) ... 28
*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ... 38
*Ctr. for Biological Diversity v. Culver*,
2024 WL 4505468 (N.D. Cal. Oct. 22, 2024) ... 42
*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
*(Rosemont*), 33 F.4th 1202 (9th Cir. 2022) ... 2, 7, 12
*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
409 F.Supp.3d 738 (D. Ariz. 2019) ... 13
*Grand Canyon Tr. v. U.S. Bureau of Reclamation*,
No. CV-07-8164-PHX-DGC, 2011 WL 1211602 (D. Ariz. Mar. 30, 2011) ... 40
*Hells Canyon Preservation Council v. Haines,*
No. CV-05-1057-PK, 2006 WL 2252554 (D. Or. 2006) ... 18, 19
*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ... 7, 19
*Loomis v. Cornish*,
836 F.3d. 991 (9th Cir. 2016) ... 49
*Loper Bright v. Raimondo*,
603 U.S. 369 (2024) ... 41
*McFarland v. Kempthorne*,
545 F.3d 1106 (9th Cir. 2008) ... 11
*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023) ... 38
*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ... 32
*Nw. Ecosystem All. v. FWS*,
475 F.3d 1136 (9th Cir. 2007) ... 7
*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ... 3
*Okanogan Highlands All. v. Williams*,
236 F.3d 468 (9th Cir. 2000) ... 3

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
957 F.3d 1024 (9th Cir. 2020) .......... 3, 7, 18, 19, 22, 24, 25
*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) .......... 36
*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
145 S. Ct. 1497 (2025) .......... 4, 5, 7, 26, 27, 30, 31
*Union Oil Co. Of Cal. v. Smith*,
249 U.S. 337 (1919) .......... 2
*United States v. Backlund*,
689 F.3d 986 (9th Cir. 2012) .......... 11
*United States v. Weiss*,
642 F.2d 296 (9th Cir. 1981) .......... 3
*Wakkary v. Holder,*
558 F.3d 1049 (9th Cir. 2009) .......... 17
*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .......... 25, 26, 27
*Wilderness Ass'n v. U.S. Forest Serv.*,
496 F. Supp. 880 (D. Mont. 1980) .......... 11
*Wilderness Soc'y v. Tyrrel,*
918 F.2d 813 (9th Cir. 1990) .......... 19

**Statutes**

16 U.S.C. § 1536(a)(2) .......... 5
16 U.S.C. § 1536(b)(3)(A) .......... 5
16 U.S.C. § 1536(b)(4) .......... 5
16 U.S.C. § 1604(a) .......... 3
16 U.S.C. § 1604(i) .......... 18
16 U.S.C. § 551 .......... 2
30 U.S.C. §§ 21-54 .......... 2
30 U.S.C. §§ 23, 26, 35, 36, 42 .......... 2
30 U.S.C. §§ 601 .......... 14, 15
42 U.S.C. § 4332(2)(C) .......... 3, 4
43 U.S.C. § 1701(a)(8) .......... 11
43 U.S.C. § 1702(e) .......... 11
5 U.S.C. § 706(2)(A) .......... 7
6 U.S.C. § 478 .......... 12

**Regulations**

36 C.F.R. § 219.15 (2012) .......... 18
36 C.F.R. § 219.15(d) .......... 18
36 C.F.R. § 228.1 .......... 3, 10, 14
36 C.F.R. § 228.12 .......... 10, 11
36 C.F.R. § 228.2 .......... 8, 9
36 C.F.R. § 228.4(a) .......... 6
36 C.F.R. § 251.50(a) .......... 11
36 C.F.R. § 294.25(b) .......... 16, 17

36 C.F.R. § 294.28(d) .......... 25
36 C.F.R. 228.3(a) .......... 8, 10, 12, 14
36 C.F.R. 228.8(f) .......... 17
36 C.F.R. 251.53(l)(4) .......... 15, 16
36 C.F.R. Part 228 Subpart C .......... 13
50 C.F.R. § 402.02 .......... 38
50 C.F.R. § 402.14 .......... 5
50 C.F.R. § 402.14(i) .......... 5, 42
50 C.F.R. § 402.14(i)(1) .......... 34, 38
50 C.F.R. § 402.16 .......... 34
50 C.F.R. § 424.02 .......... 46

**Other Authorities**

73 Fed. Reg. 61 (Oct. 16, 2008) .......... 17

## TABLE OF ACRONYMS

| | |
|---|---|
| AADT | Average Annual Daily Traffic |
| BiOp | Biological Opinion |
| DEIS | Draft Environmental Impact Statement |
| EMMP | Environmental Monitoring and Management Plan |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FWS | U.S. Fish and Wildlife Service |
| IDEQ | Idaho Department of Environmental Quality |
| ITS | Incidental Take Statement |
| MMP | Modified Mine Plan |
| MPC | Management Prescription Category |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| RCA | Riparian Conservation Area |
| ROD | Record of Decision |
| RPM | Reasonable and Prudent Measures |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SFSR | South Fork Salmon River |
| SODA | Spent Ore Disposal Area |
| SOF | Statement of Facts |
| T&C | Terms and Conditions |

## I. INTRODUCTION

The Stibnite mining area about fifty miles northeast of the town of Cascade in central Idaho has a long history of mining activity dating to the late nineteenth century that left behind open pits, underground shafts, tailings facilities, spent ore disposal areas, and other legacy features. Mining in the area has been dormant for the last thirty years but Perpetua Resources Idaho, Inc. (Perpetua), which now holds various mining claims and mill sites in the area, proposes to resume mining operations for gold, silver, and antimony (a critical mineral). This requires review and approval of a mining plan of operations by the U.S. Forest Service under applicable regulations. Perpetua submitted its first plan of operations for Forest Service consideration in 2016 followed by amended plans over the years that reduced the potential environmental effects of its mining operations, culminating in a 2021 Modified Mine Plan (2021 MMP). Following extensive review and analysis, the Forest Service decided to approve a modified plan in January 2025 (Project).

Shortly thereafter, Plaintiffs sued challenging the Project under various mining laws and regulations, the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA). Plaintiffs' claims are not well founded. They misinterpret and misapply the various mining laws and regulations, misunderstand the governing forest plans and the Forest Service's analyses showing compliance with those plans, ignore the detailed analyses in the final environmental impact statement (FEIS) while misapplying the substantial deference afforded those analyses, and fail to acknowledge (much less seriously engage with) the detailed analyses of potential effects to ESA-listed species that were iteratively developed over years and are discussed in the biological opinions prepared by the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS). For the reasons below, the Court should grant summary judgment for Federal Defendants.

## II. BACKGROUND

### A. Legal Background

#### 1. Mining Law of 1872, Forest Service Organic Act of 1897, and Part 228A Regulations

The Mining Law of 1872 (Mining Law) gives "an express invitation to all qualified persons to explore the lands of the United States for valuable mineral deposits." *Union Oil Co. Of Cal. v. Smith*, 249 U.S. 337, 346 (1919); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv. (Rosemont)*, 33 F.4th 1202, 1208 (9th Cir. 2022) ("Section 22 of the Mining Law provides that public land shall be 'free and open' for citizens to 'explor[e]' for 'valuable mineral deposits.'" (quoting 30 U.S.C. § 22)); 30 U.S.C. §§ 21-54. The Mining Law also authorizes qualified persons to stake or "locate" mining claims and mill sites on federal lands that are open to the operation of the Mining Law. 30 U.S.C. §§ 23, 26, 35, 36, 42.

The Forest Service Organic Act of 1897 imposes a dual mandate on the Forest Service to protect National Forests while allowing mineral exploration and development under the Mining Law. On one hand, the Forest Service must regulate the occupancy and use of national forests and preserve them from destruction. 16 U.S.C. § 551. On the other, the Organic Act reapplied federal mining law to National Forest System (NFS) lands to reopen them "to entry under the existing mining laws of the United States," and provided that notwithstanding any of the other provisions of the Organic Act, NFS lands "shall continue to be subject to such location and entry." *Id.* § 482. To facilitate this reapplication of mining laws to NFS lands, § 551 provides that the Organic Act "shall not be construed as prohibiting" entry upon "national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof," but those who enter national forests for these purposes "must comply with the rules and regulations covering such national forests." *Id.* § 478. These provisions "evidence the important and

competing interest[s]" of forest preservation and mineral development, and "allow the Forest Service to adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of [] claims for mining purposes." *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 478 (9th Cir. 2000).

The Forest Service adopted such reasonable regulations by promulgating Part 228A regulations pursuant to its authority under the Organic Act. *See United States v. Weiss*, 642 F.2d 296, 298 (9th Cir. 1981); 36 C.F.R. §§ Part 28, Subpart A. These regulations "set forth rules and procedures through which use of the surface of National Forest System lands in connection with the operations authorized by the United States mining laws . . . shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1.

**2. National Forest Management Act**

NFMA governs the Forest Service's administration and management of national forests. It is primarily a planning statute, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30, 736 (1998), and requires the Forest Service to develop a Land and Resource Management Plan, known as a "forest plan," for each national forest, 16 U.S.C. § 1604(a). Individual projects must be consistent with the forest plan. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F3d 1105, 1109-10 (9th Cir. 2018) (citing 16 U.S.C. § 1604(i)). In reviewing forest plan consistency under NFMA, courts may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (citations omitted).

3. **National Environmental Policy Act**

NEPA requires a federal agency to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C); *see also id.* § 4336e(6) (defining EIS as "a detailed written statement that is required by section 4332(2)(C) of this title."). An EIS must assess the "reasonably foreseeable environmental effects of the proposed agency action" and "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." *Id.* § 4332(C)(i), (iii). "NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute that [in some instances] . . . requires an agency to prepare an EIS—in essence, a report." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1507 (2025). And in preparing that report, "an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id.* "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.*

"The limited scope of NEPA also circumscribes the scope of judicial review." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, --- F.4th ---, 2025 WL 2460946, at *3 (9th Cir. Aug. 27, 2025). The Supreme Court recently emphasized that "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty.*, 145 S. Ct. at 1514. To do this, judicial review of an agency's EIS "must account for the fact that NEPA is a *purely procedural statute*." *Id.* at 1511. "So when reviewing an agency's EIS, the only role for a court is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* (citation modifed). In engaging in this review, "a court should afford substantial deference" to an agency's identification and analysis of "significant environmental impacts and feasible alternatives" because such decisions require an agency to "make predictive and scientific judgments in assessing the relevant impacts (what are the likely impacts; do they rise to the level of 'significant'?) and alternatives (what are the potential

alternatives; are they really 'feasible'?)." *Id.* at 1512. If they "fall within a broad zone of reasonableness," courts must defer to an agency's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 1513. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 1515.

**4. Endangered Species Act**

ESA Section 7(a)(2) requires federal agencies to consult either FWS or NMFS whenever a proposed federal action "may affect" a threatened or endangered species or designated critical habitat. Consultation ensures that any action authorized, funded, or carried out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). At the end of formal consultation, the expert wildlife agency (NMFS or FWS) issues a "biological opinion" (BiOp) that details "how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14. If determined that the action will not violate Section 7(a)(2), the agencies provide an incidental take statement (ITS) that specifies the amount or extent of take, reasonable and prudent measures (RPM), and terms and conditions (T&C). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

**B. Factual Background**

Mining activities in the Stibnite area located about fifty miles northeast of Cascade, Idaho, date to the late nineteenth century. Stmt. of Facts (SOF) ¶ 1. The extensive mining in the area throughout the twentieth century produced large quantities of gold and antimony. *Id.* ¶ 1-6. This largely unregulated mining also left behind an extensive legacy of "underground mine workings, multiple open pits, development rock dumps, mill tailings deposits, cyanidation heap leach pads, neutralized (spent) heap leach ore piles, a mill and smelter site, three town sites, camp sites, a

washed-out earthen dam (with its associated erosion and downstream sedimentation), haul roads, an abandoned water diversion tunnel, an airstrip, and other disturbances." *Id.* ¶ 7. The historic mining also altered stream configurations and habitat, including preventing fish passage on the East Fork of the South Fork Salmon River (SFSR) upstream of the Yellow Pine pit. *Id.* ¶ 7.

Despite the large quantity of gold and antimony already produced from the area, vast stores of minerals remain. *Id.* ¶ 31. Perpetua owns lands in the area and holds mining claims and mill sites on lands owned by the United States and managed by the U.S. Forest Service on the Boise and Payette National Forests. *Id.* ¶¶ 8, 13; FS403905-10. Access to those claims requires crossing both national forests. FS403919.

As required by Forest Service regulations, Perpetua submitted a mine plan of operations to the Forest Service in 2016 for approval of surface use in connection with mining and processing of gold, silver, and antimony in the Stibnite area. SOF ¶ 8; 36 C.F.R. § 228.4(a). This triggered a yearslong process during which the Forest Service assessed the potential environmental effects of the proposed operations, Perpetua submitted amended plans of operations that reduced those potential effects, the public commented on the various proposals, and the Forest Service consulted with FWS and NMFS under the ESA. SOF ¶¶ 9-12. This extensive process resulted in a nearly 3,000-page FEIS that assessed the 2021 MMP's potential environmental effects under NEPA and BiOps from FWS and NMFS that found the proposed operations would not jeopardize any ESA-listed species. *Id.* ¶¶ 11-12.

Based on these analyses and an extensive administrative record, the Forest Service decided to approve a mine plan of operations with modifications (Project) as set forth in the January 2025 record of decision (ROD). *Id.*¶ 13. The Project authorizes around 3 years of construction activities (including construction of the environmentally preferable Burntlog access route), *id.* ¶¶ 14, 16-23;

15 years of mine operations, *id.* ¶¶ 14, 24-31; and 5 years of closure and reclamation activities, *id.* ¶ 14, 32. It also authorizes mineral exploration during much of this time. *Id.* ¶¶ 14, 33.

All told, the Project would produce an estimated 4.2 million ounces of gold, 1.7 million ounces of silver, and 115 million pounds of antimony. *Id.* ¶ 31. The Project would confer substantial economic benefits on the surrounding area and the State of Idaho by creating numerous well-paying jobs and contributing to the tax base for many years. *Id.* The antimony the Project will produce is a critical mineral with various Department of Defense applications for which no domestic production alternative exists. *Id.* And it will do all this while also, among other things, reclaiming the Yellow Pine pit to reestablish fish passage to the upper reaches of the East Fork SFSR and restoring stream channels and wetlands in the Project area. *Id.* ¶¶ 32.

## III. STANDARD OF REVIEW

Plaintiffs' claims are reviewed under the Administrative Procedure Act. *See Rosemont*, 33 F.4th at 1216 (mining laws and regulations); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (NEPA and NFMA); *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) (ESA). A court may set aside an agency action only if it determines the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*, 145 S. Ct. at 1511. An agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider," failed to consider important factors, offered an explanation inconsistent with the record, or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Or. Nat. Desert Ass'n*, 957 F.3d at 1033. This standard of review is highly deferential, presuming the agency action to be valid." *Nw. Ecosystem All.*, 475 F.3d at 1140 (citation modified).

## IV. ARGUMENT

### A. The Forest Service Authorized the Project Under the Proper Legal Authorities.

The Project includes numerous operations—from early site preparation and infrastructure development to post-mining reclamation—that are necessary surface uses of NFS lands in connection with Perpetua's mining operations for minerals subject to disposal under the Mining Law. Those operations were analyzed and approved by the Forest Service in its nearly 3,000-page FEIS and detailed ROD. Plaintiffs repeatedly mischaracterize (or ignore) key regulatory provisions to argue that the Forest Service misapplied its regulations to three proposed Project operations: (1) construction of the Burntlog Route, (2) use of borrow pits for road construction and maintenance, and (3) Idaho Power Company's upgrade of existing transmission lines and installation of new infrastructure to support the Project. Pls.' Opening. Br. in Supp. of Mot. for Sum. J. (Pls.' Br.) 6-16, Dkt. No. 31-2. But relevant authorities make clear that the Forest Service properly applied its regulations implementing the Organic Act, Mining Law, and Idaho Roadless Rule.

#### 1. The agency properly analyzed the Burntlog Route under Part 228 Subpart A.

The Forest Service's Part 228A regulations explicitly include access roads in the definition of operations conducted under the Mining Law. 36 C.F.R. § 228.2. The regulations "apply to *operations* hereafter conducted under the United States mining laws." *Id.* (emphasis added). And they define "operations" as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, *including roads and other means of access* on lands subject to the regulations in this part, regardless of whether said operations take place on or off mining claims." *Id.* § 228.3(a) (emphasis added). The Burntlog Route, a "mine access road operated by the Stibnite Gold Project for the duration of the project," FS420797, falls squarely within this definition and was properly analyzed and approved under the 228A regulations as a component of the Project.

**a. The Burntlog Route is the sole selected access route for the Project.**

The Burntlog Route is the sole and primary[1] access route the Forest Service approved for the Project after considering two access alternatives. FS420804 ("[u]se of the Burntlog Route for mine access is superior to alternative routes"); FS420806 (listing reasons for *not* selecting the Johnson Creek Route Alternative). While the Burntlog Route is "new" in that previous mining operations in the area have used the Johnson Creek Route for access, "[o]nce construction of the Burntlog Route has been completed (2-3 years), the Johnson Creek Route would no longer be used by mine-related traffic." FS243748. Plaintiffs mischaracterize the Burntlog Route as a "secondary" route that will be used *in addition to* the existing route and is thus unnecessary. Pls.' Br. 10. But the Forest Service selected the Burntlog Route *instead of* the Johnson Creek Route because the Burntlog Route would best minimize public health and safety hazards, potential for contamination and sedimentation in streams, and impacts to riparian, aquatic, and timber resources. SOF ¶ 22.

Indeed, the existing Johnson Creek Route could not be used for long-term Project access in its current condition. Such use "would require extensive upgrades to both Johnson Creek Road and Stibnite Road," FS243647, upgrades that would impact the environment and various resource values, FS243854. But under the Project, Perpetua will only use the Johnson Creek Route until the Burntlog Route has been constructed, so the Johnson Creek Route will not undergo the significant upgrades that would be required if it were selected as the long-term access route for the Project. *Id.* Plaintiffs imply that the Johnson Creek Route Alternative requires no additional road construction or ground disturbing work. *See* Pls.' Br. 8. Both route alternatives, however, would require upgrades and reconstruction of existing routes. SOF ¶¶ 17-20.

---

[1] Under the Project, portions of the Johnson Creek Route will be used for mine access while the Burntlog Route is being constructed, FS243749, or in case of emergency, FS420774, but it will not be used for mine access concurrently with the Burntlog Route.

**b. The 228A regulations expressly govern access for mining operations.**

"[R]oads and other means of access" are expressly listed as mining "operations" governed by the 228A regulations. 36 C.F.R. §§ 228.1, 228.3(a). Operators on NFS lands are "entitled to access in connection with operations," but must propose an access method in a plan of operations and receive written approval from the agency specifying "the location of the access route, design standards, means of transportation, and other conditions reasonably necessary to protect the environment and forest surface resources." *Id.* § 228.12. The regulations also require "[a]ll operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources," *id.* § 228.8, and include road requirements, *id.* § 228.8(f) .

Here, the Forest Service properly applied the governing access provision, *id.* § 228.12, and the requirement to ensure access roads "minimize adverse environmental impacts," *id.* § 228.8. The agency thoroughly considered the environmental effects of two potential access routes to facilitate mine operations and selected the alternative it determined would minimize public health and safety hazards, reduce potential for contamination and sedimentation in streams, and reduce impacts to riparian, aquatic, and timber resources. SOF ¶ 22; FS243867-68; FS246628-715. The ROD explains the rationale for that decision, FS420803-05, and illustrates that the agency selected the Burntlog Route not because it believed "Perpetua simply had the right under the 1872 Mining Law to build this second access road," *see* Pls.' Br. 9-10, but after determining the Burntlog Route best balanced Perpetua's need for access to its proposed operations with important environmental, safety, and resource concerns. And, as required by 36 C.F.R. § 228.12 and § 228.8(f), the Forest Service's written approval specified the environmental design features and resource protection measures associated with the selected Burntlog Route. *See, e.g.*, FS420850 (design features to reduce stream sedimentation); FS420853-54 (fish passage and aquatic resource mitigation measures); FS420863 (requirement for sediment control and snow removal measures to prevent

erosion); FS420865 (speed limit for resource protection); FS420871 (road decommissioning).

Plaintiffs conspicuously ignore the access provision at 36 C.F.R. § 228.12, which directly undermines their unsupported assertion that "access rights to mining claims . . . are governed by an easement-by-necessity analysis." Pls.' Br. 10. The 228A regulations plainly provide for an access right and the process by which such access (and reasonable regulation of that access by the Forest Service) should be effected. 36 C.F.R. § 228.12. This access provision in the 228A regulations renders an easement-by-necessity analysis inapplicable here.[2]

Moreover, the Part 251 regulations that Plaintiffs urge the Court to apply instead expressly state that "special uses" covered by those regulations do *not* include uses "authorized by the regulations governing . . . minerals (part 228)." 36 C.F.R. § 251.50(a).[3] The Burntlog Route was proposed and approved specifically for mining operations, and the Part 251 regulations expressly exclude mining activities. *See United States v. Backlund*, 689 F.3d 986, 997 (9th Cir. 2012) ("all uses of National Forest System lands, *except certain expressly enumerated activities such as mining*, require special use authorization" (citing 36 C.F.R. § 251.50(a)) (emphasis added)).

Under Plaintiffs' reasoning, the existence of *any* route previously used to access an area containing a mining claim automatically removes future access proposals from the purview of the

---

[2] Courts have recognized an easement by necessity burdening federal land in other contexts, *see* Pls.' Br. 10 (citing *McFarland v. Kempthorne*, 545 F.3d 1106 (9th Cir. 2008) (involving access under the Homestead Act); *Mont. Wilderness Ass'n v. U.S. Forest Serv.*, 496 F. Supp. 880 (D. Mont. 1980) (logging access)), but such analysis is irrelevant where the 228A regulations apply.

[3] Plaintiffs mischaracterize the Forest Service's Part 251 regulations as "implementing FLPMA Title V." Pls.' Br. 8. The Federal Land Policy and Management Act of 1976 (FLPMA) indeed authorizes certain rights-of-way across federal land that parties may apply for through the Forest Service's Part 251 regulations (like Idaho Power's transmission line in this case, *see* Part IV.A.3, *infra*). But FLPMA's public lands provisions—including the Congressional declaration of policy Plaintiffs cite, *see* Pls.' Br. 7 (citing 43 U.S.C. § 1701(a)(8))—do not apply to NFS lands. 43 U.S.C. § 1702(e) (defining "public lands" for purposes of FLPMA as lands "administered by the Secretary of the Interior through the Bureau of Land Management").

228A regulations and places them under the Part 251 regulations. *See* Pls.' Br. 10-11. But nothing in the regulations, let alone the Mining Law, supports this novel argument (for which Plaintiffs provide no legal authority). And such an interpretation would hinder the Forest Service's authority to, as it did here, select an access route that best minimizes impacts to NFS resources.

**c. Nothing in *Rosemont* renders Part 228A inapplicable to access routes.**

Finally, Plaintiffs mischaracterize the Ninth Circuit's holding in *Rosemont* to suggest that approval of the Burntlog Route is "outside the bounds of the Mining Law of 1872." Pls.' Br. 11. Nothing in *Rosemont* supports this argument.

*Rosemont* involved the Forest Service's approval of a plan of operations for an open pit copper mine in Arizona that allowed the operator to place 1.9 billion tons of tailings and waste rock in facilities on NFS lands. The Ninth Circuit held that the Forest Service could not base its approval of waste rock placement on: (1) a purported right under the Surface Resources and Multiple Use Act of 1955; and (2) the theory that the operator held valid mining claims on the lands where the waste rock would be placed. 33 F.4th at 1208, 1218-24.

The Ninth Circuit did *not* address whether the 228A regulations could authorize uses reasonably incidental to mining that occur on lands not subject to "valid" mining claims. *See id.* at 1224. And the Ninth Circuit did not hold (as Plaintiffs erroneously suggest) that the 228A regulations apply only to activities expressly listed in the Mining Law.[4] *See* Pls.' Br. 11. In fact, the *Rosemont* district court described access ("ingress to and egress from a claim") as an example of an activity "authorized" under both the Organic Act, 6 U.S.C. § 478 (which expressly addresses

[4] Because access routes are not mentioned by name in the statute, such an interpretation would directly conflict with the 228A regulations' definition of covered operations as "including roads and other means of access . . . regardless of whether said operations take place on or off mining claims." 36 C.F.R. 228.3(a). Plaintiffs have not challenged the validity of the 228A regulations.

access for operations under the Mining Law) and the Mining Law, even though it is not explicitly mentioned in the statute. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 409 F.Supp.3d 738, 758-63 (D. Ariz. 2019). *Rosemont* simply offers no support for Plaintiffs' novel argument that mining access roads are not "authorized by the mining laws." Pls.' Br. 11.

**2. The Forest Service properly analyzed construction of borrow sites along the Burntlog Route as part of Project operations.**

The Project includes the construction of up to eight "borrow sites" along the Burntlog Route to support road construction and maintenance. SOF ¶ 20; FS226443 (noting borrow sites will also support decommissioning following mine closure); FS226499 (explaining most borrow material will come from existing sources but some other soil, sand, and gravel will be required). Plaintiffs refer to the borrow sites as "gravel mines" in an effort to portray them as separate, unrelated mining activities that must be analyzed under separate regulations. Pls.' Br. 12-13. But the Project does not authorize the establishment of gravel mines from which Perpetua will sell or otherwise dispose of sand, soil, and gravel under the 36 C.F.R. Part 228 Subpart C regulations Plaintiffs cite.[5] Rather, these borrow sites are for construction and maintenance of the Project access route, and the materials extracted from the sites will be used only for that limited purpose. None of the material from these sites will leave NFS lands. *See, e.g.*, FS243745 (explaining materials generated "from the new construction of the Burntlog Route would be stockpiled in the borrow source areas used for construction and widening of the route and in windrows along the edges of fill slopes"); FS245144 (identifying potential borrow sites for rock to be used during road construction and sand for road maintenance during operations).

[5] Indeed, the Forest Service specifically clarified in its FEIS Errata that the agency "intends to oversee the use of proposed borrow pits intended for construction of the Burntlog Route *under 36 C.F.R Subpart 228A*," not Subpart 228C, and "the overall disturbance area and environmental effects of these borrow sites is included in the [Supplemental Draft EIS (SDEIS)]." FS404062.

Accordingly, like the Burntlog Route, these borrow sites are properly authorized as "operations" under the 228A regulations, as the construction and use of the borrow sites constitute "work[] and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, including roads and other means of access." 36 C.F.R. § 228.3(a). The agency properly analyzed the potential environmental effects of the borrow sites and other project activities under its 228A regulations. *See* FS244576-77; FS244593; FS245031; FS246233. This was consistent with the purpose of the 228A regulations, to regulate surface use of NFS lands in connection with mining operations "so as to minimize adverse environmental impacts on NFS surface resources." 36 C.F.R. § 228.1.

Plaintiffs' argument that the Part 228C regulations apply to the Forest Service's approval of borrow sites in the mining plan is factually and legally wrong, resting wholly on their inaccurate description of the borrow sites as "gravel mines." Pls.' Br. 12-13. The 228C regulations cover the "disposal of mineral materials" from NFS lands by sales contracts or free use permits to qualifying entities. 36 C.F.R. Subpt. C § 228.41. "Mineral materials" include "petrified wood and common varieties of sand, gravel, stone, pumice, pumicite, cinders, clay, and other similar materials." *Id.* And the 228C regulations derive from different statutory authority than the 228A regulations: the Materials Act of July 31, 1947, 30 U.S.C. §§ 601 *et seq*, as amended. The Forest Service has not authorized "disposal" of mineral materials for sale, nor did Perpetua propose operations covered by the Materials Act. Plaintiffs misstate the law to the extent they argue *any use* of gravel, sand, soil, or similar materials as reasonably incident to Project operations requires approval under the 228C regulations covering the sale and disposal of such materials, *see* Pls.' Br. 13 (acknowledging the 228C regulations "establish a process for the Forest Service to contract *for the sale of such materials*" (emphasis added)). Indeed, Plaintiffs offer no legal support for that claim.

And Plaintiffs are factually wrong in characterizing the Forest Service's action as approving a "gravel mine." *Id.* Perpetua has not proposed to mine, sell, or otherwise dispose of gravel or other mineral materials, and nothing in the ROD authorizes Perpetua to remove any such materials from NFS lands for disposal. Rather, Perpetua proposed a plan of operations that includes construction of an access route (Part I.A, *supra*) with the reasonably incidental use of soil, sand, and gravel on NFS lands. The agency properly reviewed such use under the 228A regulations.

**3. The FEIS assessed the effects of a special use authorization for Idaho Power Company's transmission line but the permit has not issued.**

The 2021 MMP proposes that Idaho Power Company "rebuild or construct 72.8-miles of transmission line and associated facilities," FS243754, and the FEIS notes that Forest Service authorizing officials will need to decide "whether to authorize the power transmission line under the regulations governing special use authorizations at 36 C.F.R. 251.53(l)(4)." FS243709. Plaintiffs appear to agree that the Forest Service's Part 251 regulations apply to the proposed special use authorization for Idaho Power to construct and operate the transmission line. *See* 36 C.F.R. § 251.53(l)(4) (covering permits, leases, and easements under FLPMA for rights-of-way for "systems and related facilities for . . . transmission . . . of electric energy"). They object only to perceived final "approval" of that special use through the ROD. Pls.' Br. 14. But Plaintiffs' argument that the Forest Service violated the Part 251 regulations by "jump[ing] the gun and approv[ing] the special use authorization for the transmission line right-of-way before it even had an application," *id.* at 15, misunderstands the approval process. The agency did not authorize Idaho Power to construct a new transmission line by approving the Project. Such authorization would come only after review and approval of an application by Idaho Power. Idaho Power submitted such an application in February 2025, which the Forest Service is processing. FS421637-882.

To be sure, based on detailed proposals submitted by Perpetua, the Forest Service analyzed

potential effects of the proposed transmission line in the FEIS and supporting documents. *See* FS243754-68 (FEIS transmission line description); FS244469-5199 (FEIS Chapter 4); FS171523-694 (2017 Plan of Development); FS358575-760 (2021 Revised POD). Additionally, while the Forest Service has not yet issued the special use authorization and right-of-way, the ROD includes environmental design features and mitigation measures for the transmission line. *See, e.g.*, FS420795 (mitigation measure VEG-7); FS420846 (avian protection in Table 6 of environmental design features); FS420867 (Northern Idaho ground squirrel habitat); FS420870 (Whitebark pine restoration); and FS420874 (transmission line disturbance reclamation). And the ROD explains that "the power transmission line is proposed as part of the [2021 MMP] and therefore its environmental effects are being analyzed in the FEIS because it is part of the proposed Selected Alternative. As proposed it appears consistent with the special use authorization regulations at 36 C.F.R. 251.53(l)(4)." FS420805. While some phrasing might inadvertently suggest that the ROD includes a final decision on the special use authorization, *see* Pls.' Br. 14 (quoting FS420773), the ROD notes that the agency's assessment of the transmission line's consistency with the Part 251 regulations is subject to review of the forthcoming (now pending) application. *See* FS420805.

In short, the Forest Service properly analyzed the potential effects of the proposed transmission line in its FEIS and ROD, and its forthcoming decision on Idaho Power's application will comply with all applicable regulations. Any allegations to the contrary are premature, and the Court should reject Plaintiffs' claim that the agency has already authorized the transmission line.

**4. The Idaho Roadless Rule's exception for mineral activities applies to the Forest Service's approval of Project activities.**

The Idaho Roadless Rule expressly exempts mining operations from the Forest Service's Idaho Roadless Area Management rules. 36 C.F.R. § 294.25(b) ("nothing in this subpart shall affect mining activities conducted pursuant to the General Mining Law of 1872"). Plaintiffs

acknowledge this exception, as they must, but attempt to downplay its relevance with their familiar refrain that "extensive off-site infrastructure" is not authorized by the Mining Law. Pls.' Br. 16. This argument fails for the same reasons stated above. Indeed, Plaintiffs' extremely narrow interpretation of the Roadless Rule's "mining activities" exemption would render it meaningless, since they argue that activities like access routes and transmission line construction can never be conducted "pursuant to" the Mining Law since the statute does not list such activities by name. *Id.* An "exception" that allows mining operations in inventoried roadless areas, but not the associated and necessary access and utilities that make a mining operation possible, is no exception at all.

Plaintiffs' recitation of the general purposes from the Roadless Rule's preamble, Pls.' Br. 15, does not help them because the broad aims of the Rule do not override its express exemption for "mining activities conducted pursuant to" the Mining Law. *Compare* 73 Fed. Reg. 61,456, 61,459 (Oct. 16, 2008) (preamble stating general goals of the Roadless Rule), *with* 36 C.F.R. § 294.25(b) (specifying exception for mining activities).[6] "Prefatory language to a regulation, although often informative, does not have the same binding force as do the regulations themselves." *Wakkary v. Holder,* 558 F.3d 1049, 1058 n.4 (9th Cir. 2009). Plaintiffs also invoke an inapposite case that involved application of the 2001 Roadless Rule to a Forest Service timber harvest project—not the Idaho Roadless Rule or its relevant exception for mining activities. The Forest Service properly determined that the Project complied with the Idaho Roadless Rule.

B. **The Project Complies with NFMA.**

The Project area spans portions of the Boise and Payette National Forests, SOF ¶ 8, so

[6] The preamble also makes clear that the purpose of the exemption in § 294.25(b) was not to avoid the protections under the Idaho Roadless Rule, but to avoid duplication of the 228A regulations, which already offer environmental protection and regulation of surface use of NFS lands in relation to mining operations. *See* 73 Fed. Reg. 61,469 (noting Forest Service "has separate requirements relating to road construction and maintenance for locatable minerals at 36 C.F.R. 228.8(f) that adequately provide for these protections").

NFMA requires that the Project be consistent with the standards in both Forest Plans. NFMA does not require the Forest Service to "analyze and show" that an action (let alone each and every sub-component of that action) conforms to applicable forest plan provisions. *Or. Natural Desert Ass'n*, 957 F.3d at 1033. Rather, NFMA requires a project to be consistent with the forest plan, 16 U.S.C. § 1604(i), and Forest Service regulations call for project consistency to be documented in the decision. 36 C.F.R. § 219.15(d). The Forest Service did so here. FS420812 (finding Project consistent with the Payette and Boise Forest Plans and noting "consistency evaluations" are available in the project record); FS403959-4033 (Consistency Review).

**1. Plaintiffs mischaracterize the Forest Service's obligations under NFMA.**

At the outset, Plaintiffs argue that the Forest Service's approval of the Project was inconsistent with two forest plan standards governing mineral and geology resource activities in Riparian Conservation Areas (RCAs). Plaintiffs claim, without legal support, that NFMA requires the agency to individually document alternative locations for each individual segment of the many dozens of roads crossing through an RCA or any portions of structures and facilities located in RCAs. Pls.' Br. 18-19. But such a granular documentation requirement cannot be found in NFMA, Forest Service regulations implementing NFMA, or binding case law.

The only case Plaintiffs cite for support, *Hells Canyon Preservation Council v. Haines*, does not support their novel interpretation of NFMA's requirements. *See* Pls.' Br. 18-19 (citing *Hells Canyon,* No. CV-05-1057-PK, 2006 WL 2252554, *7-10 (D. Or. 2006)). For one thing, the Oregon district court's non-binding opinion in *Hells Canyon* predates the 2012 Forest Service regulations requiring only project-level documentation of an agency's consistency determination, not written analysis or separate determinations for every project component. 36 C.F.R. § 219.15 (2012). *Hells Canyon* also predates the Ninth Circuit's recent confirmation that agency actions must be consistent with forest plans, but agencies need not "analyze and show" such consistency

in NEPA documents. *Or. Natural Desert Ass'n*, 957 F.3d at 1033 (substantive NFMA violations may be "contained within written analyses required by [NEPA]," but "NFMA and the APA, on their own, [do not] require the Forest Service to 'analyze and show,' in a contemporaneous written document, that each of its actions conform to the applicable forest plan").

Moreover, the record in this case is easily distinguishable from *Hells Canyon*, where the court found the Forest Service's consistency determination for a forest plan mining standard was insufficient because the agency had erroneously concluded that the standard did not apply at all to the location of certain roads and settling ponds. 2006 WL 2252554, at *8-9. Such "semantic argument[s]" informed the court's conclusions in *Hells Canyon*, but are not at issue here. *See id.* And, in any event, the Ninth Circuit has since cautioned that courts "are not free to impose on the agency [their] own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Lands Council*, 537 F.3d at 993 (citation modified). Nor may courts impose "procedural requirements [not] explicitly enumerated in the pertinent statutes." *Wilderness Soc'y v. Tyrrel,* 918 F.2d 813, 818 (9th Cir. 1990).

The Forest Service fulfilled its procedural obligation under NFMA to document overall Project consistency with governing forest plan provisions. As described below, the agency also fulfilled its substantive obligation to ensure such consistency. Plaintiffs fail to present any purportedly overlooked alternative and ignore all the alternatives the Forest Service did consider in attempting to site the Project's many components outside RCAs. Indeed, given the robust record on which the Forest Service based its determination, Plaintiffs cannot prove the agency made a "clear error in judgment." *Or. Nat. Desert Ass'n*, 957 F.3d at 1035 (citation omitted).

**2. The Project is consistent with MIST08.**

The Boise and Payette National Forests' Mineral and Geology Resources Standard 8 (MIST08) requires the Forest Service, when approving new site-specific projects, to:

> Locate new structures, support facilities, and roads outside RCAs. Where no alternative to siting facilities in RCAs exists, locate and construct the facilities in ways that avoid or minimize degrading effects to RCAs and streams, and adverse effects to [threatened, endangered, proposed, and candidate] species [under the ESA]. Where no alternative to road construction in RCAs exists, keep roads to the minimum necessary for the approved mineral activity. Close, obliterate, and revegetate such roads if no longer required for mineral or other management activities.

FS003304 (Payette Forest Plan); FS001328 (Boise Forest Plan). The Forest Service rationally concluded that the Project is consistent with MIST08 because the Project identifies "reasonable locations for access, processing, and disposal facilities outside of RCAs, wherever possible," and "[u]navoidable effects are mitigated via the activities in the Compensatory Mitigation Plan." FS403996. Numerous analyses either conducted or considered by the Forest Service, and all contained in the record, support this reasoned conclusion.

**a. The agency reasonably concluded the Project could not locate all structures, facilities, and roads outside RCAs.**

The record reveals that the Forest Service considered numerous Project alternatives but identified no feasible alternative that would locate all new structures, support facilities, and roads outside RCAs. Mining activities approved under the Project will take place across approximately 3,266 acres, *see* FS420774, approximately 918 of which are mapped as RCAs. FS244805; FS244807. This overlap between the Project area and RCAs demonstrates that it was reasonable (and not "clear error") for the Forest Service to conclude, after considering more than 20 alternatives, that some Project components could not be sited outside RCAs.

As discussed in relation to Plaintiffs' NEPA claims, *see* Part IV.C.1, *infra*, the Forest Service considered numerous Project alternatives, several of which involved alternative placement of new structures and roads. *See, e.g.*, FS262586 (noting impacts to riparian areas was a significant issue considered in alternatives development). For example, the Forest Service considered an underground mining alternative but determined it would not produce sufficient minerals to meet

the Project's purpose and need nor completely avoid the need for surface disturbance. FS243861. The agency considered three potential alternative locations for the tailings storage facility (TSF), but found those alternatives would have greater or equal impacts to riparian areas than the TSF location in the 2021 MMP. *See* FS243863-64; *see also* FS016950 (technical memo finding phased tailings approach "introduces additional impacts to streams and wetlands").

The Forest Service also considered technical reports assessing the feasibility of alternative siting for the Stibnite Gold Project worker housing facility to address, in part, RCA impacts, FS016895; FS243863, and alternative locations for the reclaimed Meadow Creek, FS016915. And the agency considered different siting options for the transmission line extension and upgrades with various levels of surface disturbance. *See* FS016924 (noting transmission line siting designed "to avoid as many wetland and vegetation impacts as practicable"); FS016938 (describing transmission line alternative that would have greater impacts on RCAs); FS243864.

The record contains technical reports analyzing different access route alternatives and their various levels of impact to RCAs; notably, all alternatives still required some road overlap with RCAs. FS016852 (Johnson Creek Route); FS016861 (Old Thunder Mountain Road and Burnt Log Road); FS016963 (Burntlog Route). Indeed, the Forest Service determined that "[t]he 2021 MMP and the Johnson Creek Route Alternative would result in the same loss of 119.8 wetland acres within the mine site focus area and 618.2 acres of [RCAs]." FS243659. The agency also considered a detailed summary of public access route alternatives, which noted that some overlap with RCAs, was "unavoidable, especially at stream crossings." FS017030.

The record confirms that the Forest Service avoided locating access, processing, and disposal facilities in RCAs wherever possible, FS403996, and that the agency considered a broad variety of siting alternatives for structures, support facilities, and roads before rationally

concluding that no Project alternative could completely avoid siting some new Project facilities and portions of access routes through RCAs. Plaintiffs offer no substantive arguments to the contrary and present no purportedly overlooked alternatives. *See* Pls.' Br. 16-20.

**b. The Forest Service reasonably concluded the Project is consistent with MIST08's mitigation requirements for roads and facilities in RCAs.**

The Project is also consistent with MIST08's direction governing construction of facilities and roads in RCAs when siting alternatives do not exist. FS403996. The Forest Service analyzed in detail the potential effects the Project's roads, structures, and facilities would have on riparian areas in the FEIS, FS244798-820, and the wetlands specialist report, FS225758-891. Then, consistent with MIST08, the Forest Service selected an alternative that included numerous mitigation measures to "avoid or minimize degrading effects to RCAs and streams" and adverse effects to protected species. FS003304; FS001328.

For example, the Project requires exploration roads and drill sites be located in historical use areas where possible to avoid new impacts to RCAs. FS243812. Perpetua is required to divert Meadow Creek around the Hangar Flats pit and reconstruct it "to allow potential for spawning habitat and establishment of riparian habitat within the floodplain." FS243794. The channel would be lined to avoid loss of stream habitat. *Id.* Perpetua must employ specific measures in tailings operations "[t]o prevent tailings consolidation water from mixing with surface water on the cover, potentially leading to water quality impacts if discharged to streams." FS243820.

After operations, Perpetua is required to "restore appropriately designed meandering stream channels" to allow for "post-closure development of riparian habitat." FS243820. Following its closure, the entire surface of the backfilled Hangar Flats pit would be covered and reseeded to establish wetlands, drainages in adjacent upland areas "would be routed to facilitate development of the wetland hydrology," and portions of Meadow Creek "would be enhanced

during mine operations with large woody debris, boulder cluster habitat structures, and riparian plantings." FS243821. And compensatory mitigation measures that address RCAs are also included in the Project. FS420783 (mitigation measures are "conditions of this decision"); FS420638-39; FS382911-3218 (Compensatory Mitigation Plan).

The Burntlog Route was also designed specifically to avoid or minimize degrading effects to RCAs and streams, consistent with MIST08's requirements, by: improving existing road segments to suppress dust, increase stability, and reduce sediment runoff; placing gravel to reduce sedimentation; and installing side-ditching, culverts, guardrails, and bridges with design features to provide fish passage and limit potential sediment delivery to streams. FS243748-853. The agency considered a stream crossing impact analysis for the Burntlog Route. FS016960-7004. And selection of the Burntlog Route is consistent with MIST08 because it minimizes overall effects to RCAs compared to the Johnson Creek alternative. FS420804 (Burntlog "[r]educes acres of riparian area lost within the off-site focus area"); FS003304 (MIST08 requirement that new roads in RCAs be kept "to the minimum necessary for the approved mineral activity.").

After mining operations conclude, road segments in RCAs will be reclaimed as described in the FEIS. FS243821-22 (segments of Burntlog Route that were newly constructed for the Project will be fully decommissioned and reseeded). This is fully consistent with MIST08's requirement that new roads located in RCAs should be "[c]lose[d], obliterate[d], and revegetate[d]" when no longer required for mineral or other management activities. FS003304; FS001328.

The Project's numerous design features and mitigation measures to avoid or minimize degrading effects to RCAs and streams demonstrate compliance with MIST08.

### 3. The Project is consistent with MIST09.

Forest Plan Mineral and Geology Resources Standard 9 (MIST09) requires the Forest Service, when approving new site-specific projects, to "[p]rohibit solid and sanitary waste facilities

in RCAs." FS003305 (Payette Forest Plan); FS001329 (Boise Forest Plan). "If no alternative to locating mine waste (waste rock, spent ore, tailings) facilities in RCAs exists," MIST09 requires the agency to analyze, locate, monitor, reclaim, and bond such mine waste facilities. *Id.*

The Forest Service properly determined that the Project is consistent with the first portion of MIST09 because "no solid or sanitary waste facilities are proposed within RCAs." FS403997. Plaintiffs argue this is a "false assertion" because the TSF is a mine waste facility and is sited within an RCA. *See* Pls.' Br. 19-20. But the plain text of MIST09 distinguishes between "solid or sanitary waste facilities" and "mine waste facilities."[7] FS003305; FS001329. The former is flatly prohibited in RCAs with no exceptions, while the latter may be approved in RCAs if consistent with the five mitigating requirements set forth in MIST09 when mine waste facilities must be located in an RCA. Indeed, the agency noted in response to comments in the FEIS that "MIST09 *also* pertains to the location of waste rock and tailings facilities relative to RCAs, including requirements [to] characteriz[e] materials, predict the release of constituents, monitor facilities, reclaim facilities, and bond facilities." FS246187-88 (emphasis added). Plaintiffs nowhere challenge the Forest Service's thorough analyses of mine waste storage and Project design elements related to that storage, and their claim fails because it misunderstands MIST09 and incorrectly conflates "solid and sanitary waste facilities" with "mine waste facilities."

**4. The Burntlog Route is consistent with the Forest Plan roadless provisions.**

In a brief argument rehashing their meritless Idaho Roadless Rule argument, *see* Part IV.A.4, *supra*, Plaintiffs assert that the Project is inconsistent with the Payette and Boise Forest

[7] The Forest Plans use the term "solid waste" in discussing solid waste disposal for homeowners, *see, e.g.*, FS003493 and waste transfer stations, *see, e.g.*, FS003476. Indeed, the FEIS states: "[s]olid waste from the worker housing facility, shops, and other work areas that cannot be composted or recycled would be collected in wildlife-resistant receptacles and hauled off site for disposal in a municipal waste landfill." FS243805. By contrast, as MIST09 makes clear, "mine waste" consists of "waste rock, spent ore, [and] tailings" produced from the mining operations."

Plans' "standards prohibiting new roads in [inventoried roadless areas] with the exception that 'road construction or reconstruction may only occur where needed to provide access related to reserved or outstanding rights, or to respond to statute or treaty.'" Pls.' Br. 20 (quoting FS003247). Plaintiffs appear to cite the Payette Forest Plan's management prescription category (MPC) 4.1(c), which indeed mirrors the Idaho Roadless Rule's prohibition on new road construction in roadless areas except where necessary for access "related to reserved or outstanding rights." *Id.*

For all the reasons Plaintiffs' Idaho Roadless Rule claim fails, *see* Part IV.A.4, *supra*, Plaintiffs' cursory NFMA claim regarding roadless areas fails too. Plaintiffs fail to show that the Burntlog Route, which the Forest Service selected as the best Project access alternative to minimize adverse environmental impacts, is not "needed" or sufficiently "related to" Perpetua's mining operations. *See* Pls.' Br. 20. Moreover, to the extent Plaintiffs suggest that MPC 4.1(c) somehow limits the exceptions set forth in the Idaho Roadless Rule, the Idaho Roadless Rule clearly states that its provisions "shall take precedence over any inconsistent land management plan component." 36 C.F.R. § 294.28(d). Regardless, both the Idaho Roadless Rule and Forest Plan provisions limiting road construction in roadless areas include express exceptions for access routes, like the Burntlog Route, that provide necessary access to mining operations authorized under the Mining Law. Plaintiffs' perfunctory claims to the contrary are meritless.

**C. The FEIS Complies with NEPA.**

**1. The FEIS considered a reasonable range of alternatives.**

The FEIS explained that the purpose of the agency action was "to consider approval of Perpetua's proposed use of the surface of NFS lands in connection with operations authorized by the U.S. mining laws," and that the need for action arose from Perpetua's submission of its 2021 MMP "to mine and mill gold, silver, and antimony deposits." FS243706. Plaintiffs rightfully do not challenge this statement of purpose and need. *See Westlands Water Dist. v. U.S. Dep't of*

*Interior*, 376 F.3d 853, 866 (9th Cir. 2004) ("Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS."). But they do claim the FEIS should have considered more alternatives. *See* Pls.' Br. 22-25. This claim flouts the substantial deference afforded the Forest Service's identification and consideration of alternatives, and it ignores the FEIS's reasoned explanations for not considering more alternatives in detail because those alternatives would not meet the purpose and need for the action, would not reduce environmental effects over the proposed action, were technologically or economically infeasible, or were duplicative of the alternatives considered.

A court affords "substantial deference" to an agency's range of alternatives determination, *Seven Cnty.*, 145 S. Ct at 1512, employing a "rule of reason" under which an "EIS need not consider an infinite range of alternatives, only reasonable or feasible ones," *Westlands Water Dist.*, 376 F.3d at 868. An agency also need not "undertake a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Id.* And an EIS need not consider "remote and speculative alternatives," nor must it consider alternatives that "extend beyond those reasonably related to the purpose of the project." *Id.*.

In developing alternatives for detailed consideration in the FEIS, the Forest Service applied four screening criteria to determine whether an alternative: (1) met the purpose and need for the action; (2) potentially reduced environmental effects to at least one resource over the proposed action; (3) was technically feasible; and (4) was economically feasible. FS243733. The Forest Service also screened out duplicative alternatives. *Id.* This process resulted in the FEIS considering three alternatives (no action and two action) in detail. FS243733-34. The no-action alternative

provided a baseline against which to consider the effects of the action alternatives. *Id.* And the action alternatives assessed the same mining operations but considered different access routes to access the mine site during operations. FS243734.

Besides considering the potential effects of these three alternatives, the FEIS considered 18 other alternatives, including alternative mining methods, processing methods, facility locations, transportation and access roads, and water management. FS243860-67. But these alternatives were eliminated from detailed analysis because they did not meet the purpose and need for the action, did not reduce environmental effects over the proposed action, were not economically or technically feasible, or were duplicative. The Forest Service's reasoned approach warrants substantial deference and satisfied NEPA. *See Seven Cnty.*, 145 S. Ct. at 1512.

Indeed, even before *Seven County*'s course correction, the Ninth Circuit upheld just such an approach in *City of Los Angeles v. FAA*, 63 F4th 835 (9th Cir. 2023). There, the agency identified ten potential alternatives and then subjected those alternatives to a "two-step screening process" that asked whether the alternative could achieve the purpose and need of the proposed action and whether an alternative was "practical or feasible to implement from a technical or economic standpoint." *Id.* at 845. This process eliminated nine alternatives, leaving just the proposed action alternative and no-action alternative for consideration in the EIS. *Id.* at 845-46. In upholding this range of alternatives, the court explained that "there is no minimum number of alternatives that must be discussed in an EIS," and that an agency can "compare the proposed action to only a no action alternative where the circumstances justified that choice." *Id.* at 847.

Rather than engage with this binding precedent (indeed, Plaintiffs do not even mention it), Plaintiffs cherry-pick a few alternatives they think the FEIS should have considered in detail. *See* Pls.' Br. 22-25. But Plaintiffs' arguments are factually wrong, fail to afford substantial deference

to the Forest Service's reasonable decisions, and fall far short of meeting their "burden to show that" another alternative is feasible or viable. *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 828 (9th Cir. 2025); *see also City of Los Angeles*, 63 F.4th at 846-47 (noting party "challenging an agency's failure to consider an alternative" must show "alternative is viable").

For example, Plaintiffs contend the FEIS should have considered in detail an off-site ore processing alternative. Pls.' Br. 23-24. But the FEIS reasonably explained that such an alternative would "greatly increase the air emissions and transportation impacts of the [project] and dramatically increase operational costs" because it "would require approximately 550 round trips daily during the 15 years of mine operations." FSS243862. The FEIS also explained that no commercial milling facility existed in the western United States that could process the ore, meaning a new facility, with all its associated environmental impacts, would still need to be constructed. *Id.* And milling off-site would eliminate the "environmental benefits of legacy material removal," and would be inconsistent with the purpose and need for the project by resulting in a "supplemental loss of gold." *Id.* For these reasons, the FEIS reasonably explained that this alternative was not discussed in detail because it "would increase mine traffic and air emissions, would not reduce environmental effects, and would be economically infeasible." FS243682-83. This reasonable explanation is subject to substantial deference.

The FEIS offered similarly reasonable explanations for excluding other alternatives, including those Plaintiffs highlight in their brief. *See* FS243860-67. Far from conflating "Perpetua's interest in maximizing profit" with the agency's need to review the 2021 MMP, as Plaintiffs claim, Pls.' Br. 24, the FEIS explained that limiting the mine to "ore that contains high antimony mineral grades," would "severely impact the economics of the [project]" and render any antimony-emphasis alternative "purely conjectural" with potential implementation being "remote

and speculative." FS245536. Similarly, Plaintiffs' reference to their comments on the draft EIS (DEIS), asking for an alternative to avoid locating roads, structures, and facilities in RCAs, relates to compliance with Forest Plan standards (i.e., NFMA), not NEPA. Pls.' Br. 24 (citing FS246110). And even if the comments related to an alternatives analysis under NEPA, they fail to meet Plaintiffs' burden of not only proposing a specific alternative for consideration but also showing that it would be feasible or viable to completely avoid RCAs when locating roads, structures, and facilities for the Project. *See* FS246110.

Even a cursory review of the FEIS dispels Plaintiffs' claims that the FEIS somehow failed to consider a reasonable range of alternatives or to explain why other alternatives were not considered in detail. Perhaps recognizing this, Plaintiffs engage in misdirection by suggesting the FEIS somehow violated NEPA when it "abandoned" or "jettison[ed]" two alternatives included in the DEIS. Pls.' Br. 23. But Plaintiffs conveniently omit the reason for reducing the number of alternatives considered. After publication of the DEIS, Perpetua submitted an updated plan of operations that reduced potential environmental impacts from the proposal under consideration in the DEIS. SOF ¶ 9. The Forest Service responded by preparing SDEIS that combined two alternatives considered in the DEIS into the proposed action (i.e., the updated plan of operations). And the SDEIS removed one of the DEIS's alternatives from consideration because it would have more impacts "to local fish habitat and would not result in the cleanup of the legacy [Spent Ore Disposal Area (SODA)]" and certain legacy tailings. *Id.* The FEIS carried forward these three alternatives from the SDEIS. *Id.* ¶ 10. This was entirely reasonable.

In short, the FEIS explained the process for developing alternatives, considered a reasonable range of alternatives, identified other alternatives, and explained why those alternatives were not analyzed in detail. These "fact-dependent, context-specific, and policy-laden choices

about the depth and breadth of [the FEIS's] inquiry" were reasonable and subject to substantial deference. *Seven Cnty.*, 145 S. Ct. at 1513. This more than satisfied NEPA.

**2. The FEIS reasonably assessed the Project's potential impacts.**

The FEIS spent over 30 pages describing the potentially affected area for air quality, over 40 additional pages assessing the alternatives' potential effects on air quality, and supported this extensive analysis with an even more extensive specialist report. FS243937-69 (potentially affected area); FS244492-532 (effects analysis); FS393626-4008 (specialist report). In doing so, the FEIS examined "four components of air quality impact: magnitude or intensity, duration, geographic extent, and context." FS244492. Plaintiffs challenge these extensive analyses by falsely claiming the FEIS "grossly underestimat[ed] potential air pollution from the Project" by "ignor[ing] nearly half the particulate matter and arsenic emissions" from the Project. Pls.' Br. 25. In doing so, Plaintiffs point to the fact that the Idaho Department of Environmental Quality's (IDEQ) air quality permit used an analysis of up to 180,000 tons per day of haul traffic while the FEIS assessed 99,500 tons per day. *Id.* (citing FS101467, FS244497, FS393664-65). But Plaintiffs ignore that the "hypothetical maximum possible production mining rate of 180,000 tons/day of ore and development rock" used by IDEQ was intended "to ensure ease of permitting and [was] not representative of real-world operations." FS244497. Instead, the "highest realistic annual production" under the 2021 MMP is "approximately 99,500 tons per day." *Id.* In assessing the potential effects of the 2021 MMP, the FEIS considered the reasonably foreseeable effects of this highest realistic annual production.

Plaintiffs also challenge the FEIS's analysis of the risk of fuel and other hazardous material spills. Pls.' Br. 25-27. Just as with air quality, the FEIS included a detailed description of the potentially affected area for hazardous materials and assessed the likelihood and potential effects of accidental releases of such materials. FS244001-10 (potentially affected area); FS244601-22

(effects analysis); *see also* FS24495-96 (assessing crash projections and offsite transportation of hazardous materials). That analysis examined the volumes and types of hazardous materials that would be transported and stored, storage practices, amount of vehicular transport of those materials, and the travel routes and conditions. FS244601. It also considered measures to avoid or reduce impacts, including transportation methods and responses to potential spill events. *Id.*

As part of this analysis, the FEIS acknowledged that "[s]ubstantial quantities of fuels, lubricants, and chemicals would be transported annually via large trucks." FS244604. During construction, an estimated 30 heavy trucks would travel daily from state highway 55 to the Stibnite logistics facility and 45 from the facility to the mine site. FS395567; FS244606. During operations, the number of trucks would decrease to 25 and 33, respectively. FS395571; FS244606. In light of this traffic, the FEIS explained that although "the greatest concern would be a significant release of a hazardous material from a transportation accident," the relevant data showed "very low rates of large truck accidents resulting in spills of hazardous material," and "[s]trict regulatory controls and [Project] emergency response procedures would be expected to limit the extent of any such incidents." FS244616; *see also* FS244995 (explaining estimated 0.6 percent annual increase in predicted number of crashes of any type of vehicle on state highway 55). The FEIS then quantified those rates while acknowledging that "[s]tatistics for haul truck accidents on county roads and/or in mountainous terrain are very limited," but explaining that use of those roads for the Project "would be controlled with pilot vehicles and at lower speeds and with less traffic than highways and would likely be less prone to vehicle crashes than on the public highways." FS244616-17.

Plaintiffs challenge the FEIS's analysis, arguing instead for a different type of quantitative analysis that would apply a specific formula based on the number of miles traveled. Pls.' Br. 26-

27. But Plaintiffs' desire for a different type of analysis does not establish a NEPA violation.[8] *See Cascadia Wildlands*, 2025 WL 2460946, at *26 (noting a court's deference to technical or scientific expertise "is at its apogee" and that a court is not to order an "agency to explain every possible scientific uncertainty." (citation omitted). Again, the Forest Service's fact-dependent, context-specific, and policy-laden choice was reasonable and is subject to substantial deference.

**D. Federal Defendants Complied with the ESA.**

FWS, NMFS, and the Forest Service, exercised their scientific judgment to reach sound conclusions that comply with the ESA. The agencies here spent years testing assumptions, developing complex models, and building enforceable controls; they scrutinized the Stibnite Project detail by detail and concluded it satisfied ESA standards. Even so, Plaintiffs respond with abstractions. They present broad-brush claims that the agencies ignored factors, left out measures, or failed to act entirely. But these allegations are divorced from the text of the consultation documents and the record. Put simply, Plaintiffs never engage with the Project's details, the species-specific science and data, or the complex analytical paths the agencies followed. As a result, their challenge falls flat. Federal Defendants below unpack each generic allegation and show—claim by claim—that what Plaintiffs argue is missing from the agencies' analyses is, in fact, present in the consultation documents or elsewhere in the administrative record. The Court should defer to the agencies' careful scientific judgments. *See Motor Vehicle Mfrs. Ass'n of the*

[8] Plaintiffs also question "the R (rate of spills) used by the Forest Service." Pls.' Br. 27 (citing FS244616). But the cited page nowhere mentions the spill rate referenced in Plaintiffs' brief. Even so, the Forest Service reasonably determined the spill rates proposed by Plaintiffs' expert overstated the spill rate by not distinguishing small spills that are easily contained from larger spills that may affect the environment. *See* FS223023-28. The Forest Service's reasoned choice of spill rates is well within its technical expertise and is subject to substantial deference. Further, other than hyperbolically claiming the spill rate used by the Forest Service is a "100-times-lower spill risk value," Pls.' Br. 27, Plaintiffs fail to explain how use of a spill rate of $1.4 \times 10^{-9}$ would provide a meaningfully different assessment of the Project's potential effects than a spill rate of $1.87 \times 10^{-7}$. Either way, the FEIS acknowledged and assessed the potential for a spill.

*U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

**1. FWS's BiOp appropriately analyzed all relevant wolverine impacts and reasonably concluded "no jeopardy."**

During consultation, FWS analyzed effects on wolverines and their habitat in the action area. FWS000336; FWS000339. It documented 16 wolverines in or near the action area (2010-2015), including four within the mine-site boundary, and a likely resident reproductive female in the general area (no den yet documented). FWS000319-20. FWS identified likely Project effects (noise, light, traffic, winter plowing) and quantified their impacts using site-specific metrics. FWS found that traffic noise attenuated below ambient levels within about 500 feet, most road-noise effects occurred within about 1 to 2 miles, and excessive speed increased collision risk. FWS000330; FS153790. FWS quantified projected disturbance of 2,341.6 acres of modeled suitable and denning habitat (combined) out of 340,606.7 action-area acres (about 0.7%). And FWS projected disturbance to 779.3 of just denning acres (about 0.3% of action-area denning; 0.02% statewide). FWS000336.

FWS also considered wolverine mobility (wide home ranges/localized displacement) and required noise/light-reduction environmental design features with adaptive modifications if wolverines were observed. FWS000337. FWS noted closure measures included decommissioning about 15 miles of Burntlog Route segments and restoring widened segments to pre-mining condition, with grading, seeding, drainage restoration, and erosion controls to avoid lasting footprints. FWS000324. FWS also recognized minimized collision risks with enforced speed limits. FWS000330; FS153790. After accounting for reclamation and habitat regeneration commitments, FWS concluded that habitat effects were localized, not long-term at action-area, statewide, or population-level scales, and would not measurably affect recovery. For these reasons,

FWS determined that the Project would not appreciably reduce numbers, reproduction, or distribution of wolverines. FWS000336–37.

After integrating the baseline, likely effects, and cumulative effects, FWS concluded the Project would not jeopardize the wolverine because the effects were individual and localized, not population-level. FWS000337. FWS then specified the "amount or extent" of take—numeric where practicable or, for a cryptic, low-density species like wolverine, by surrogate. 50 C.F.R. § 402.14(i)(1). FWS's ITS adopted a denning-acreage surrogate (779.3 acres of disturbance) and stated that exceeding it required reinitiation. 50 C.F.R. § 402.16; FWS000339-41. The ITS also required the Forest Service's environmental design features to minimize the other effects. These consultation decisions are reasonable, record-supported, and should be upheld. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236.

**2. FWS's BiOp survives Plaintiffs' wolverine critiques.**

**a. The BiOp's conclusions are consistent and supported.**

Plaintiffs pick at one part of the BiOp to assert that FWS made a "conclusory" determination that Project effects would not be long-term or measurable on wolverines. Pls.' Br. 31. To the contrary, FWS tied its conclusion to a quantitative, scale-based analysis and required enforceable safeguards in the proposed action.

First, the BiOp quantified small, localized effects: 779.3 acres of denning disturbance—which amounts to 0.3% of action-area denning habitat (231,053.9 acres) and 0.02% of statewide denning habitat (3,431,818 acres). Much of this habitat, however, would be reclaimed after mining is complete. FWS000337. Second, acknowledging life-of-project disturbance, FWS evaluated

noise, light, and traffic in context of wolverine biology: about 65 AADT[9] at construction; less than 50 AADT during operations; and 15–20 mph speed limits, all of which make collision risks discountable and denning-noise effects insignificant. FWS000329; FS153791; FS153789-90. And any reclamation occurred outside the denning season. FWS000327. On that record, FWS reasonably concluded that no long-term effects are likely at action-area, statewide, or population-level scales, and no measurable effects are likely on conservation or recovery. FWS000335; FWS000339.

Plaintiffs cherry-pick part of the FEIS to show alleged inconsistencies in FWS's "no long-term or measurable effect" conclusion. Pls.' Br. 31. But the quoted text addressed localized site-level impacts and recovery timing, not population-scale jeopardy. FWS000335-36. Accounting for scaling (0.3% action-area denning; 0.02% statewide), traffic/noise and species behavior, reclamation timing, and enforceable environmental design features, FWS reasonably found no long-term population-scale effects and no measurable impact on recovery. FWS000329, 000335–39; FS153789–91. That determination is science based, and reasonable.

**b. The BiOp appropriately accounts for wolverine population size.**

Plaintiffs next argue, incorrectly, that FWS ignored wolverine population size. Pls.' Br. 32-33. But the BiOp analyzed the wolverine baseline and status, including occurrence data. FWS000316 (incorporating Appendix D); FWS000322 (16 individuals near the action area); FWS000323 (effects given low densities and large home ranges); FS153786 (Heinemeyer et al. detections; Idaho Fish & Game observations). FWS then connected the scale of impacts to population metrics. Only 0.3% of action-area denning habitat and 0.02% statewide denning habitat

[9] AADT, or Average Annual Daily Traffic, is a measure of the average number of vehicles passing a specific point on a road per day over an entire year. This measurement is used in noise models to help predict road noise levels.

are unavailable during operations; even assuming full loss of disturbed acres, that is only 0.7% of all suitable and denning habitat in the action area. FWS000336, 338. Given low densities and large home ranges, wolverine dispersers can route around temporary disturbances without impeding gene flow. FWS000320-23. FWS expressly evaluated how small-scale impacts affect the species as a whole and found no long-term effect on numbers, reproduction, or distribution. FWS000336; FWS000338.

FWS thus addressed population size directly (baseline, status, occurrences, effect scaling) and, at the population scale, reasonably found no long-term or measurable changes. FWS000336-38; FS153786. Plaintiffs' bare disagreement does not expose any legal error here. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02 (9th Cir. 2014) (upholding BiOp and explaining that courts do not substitute plaintiff's judgment for the agency's, especially on scientific matters where review is "at its most deferential").

**c. The BiOp appropriately added Project effects to a climate-informed baseline.**

Plaintiffs next claim FWS ignored climate change. Pls.' Br. 33-35. Not so.

In Appendix D, FWS addressed climate change effects on snowpack/snow cover and wolverine habitat. FWS000442–46. FWS added project effects to a climate-informed baseline—*i.e.*, one that incorporated the biological assessment's climate analysis. FWS000336; FS153441. FWS then tied its habitat baseline to persistent spring snow (the climate driver for denning habitat). In setting the environmental baseline and "status in the action area," FWS defined wolverine habitat using Copeland/Heinemeyer persistent spring-snow modeling (April 24–May 15 window) and mapped it for the action area. FWS000317–18 (model description and denning-window basis – Figure 22). FWS then carried that same climate-based habitat focus into its effects analysis. FWS000322 (persistent-snow model used "to assess impacts to wolverine habitat, particularly

denning habitat" underpinning Table 44); *see also* FS153789.

Using that baseline, FWS calculated total modeled habitat in the action area (340,606.7 acres overall; 231,053.9 denning (3-7 yrs)) and overlaid the project footprint to quantify disturbance by snow class. FWS000322 (Table 44: 109,552.8 acres suitable habitat (1-2 yrs); 231,053.9 acres denning habitat (3-7 yrs)); FS153789. FWS then noted the conservation and avoidance/minimization measures included in Stibnite's proposed action that tied to the climate proxy for denning habitat—persistent late-spring snow cover, a climate-sensitive variable. To further reduce risk during the denning season, FWS noted the Forest Service's requirement of a one-mile no-disturbance buffer around all modeled denning habitat (*i.e.*, the persistent-snow layer) from January 15 to May 15, which protects not only known dens but the broader denning habitat during exploratory drilling. FWS000327; FS153793. FWS then weighed additive effects using the climate proxy at action-area and rangewide scales. FWS000336-37. Because the disturbance (779.3 acres) equaled 0.3% of action-area denning habitat and 0.02% statewide—much of which will be reclaimed—FWS concluded long-term effects were not expected and no measurable effects on conservation or recovery would occur. FWS000338-39.

Contrary to Plaintiffs' assertion, the record here shows a climate-aware jeopardy analysis. FWS grounded wolverine habitat and denning in persistent-spring-snow science, incorporated the Forest Service's climate projections, quantified and added Project effects to that climate baseline at the action-area and statewide scales, and adopted denning-season measures keyed to the same climate proxy. This allowed FWS to reasonably explain, with numbers, why the additive effects would not jeopardize the wolverine. FWS000317-18, 321-22, 327, 335-39; FS153441, 789-94.

Despite this robust analysis (or perhaps because of it), Plaintiffs suggest the Project causes additional climate impacts that FWS ignored. Pls.' Br. 33-35. But Plaintiffs identify no scientific

data tying project-level greenhouse gas emissions or air-temperature changes to reduced snowpack affecting wolverines. An "effect of the action" must be a but-for cause of the action and reasonably certain to occur. 50 C.F.R. § 402.02. Speculative, worst-case assumptions are improper. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 598-600 (D.C. Cir. 2023) (rejecting NMFS's use of "benefit of the doubt" and worst-case assumptions in its Section 7 analysis and instead required an analysis of what is likely using the best available science, not speculative effects). Without specific data, FWS was not required to analyze *speculative* impacts as an "effect" of this Project. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 1013-14 (9th Cir. 2025) (holding agencies reasonably concluded effects of a project's greenhouse gas emissions on listed species were not sufficiently linked to merit further Section 7 analysis as an "effect of the action"). Plaintiffs' contrary arguments thus fail.

**d. The wolverine ITS is reasonable and appropriate.**

**i. The ITS's monitoring and reporting is tied to the take surrogate.**

Plaintiffs next misconstrue the wolverine ITS by arguing that FWS included no monitoring and reporting related to the take limit. Pls.' Br. 35-36.

As noted above, FWS must specify the amount or extent of take when issuing a BiOp, which comes in the form of a numeric limit or, as here, a "surrogate" measure of anticipated take. 50 C.F.R. § 402.14(i)(1). The surrogate, in turn, provides a clear trigger for reinitiation. FWS's ITS set a measurable surrogate—779.3 denning acres—and required reinitiation if this level of habitat disturbance is exceeded. 50 C.F.R. §§ 402.14(i)(1), 402.16; FWS000339.

When issuing an ITS, FWS also provides for monitoring and reporting of the surrogate measure. 50 C.F.R. § 402.14(i)(1). The wolverine's ITS surrogate is monitored through the compliance framework specific to this Project, which tracks real-time Project disturbance (denning habitat as the acreage surrogate). The BiOp incorporated the Environmental Monitoring and

Management Plan (EMMP), which "will provide direction to monitor operations and environmental commitments, document permit compliance, and reduce potential impacts." FWS000117; FS153491. The EMMP comprises an interagency board (including FWS) that "will have access to . . . monitoring reports, as-built drawings, monitoring and mitigation plans under the EMMP (including adaptive management)," among other construction-stage documents – the very records that track ground-disturbing impacts to denning habitat. FWS000129–130; FS153517–518. The BiOp further explained that monitoring is conducted by the operator and reviewed by the Forest Service and other regulatory agencies, including FWS, to ensure permit compliance. This framework ties reporting on the progress of the action (including denning acreage cleared) to agency oversight. FWS000116–17.

The disturbed-denning-acreage surrogate is inherently measurable within the EMMP framework. The Forest Service quantified habitat effects by component/phase, and the BiOp used those totals as the take surrogate (0.3% of action-area denning). FS153789–90; FWS000339. EMMP reporting and agency review ensure the Forest Service and FWS will know if disturbance approaches/exceeds 779.3 acres—the clear standard § 402.14(i)(1)(i) requires. FWS000129-130; FWS000338-40; FS153517-518. Unlike Plaintiffs' cited *Wild Fish Conservancy* case , Pls.' Br. 36, this ITS sets a clear acreage-based exceedance standard with a reinitiation trigger, includes ITS-specified monitoring/reporting, and operates within an EMMP that tracks the same ground-disturbance data that define the surrogate. FWS000338-39; FWS000116-17, 129-130; FS153490-491, 517-519. Plaintiffs thus fail to identify any defect with *this* ITS.

**ii. The ITS appropriately captures all take via the Project's environmental design features and FWS's den-based surrogate.**

Plaintiffs also claim FWS ignored non-habitat take (noise, light, human presence). Pls.' Br. 36-38. Given the impossibility of counting individual wolverines, FWS rationally used a

two-pronged approach to minimize the impact of take.

First, after analyzing the exact "non-habitat" stressors Plaintiffs identified, FWS included measures to minimize the impact of potential instances of take. FWS minimized non-habitat stressors via environmental design features in the proposed action—like speed limits, training, lighting/noise controls—making most effects insignificant or discountable. FWS000325; FWS000329-330; FWS000335; FS153791; FS153319; FS153320; FS153339. Second, with the non-habitat stressors reduced to insignificant or discountable levels, FWS focused the surrogate on den disturbance and abandonment—the potential injury/mortality take—using denning acres and a 779.3-acre reinitiation trigger. FWS000338-39. These facts render Plaintiffs' cited cases inapposite. *See* Pls.' Br. 36-37. Those decisions involved ITSs that left nonlethal take unbounded. Here, FWS analyzed each stressor, minimized them, and limited potential injury/mortality via a denning-acreage surrogate and bright-line reinitiation trigger. FWS000338-39; FWS000335.

FWS accounted for all non-habitat stressors, reduced them via enforceable environmental design features (requiring reinitiation if not implemented), and minimized potential injury/mortality with a causally linked surrogate and clear trigger. This is exactly what the ESA requires. *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, No. CV-07-8164-PHX-DGC, 2011 WL 1211602, at *5-10 (D. Ariz. Mar. 30, 2011) (upholding FWS's ITS using a surrogate with measurable guidelines and a causal link to take, and reasonably relying on the project's existing conservation and monitoring as enforceable reasonable and prudent measures or RPMs) ), *vacated as moot on other grounds by* 691 F.3d 1008, 1013-15 (9th Cir. 2012).

**iii. The RPMs and T&Cs are present and enforceable**.

Plaintiffs argue that FWS included "no RPMs" in the ITS. This argument simply disregards the ITS they challenge, which incorporated as RPMs the required and enforceable environmental design features included in the proposed action. *See* Pls.' Br. 38-39.

The ESA authorizes FWS (and NMFS) to specify "reasonable and prudent measures" during consultations that they consider to be "necessary or appropriate." 16 U.S.C. § 1536(b)(4)(C)(ii). This "necessary or appropriate" statutory command commits the decision to the FWS's discretion—a point confirmed by the Supreme Court's decision in *Loper Bright v. Raimondo*, 603 U.S. 369 (2024). There, the Supreme Court held that questions of statutory interpretation are for the federal courts to decide. 603 U.S. at 400, 412-13. But within that framework, the Court identified a category of statutory enactments that "delegate[] discretionary authority to an agency." *Id*. at 395. The Court cited as examples statutes that empower an agency to regulate to "appropriate" or "reasonable" limits. *Id*. at 395 & n.6.

That is what we have here. Congress delegated discretion to FWS to identify those measures that *FWS*—not Plaintiffs—deem necessary or appropriate, and Congress placed no other limits on FWS's decision-making. And FWS exercised its discretion rationally here. FWS identified the RPMs by adopting the Project's environmental design features (as outlined in the Forest Service biological assessment). FWS000338-39; *see also* FS153506-07 (enumerating the on-the-ground implementation items FWS relied on: (1) notify the USFS Wildlife Program Manager and FWS upon any wolverine sighting; (2) make temporary adjustments to construction/operations based on sighting locations; (3) alert other operators along access/haul routes; and (4) impose reduced speed limits on project roads); FS153789; FS153859. FWS deemed these environmental design features as "essential" to minimize take and tied compliance to reinitiation. FWS000338-39. The ITS then set forth concrete T&Cs for how the Forest Service must implement the RPMs through monitoring and reporting—notification to FWS if any wolverine is observed and the "Disposition of Individuals Taken," including immediate coordination with FWS Law Enforcement if a listed animal is dead, injured, or sick. FWS000339.

The ITS adopts the environmental design features in the Forest Service's biological assessment as the RPMs, provides T&Cs for monitoring and reporting, and links compliance to the reinitiation standard—precisely what the ESA and its implementing regulations require. *See* 16 U.S.C. §§ 1536(b)(4)(C)(ii); 50 C.F.R. § 402.14(i). Contrary to Plaintiffs' assertion, this is not a "no-RPMs" scenario, which makes their reliance on *Ctr. for Biological Diversity v. Culver*, 2024 WL 4505468, No. 21-cv-07171-SI, at *64–65 (N.D. Cal. Oct. 22, 2024), misplaced. Unlike *Culver*, the RPMs and T&Cs here, as identified in the Forest Service's biological assessment and cross-referenced in the ITS, are trackable, required components of the proposed action, and enforceable through the ITS and FWS's reinitiation framework. FWS000338-39; FS153506-07; FS153789; FS153859.

**3. FWS's BiOp appropriately analyzed all whitebark pine effects and reasonably concluded "no jeopardy."**

Plaintiffs present a cursory challenge to FWS's analysis of whitebark pine, broadly proclaiming that FWS failed to analyze the Project's effects on the species. Pls.' Br. 39-40. Even a cursory review of the BiOp thoroughly disproves this claim.

In the BiOp, FWS relied on 2019 Forest-led modeling and field surveys identifying about 4,259 acres of modeled suitable habitat, 2,069 of occupied habitat, and 78 unsurveyed acres conservatively treated as occupied. FWS000302–05. FWS estimated adverse effects to 259.5 occupied acres, 78 assumed-occupied acres, and 287.4 suitable acres, with about 1,278 trees affected (27 cone-bearing). And FWS explained that the effects are localized and predominantly affect saplings. FWS000313–14; FS153811. FWS then scaled the affected acreage against the action-area, Idaho Batholith analysis unit, and the U.S. range—finding less than 3.6%, 0.005%, and 0.001% impacts, respectively. FWS determined these effects to be too small to influence numbers, reproduction, or distribution at broader scales. FWS000313-14. FWS added these effects

to the 1,902 (of 2,069) occupied acres already affected by fire, beetle, and rust, and FWS found the Project was not expected to exacerbate those stressors at the population scale. FWS000305; FWS000313. Additionally, the enforceable environmental design features further minimize effects. FS153816-20; FWS000310-14.

On that record, FWS concluded the Project was "not likely to jeopardize" the whitebark pine. The impacts were individual/localized, most affected trees were saplings, many cone-bearing and rust-resistant trees remained, and the required minimization measures reduced risks to insignificant and discountable levels. FWS000314; FS153811. FWS thus performed the analysis Plaintiffs wrongly argue is missing, and FWS did so reasonably.

**4. FWS's BiOp appropriately analyzed all bull trout effects and reasonably concluded "no jeopardy."**

FWS anchored its bull trout analysis in the ESA's required framework. It fully acknowledged existing temperature and habitat stressors in the action area—temperature-impaired streams and habitat availability by stream reach. FWS000146, 148. FWS then applied the best-available temperature data (approximately 16°C chronic tolerance threshold and spawning/rearing ranges) to evaluate risk and likely Project effects. FWS000147, 279. FWS next used quantitative modeling regarding Project-caused temperature changes by stream reach and decision year, then tied enforceable compliance to those model outputs. FWS000178 (Table 24), 265, 276. And FWS integrated its analysis of the species' status, the impaired baseline, the Project's incremental effects (including temperature, flow, sediment, and chemical effects), and cumulative effects. FWS000276; FWS000263-67.

Considering magnitude, duration, geographic scope, and life-stage considerations and sensitivities, FWS reasonably concluded the action will not "appreciably reduce" bull-trout survival or recovery prospects and therefore would not result in jeopardy. FWS000261;

FWS000263-67. Recognizing incidental take was reasonably certain (including limited fish-handling and habitat-mediated effects), FWS issued an ITS that (1) specified take limits via scientifically grounded surrogates (the Table-24 temperature ceilings by reach), (2) imposed RPMs with T&Cs to minimize and monitor take, and (3) required reporting and reinitiation if limits were approached or exceeded. FWS000263-67, 276; FWS000261-62; FWS000268-70; FWS000178, 265. As further explained below, FWS's ESA determinations here are reasonable, supported by the record, and should be upheld. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236.

**a. The BiOp considered all bull trout effects.**

Plaintiffs first argue that FWS's accounting for injury or mortality to 402 bull trout due to "fish handling" disregards four other categories of activity that would result in take. They also argue that FWS failed to properly consider the impacts from that loss on local bull trout populations. Pls.' Br. 41-42. Both arguments fall flat when considering FWS's robust analysis of bull trout and its habitat.

First, FWS fully accounted for and analyzed all five categories of activities that affect bull trout. FWS000261-62. For electrofishing, FWS identified individual numbers because it had literature to cite which allowed it to identify a percentage of mortality. FWS000268; FWS000229-30. Although FWS identified the other categories, the science did not exist to allow FWS to identify mortality with the same precision. FWS000263. But FWS accounted for and analyzed the anticipated mortality of bull trout from all expected activities. For a second time in its ITS, FWS again accounted for and analyzed habitat loss (flows and temperature), sediment, chemical contaminants, physical barriers, and fish-handling, and set measurable reinitiation triggers for each. *See, e.g.*, FWS000264 (flow/baseflow and temperature "take exceedance" triggers); FWS000265-66 (sediment surrogate and trigger); FWS000266-67 (antimony and mercury concentration triggers); FWS000267 (physical-barrier loss and trigger). FWS then provided RPMs

across all five categories (habitat loss, sediment, contaminants, barriers, fish handling, plus dewatering and trap-and-haul). FWS000275.

Second, FWS analyzed the Project's effects at the proper scales for its jeopardy analysis. It analyzed the South Fork Salmon core area and its local populations, statewide numbers, and population-level rangewide numbers. FWS000261-62. FWS's conclusion, in turn, relied on the SFSR core area baseline conditions and found the predicted adverse effects to be "localized" and "limited to . . . five out of 27 local populations (18.5%)." Considering these effects, the action "is expected to maintain population size and growth and survival." FWS000261-62; *see also* FWS000274-75. FWS's analysis is supported by Appendix C of the Forest Service's biological assessment, which found that salvage-related mortality is limited (about 10%), short-term temperature and chemistry effects are temporary and managed within protective measures, and the overall condition maintains local population productivity and growth. FS153942-50. FWS also noted, as another point of comparison, that 629 potential handling-related injuries and mortalities across the Stibnite project area and Lemhi restoration project area constitutes about 0.06% of statewide abundance. To be clear, FWS's jeopardy analysis is based on the localized core-area assessment and maintenance of population data, not a statewide comparison or statistic, as Plaintiffs suggest. FWS000261, 274-75. But FWS's comprehensive analysis thoroughly rebuts Plaintiffs' assertions of a missing or arbitrary analysis.

**b. The BiOp adequately considered climate change effects to bull trout.**

Plaintiffs next claim that FWS failed to consider climate change effects to bull trout. Pls. Br. 42-45. But FWS identified climate-change forecasts that were used to shape Project designs, sensitivity analyses, and mandatory adaptive management measures. FWS then applied those results in its jeopardy analysis at the appropriate scales (population and core habitat unit). FWS000163-64, FWS000173-75, FWS000285; *see also* FS153440-46, FS153667-69. Indeed,

FWS included a dedicated "Climate Change" section that (1) applied NOAA Fisheries' climate-resilience guidance, (2) used Bureau of Reclamation's West-Wide Climate and Hydrology Assessment to frame future flow and temperature trends through the year 2100, (3) explained why most operational Project components are short-lived and why post-closure stream-restoration components were prioritized for climate variability, and (4) documented use of sensitivity analyses that were carried into Project component designs (*e.g.*, channel and pond sizing, riparian shading). FWS000164-65; FS153440-46.

FWS also properly acknowledged model uncertainties and limitations. FWS predicted the likely added warming of approximately 0.1–2.0°C by 2030 through 2059. FWS000175. It also noted greater uncertainty for later-year predictions. *Id*. Because of that uncertainty, FWS required added monitoring and measures during the closure and reclamation phases (increased riparian planting, mechanical shading, snow harvesting). FWS000173-75; FS153667-69. FWS then used modeled temperature trajectories with sensitivity and uncertainty discussions to describe short-term increases followed by overall improvement as riparian shade and Stibnite Lake functions develop. FWS000291-92 (explaining, for example, that by Mine Year 112 the East Fork of the SFSR segment between Yellow Pine Pit and Sugar Creek is approximately 0.2°C above baseline temperatures, while below Sugar Creek the summer and fall maxima are 0.2–0.6°C cooler than baseline temperatures); FS153669. With this background and analysis, FWS evaluated bull trout physical and biological features[10] and concluded that, although some effects persist more than 20 years at the mine site, effects at the core habitat use area/core habitat unit scales are localized and "insignificant." FWS000285.

[10] Under the ESA, physical or biological features are the elements within a species' habitat that are essential for its conservation. 50 C.F.R. § 424.02

Faced with this analysis, all Plaintiffs can argue is that FWS ignored climate change. Pls.' Br. 42-45. But, as shown, FWS squarely addressed climate change, quantified likely warming, required adaptive measures to address uncertainty, and reasonably concluded, based on climate-aware modeling and "physical and biological features" analysis, that effects are localized and not jeopardizing at the core habitat use area/core habitat unit scales.

**c. The bull trout ITS is reasonable and appropriate.**

**i. The RPMs and T&Cs are present and enforceable.**

Contrary to Plaintiffs' generalized claim, *see* Pls. Br. 45-46, the bull trout ITS contains concrete, non-discretionary RPMs and T&Cs that adopted specific design measures from the Forest Service's biological assessment and imposed enforceable, not-to-exceed performance standards keyed to the predicted effects in identified tables. *See* FWS000275-78.

RPM 1, for example, required minimization of take from "baseflow reductions and increases in stream temperatures." FWS000275. The T&Cs here require the Forest Service to develop and implement plans "to ensure that baseflow depletions do not exceed the predicted . . . [amounts by reach and phase, Table 35]" and that "stream temperatures do not exceed the predicted temperatures . . . [in Table 24]." FWS000275-77. Implementation of Appendix B environmental design features and best management practices is also mandated. FWS000275. Appendix B specifies concrete minimization measures, like low-flow bypass piping, restoring and adding shade, and siting intakes to "use the coolest water available," plus flow-protection and hydrologic measures (*e.g.*, fishway intake capped at ≤20% of lower-reach flow with auto-shutoff; cutoff walls and underdrains to maintain baseflow connectivity). *See* FS153863; FS153870-71; FS153888-91.

Another example is found in RPM 2 which requires minimization of take from "sediment delivery." FWS000275. The T&Cs implementing this RPM direct development and implementation of a plan "to ensure that sediment delivery does not exceed the predicted changes"

in Tables 28–31. FWS000275-76. The biological assessment and BiOp both identified, and the RPMs incorporated, road and construction best management practices that actively reduce erosion and turbidity (*e.g.*, road surfacing and maintenance, culvert work, revegetation, energy dissipation at outfalls). FS153612; FS153529; FWS000193-94; FWS000265-66. And the ITS added compliance metrics. Annual turbidity results must show compliance with Idaho standards and revegetation must achieve approximately 70% ground cover within three years. FWS000277.

In sum, the ITS tied monitoring to enforceable performance standards ("do not exceed the predicted" values) and to concrete environmental design features and best management practices the Forest Service must implement. The ITS also incorporated compliance reporting (e.g., turbidity standards, revegetation targets, etc.). FWS000275-77; FS153518-19; FS153529. That is a far cry from an ITS that fails to include any requirements to minimize incidental take. *See* Pls.' Br. 45.

ii. **The ITS's temperature take limit is appropriate and reasonable.**

Plaintiffs argue that a "5-60 year gap" exists in monitoring. Pls.' Br. 46-47. But the bull trout ITS expressly stated that "authorized take will be exceeded if measured increases in water temperature . . . exceed the predicted increases in water temperature in each of the affected stream reaches shown in [the tables]." FWS000264. That is a continuous trigger based on field measurements; it does not hinge on discrete model years.

The BiOp incorporated the modeled temperature results by reach and time steps, as shown in Table 24's listing of maximum weekly water temperatures for modeled mine and post-closure years. FWS000178. This analysis provided concrete benchmarks for the "predicted increases" referenced in the trigger. FWS000178. The BiOp also required temperature to be measured "during each surface-water sampling event" and to be reported quarterly. FWS000118-19. Separately, the BiOp documented that daily temperatures in East Fork SFSR, Meadow Creek, and East Fork Meadow Creek have been monitored in 15-minute increments since 2012, and the agencies use

this data to track temperatures for bull trout purposes. FWS000147-48. The Forest Service's biological assessment further included a Water Resources Monitoring Plan that lists numerous stations (Table 3.8-1) where "temperature" is a required parameter. The Forest Service therefore "will review monitoring results for comparison to the modeling forecasts," confirming the operational feedback loop to the surrogate trigger. FS153492-94; FS153495. If the measured data cross the trigger, the ESA requires reinitiation of consultation. *See* FWS000340-41.

FWS's ITS thus tracks measured temperatures and enforced through frequent monitoring and quarterly reporting, with explicit reinitiation if measured increases exceed modeled increases. Plaintiffs' contrary arguments therefore are unsupported by the BiOp, or the law.

**5. The Forest Service did not breach terms in its Forest Plan BiOp.**

Plaintiffs claim the Forest Service breached T&Cs in NMFS's 2003 Forest Plan BiOp. Pls.' Br. 47-49. This argument misunderstands the 2003 BiOp/ITS, as well as the agencies' Stibnite consultation. Under the 2003 BiOp, the Forest Service ensures that certain criteria are met during consultation, FS000329, which then informs NMFS's analysis in project-level consultations. What Plaintiffs really attack is NMFS's project-level effects analysis in the Stibnite BiOp. Yet they do not actually challenge NMFS's BiOp or show that NMFS's analysis for *this Project* is deficient.[11] Without doing this, Plaintiffs cannot show that NMFS ignored relevant factors or effects.

In particular, T&C 3.B.3.a, the provision Plaintiffs emphasize, requires the Forest, in this subbasin, to demonstrate during consultation that similar projects avoided and minimized sediment delivery, with monitoring and effectiveness review where sediment is a risk.[12] FS000328-29. Here,

[11] *See* Pls.' Br. 2 n. 2. Plaintiffs waived any claims challenging NMFS's BiOp by not pleading or advancing them here. *Loomis v. Cornish*, 836 F.3d. 991, 997 (9th Cir. 2016).

[12] Plaintiffs reference two other T&Cs in the 2003 BiOp – 1.E. and 3.B.3.c. – but offer no substantive argument or rationale on which to base a defense. Pls.' Br. 47.

NMFS reviewed the Forest Service's draft biological assessment and requested controls from the similar Golden Meadows project. FS150855-56. Additionally, in a Nov. 22, 2023, insufficiency letter, NMFS reiterated sediment-delivery concerns and asked the Forest Service to acknowledge that Golden Meadows measures would be incorporated. NMFS C 0045378-79. The Forest Service responded in its revised 2024 biological assessment, adopting Golden Meadows methods aimed at avoiding/minimizing sediment delivery and tying them to concrete environmental design features. FS153473; FS153320; FS15383-84. The Forest Service conducted GRAIP-Lite sediment modeling, providing quantitative, location-specific comparisons of road-related sediment across phases/routes – documenting phase-specific decreases (construction) and increases (operations), identified where risk shifts (to Burntlog/on-site), and used conservative controls. FS153609–614.

Assuming the modeling's accuracy, NMFS found that restoration to address chronic East Fork Meadow Creek sediment sources, planned road closures, and mine-site revegetation would substantially reduce sediment delivery to action-area streams. NMFS A 0000335. NMFS likewise found that implementing best management practices and environmental design features in the proposed action should effectively minimize sediment delivery. NMFS A 0000334; NMFS A 0000289. On that basis, NMFS reasonably found "no jeopardy/adverse modification." NMFS A 0000371.[13] The agencies complied with the 2003 Forest-level BiOp.

## V. CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion, and enter judgment for Federal Defendants.

[13] Given this record, Plaintiffs' reliance on *Alliance for the Wild Rockies v. Marten* is misplaced. *See* 585 F. Supp. 3d 1252, 1280-82. The record here amply demonstrates that the proposed action addresses the sedimentation concerns at issue in T&C 3.B.3.a.

Respectfully submitted this 19th day of September, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*<u>/s/Shaun M. Pettigrew</u>*
SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

RICKEY D. TURNER, JR. (CO Bar No. 38353)
Senior Trial Attorney
Wildlife & Marine Resources Section
999 18th Street, North Terrace Suite 600
Denver, CO 80207
(202) 532-3073
rickey.turner@usdoj.gov

EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(202) 305-5689
emma.hamilton@usdoj.gov

*Counsel for Federal Defendants*