UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAVE THE SOUTH FORK SALMON; IDAHO CONSERVATION LEAGUE; IDAHO RIVERS UNITED; EARTHWORKS; CENTER FOR BIOLOGICAL DIVERSITY; and AMERICAN RIVERS, | ) ) ) ) ) ) ) Case No. 1:25-cv-00086-AKB |
| Plaintiffs, | ) **MEMORANDUM DECISION ON** |
| | ) **MOTION FOR PRELIMINARY** |
| v. | ) **INJUNCTION (DKT. 58) AND** |
| | ) **MOTION TO STRIKE (DKT. 60)** |
| U.S. FOREST SERVICE; U.S. FISH AND WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE; U.S. DEPARTMENT OF AGRICULTURE; U.S. DEPARTMENT OF THE INTERIOR; U.S. DEPARTMENT OF COMMERCE; BROOKE ROLLINS, in her official capacity as U.S. Secretary of Agriculture; DOUG BURGUM, in his official capacity as U.S. Secretary of the Interior; and HOWARD LUTNICK, in his official capacity as U.S. Secretary of Commerce, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Federal Defendants, | ) ) |
| and | ) ) |
| PERPETUA RESOURCES IDAHO, INC. | ) ) |
| Defendant-Intervenor. | ) ) ) |

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Dkt. 58) and Perpetua Resources Idaho, Inc.'s Motion to Strike Declarations Submitted with Plaintiffs' Motion for Preliminary Injunction (Dkt. 60). The Court held oral argument on the preliminary injunction

motion on May 28, 2026. For the reasons discussed below, the Court grants in part Perpetua's motion to strike and denies Plaintiff's motion for preliminary injunction.

## BACKGROUND

Defendant-Intervenor Perpetua Resources Idaho, Inc. (Perpetua), submitted a mine plan of operations to the United States Forest Service (Forest Service) for the Stibnite Gold Project (Project) to mine and process gold, silver, and antimony (Dkt. 34-1 at ¶ 8). The project is located primarily on National Forest System lands in the Boise and Payette National Forests, in the headwaters of the East Fork South Fork Salmon River (EFSFSR) where Perpetua has mining claims. Mining activity began in the area in the late nineteenth century. As a result, unregulated mining activities has disturbed the area (FS243703-04). Perpetua's plan is to both clean up these disturbances and to resume mining gold, silver, and antimony.

The U.S. Forest Service (Forest Service) approved the Project through a Record of Decision (ROD) issued in January 2025 after completing a Final Environmental Impact Statement (FEIS). (Dkt. 58-1 at 11; FS-420760 to 420913). In connection with that approval, the Forest Service approved the Burntlog Route to provide access to the mine, and the U.S. Fish and Wildlife Service (FWS) issued a Biological Opinion (BiOp) and Incidental Take Statements (ITS) addressing the Project's effects on species protected under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et. seq.*, including North American wolverine, bull trout, and whitebark pine. (FWS-Stibnite-AR-000001 to 000358). FWS concluded the Project is not likely to jeopardize the continued existence of those species but also concluded that incidental take of them is reasonably certain to occur. (FWS-Stibnite-AR-000261 to 000276; FWS-Stibnite-AR-000337 to 000340).

Plaintiffs, who include non-profit organizations dedicated to protecting the environment, filed this action against Defendants, including the Forest Service and the FWS, challenging their

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 2**

decisions under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701--706, and other federal statutes. Perpetua subsequently intervened. The parties have filed cross-motions for summary judgment. (Dkt. 31; Dkt. 32; Dkt. 35; Dkt. 41; Dkt. 52; Dkt. 53; Dkt. 57). Meanwhile, Plaintiffs and Perpetua entered a stipulation allowing certain limited initial activities to proceed (Dkt. 40; Dkt. 58 at 2 n.1).

On May 8, 2026, Plaintiffs filed their preliminary injunction motion seeking to enjoin Perpetua from moving forward with Project activities authorized by the ROD, BiOp, and ITSs on National Forest land (Dkt. 58-1 at 29). The immediate dispute concerns Perpetua's proposed commencement of construction activities beginning on May 30, 2026. Plaintiffs characterize that work as the start of full construction. Perpetua, however, responds that it does not intend to begin all Project construction immediately; instead, it identifies a narrower list of critical-path construction activities that, in its view, must begin by May 30 to avoid substantial schedule and associated financial consequences (Dkt. 62 at 9-10; Dkt. 62-1 ¶¶ 5-7, 12-23).

These critical-path activities include, for example, work on existing roadway segments and stream crossings; geotechnical drilling along new Burntlog Route segments; development of the RQ-1 borrow area and construction camp; extension of the existing Burntlog Route to Trapper Creek; and beginning work on new segments from Trapper Creek to Meadow Creek Lookout and from Meadow Creek Lookout to the Worker Housing Facility (Dkt. 62-1 ¶¶ 7-12; Dkt. 62-2 ¶ 6). Perpetua also identifies additional near-term work involving the Worker Housing Facility; the Administrative Pad; and the Yellow Pine Pit aggregate borrow area, wells, and related facilities (Dkt. 62-1 ¶¶ 42-55). In particular, Perpetua stresses the importance of completing the Burntlog Route, which it contends is required to avoid substantial and costly scheduling issues.

MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 3

For purposes of their preliminary-injunction motion, Plaintiffs focus on claims relating to the Forest Service's approval of the Burntlog Route and the associated borrow sources and on FWS's BioOp and ITSs under the ESA (Dkt. 58 at 2; Dkt. 58-1 at 13-22). Both parties rely heavily on their summary judgment briefing to support their arguments related to the preliminary injunction motion.

## MOTION TO STRIKE

As an initial matter, the Court addresses Perpetua's motion to strike the Declarations of Diane Evans Mack and Mary Faurot-Petterson which Plaintiffs filed in support of their preliminary injunction motion (Dkt. 60). Perpetua argues the declarations are impermissible extra-record evidence because they challenge the agencies' technical and scientific conclusions (Dkt. 60-1 at 4-6). Plaintiffs respond that they offer the declarations only for non-merits equitable issues, including irreparable harm, balance of equities, public interest, and remedy (Dkt. 63 at 4-6).

In an APA case, judicial review of the merits is generally limited to the administrative record. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602-03 (9th Cir. 2014) ("*Jewell*"). The Court therefore does not consider Mack's or Faurot-Petterson's declarations in deciding whether Plaintiffs have shown a likelihood of success on the merits of their APA and ESA claims. That merits analysis is based on the administrative record. Nor may parties use extra-record declarations to provide a declarant's own interpretation of the administrative record or to challenge the correctness or wisdom of the agency's technical conclusions. *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300-01 (D. Or. 2011). The Court also does not rely on those declarations to resolve any disputed technical issue committed to the agencies' APA merits analysis.

MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 4

That limitation, however, does not require striking the declarations wholesale. Courts may consider extra-record evidence for non-merits issues, including standing, irreparable harm, balance of equities, public interest, and remedy. *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527 (9th Cir. 1997); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1106-08 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020), *aff'd sub nom. E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021). The preliminary injunction inquiry requires the Court to assess not only whether Plaintiffs are likely to succeed on the merits, but also whether the challenged activities are likely to cause irreparable harm before the Court resolves the merits. That latter inquiry is not itself an APA merits review.

Accordingly, the Court grants Perpetua's motion to strike in part. The Court will not consider Mack's and Faurot-Petterson's declarations for APA merits review or to contradict, supplement, or reinterpret the administrative record. The Court's analysis regarding Plaintiffs' likelihood of succeeding on the merits is based on the administrative record, not on the challenged declarations. The Court, however, denies the motion to the extent Perpetua seeks to exclude the declarations categorically from consideration for non-merits equitable issues, including irreparable harm, balance of equities, public interest, and remedy.

Moreover, the Court notes that declarations Defendants submitted also contain evidentiary issues. For example, some cite or recount inadmissible hearsay (Dkt. 62-3, 62-5). To the extent any of the declarations contain inadmissible evidence, the Court will not consider that information and does not need to consider it for purposes of ruling on Plaintiffs' preliminary injunction motion.

MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 5

**LEGAL STANDARD**

## I.    Preliminary Injunction

Under Rule 65 of the Federal Rules of Civil Procedure, a party may obtain injunctive relief before a final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ordinarily, preliminary injunctions may go no further than necessary to provide interim relief to the parties, and any equitable remedy must not be more burdensome to the defendant than necessary to redress the plaintiff's injuries. *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on the merits; they are likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in their favor; and an injunction is in the public interest. *Winter*, 555 U.S. at 20. Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Id.* at 24. Generally, when the Government is a party, the factors regarding public interest and equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). A plaintiff's ability to demonstrate a likelihood of success on the merits is the most important factor in determining whether a preliminary injunction should issue. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

Public interest is generally subsumed by the balance of the equities analysis when the Government is a party. *Drakes Bay Oyster Co.*, 747 F.3d at 1092. In ESA cases, equities and public

interest weigh strongly in favor of the endangered species. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090–91 (9th Cir. 2015). A plaintiff, however, must show irreparable injury to justify injunctive relief in an ESA case. *Id.* at 1091. "[T]here is no presumption of irreparable injury where there has been a procedural violation in [an] ESA case[]." *Id.* Regardless, "establishing irreparable injury should not be an onerous task for plaintiffs." *Id.*

## II.   APA

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, governs judicial review of agency actions. The APA provides that unless an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," the court must uphold the action. 5 U.S.C. § 706(2). "The arbitrary or capricious standard is a deferential standard under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("*Locke*").

The court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Jewell*, 747 F.3d at 601. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). Even where an agency's action lacks clarity, if the court can discern its reasoning and that the record adequately supports that reasoning, then the agency is not arbitrary and capricious. *Id.*; *see also San Luis & Delta-Mendota Water Autho. v. Jewell*, 747 F.3d 581, 606 (9th Cir. 2014).

An agency's action is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. "The reviewing court should not attempt itself to make up for such deficiencies: [The court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

## ANALYSIS

### I.    Likelihood of Success on the Merits

#### A.    Approval of the Project's Infrastructure

Plaintiffs argue the Court should reverse the FEIS and ROD because the Forest Service erred as a matter of law in approving the Project's off-site infrastructure, including the Burntlog Route and "gravel mines"[1] (Dkt. 32-1 at 14). Plaintiffs also argue that approval of the Burntlog Route violates the Idaho Roadless Rule, 36 C.F.R. § 294.20-29.

#### 1.    Burntlog Route Access

The Forest Service evaluated in detail two possible access routes to the mine: the Johnson Creek Route, which currently provides access to the mine, and the Burntlog Route, which Perpetua would construct to provide new access (Dkt. 31-1 at ¶ 15; Dkt. 34-1 at ¶¶ 18-23; Dkt. 41-1 at ¶ 18). According to the FEIS, the Burntlog Route would connect Warm Lake Road, Meadow Creek Lookout Road, Thunder Mountain Road, and two new road segments, totaling approximately fifteen miles (FS243748). The Forest Service approved the Burntlog Route (Dkt. 41-1 at ¶ 18).

The parties dispute whether the Forest Service applied the correct regulatory scheme to approve the Burntlog Route. In approving Perpetua's plan, the Service relied on the General

---

[1]    In their summary judgment motion, Plaintiffs also argue that the Forest Service erred in approving the transmission lines, but they do not raise this issue in support of their preliminary injunction motion.

Mining Law of 1872, 30 U.S.C. §§ 21-54, and on 36 C.F.R. Part 228 Subpart A (FS420772). The Service promulgated these Part 228A regulations under the Organic Act to implement the Mining Law. *Ctr for Biological Diversity v. United States Fish and Wildlife Serv.*, 33 F.4th 1202, 1211 (9th Cir. 2022) ("*Rosemont*"). Part 228A regulations apply to the "use of the surface of National Forest System lands *in connection with operations* authorized by the United States mining laws . . . to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1 (emphasis added).

Part 228A regulations define mining "operations" to include "[a]ll function, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, *including roads and other means of access on lands* . . . regardless of whether said operations take place on or off mining claims." *Id.* § 228.3(a) (emphasis added). Part 228A also provides for roads in other regulations. For example, § 228.8(f) governs an operator's construction and maintenance of roads. Further, § 228.12 provides that "an operator is entitled to access in connection with operations, but no road . . . shall be constructed . . . . until the operator has received approval of an operating plan . . . ."

Defendants assert the Forest Service correctly relied on the Part 228A regulations in approving the Burntlog Route. Plaintiffs disagree, arguing that the Service must also comply with 36 C.F.R. Part 251 Subpart B. The Service promulgated Part 251B regulations under Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1761-1771, which authorizes rights-of-way on public lands and empowers the Secretary of the Interior to grant permission for roads. Section 251.50 provides the scope of the regulations states that "all uses of National Forest System lands, improvements, and resources, *except those authorized by regulations*

*governing . . . minerals (part 228)* are designated 'special uses.'" 36 C.F.R. §251.50(a) (emphasis added).

As one Ninth Circuit judge has noted, the regulatory schemes under Part 251B and Part 228A are mutually exclusive because Part 251B expressly excludes activities which Part 228A authorizes. *Rosemont*, 33 F.4th at 1232 (dissent). The Forest Service "has broader regulatory authority under Part 251B than under Part 228A." *Id.* at 1128. For example, under Part 251B, the Service will only grant a special-use application if it does not create an exclusive or perpetual right, does not involve the disposal of solid waste or hazardous materials, and is not contrary to the public interest. *Id.*

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022) (quotations omitted). The starting point of the analysis is the regulation's language. *Id.* The court gives each word its ordinary, contemporary, common meaning. *Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017). "If the regulation is unambiguous, its plain meaning controls unless such reading would lead to absurd results." *United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004).

Here, the plain language of Part 228A regulations unambiguously provides for the construction of a road to access a mine. Section 228.3(a) clearly defines "operations" to include "roads and other means of access" as an activity in connection with mining. Meanwhile other Part 228A regulations govern the construction and maintenance of such a road. *See* 36 C.F.R. § 228.8(f) (governing operator's construction and maintenance of roads); § 228.12 (providing operator is entitled to access and may construct road upon approval of plan). In contrast, Part 251B expressly excludes from its scope all uses authorized under Part 228A. Based on the plain, unambiguous

language of both Part 228A and Part 251B regulations, Plaintiffs are unlikely to succeed on the merits of their argument that the Forest Service erred as a matter of law by relying on Part 228A regulations to approve the Burntlog Route.

The Court disagrees that approval of the Burntlog Route is unlawful under Part 228A regulations because "nothing in the Mining Law confers upon [Perpetua] the right to construct a second access route over federal lands" (Dkt. 32-1 at 17m 24). The Mining Law's silence about access rights does not require an existing route must be used or foreclose an alternative access route to a mining claim, and Plaintiffs cite no authority for this proposition.

Further, characterization of the Burntlog Route access as a "new" route is not entirely accurate; although it will provide new access to the mining site, at least portions of the route already exist, will be improved, and will be connected by a new portion of road. Under these circumstances, the Forest Service was within its discretion to conclude the Burntlog Route is the preferred route because it is a safer, less environmentally impactful alternative to the Johnson Creek Route, a conclusion which Plaintiffs do not challenge. (*See* FS243749) ("The Burntlog Route would avoid environmental human health and safety risks associated with the Johnson Creek Route.").

Further, Plaintiffs' reliance on *Rosemont* to argue that Part 228A regulations are inapplicable is misplaced. In that case, Rosemont had valid mining rights on land to pit mine copper. It proposed dumping 1.9 billion tons of waste rock near its pit on 2,447 acres of National Forest land. The Forest Service approved Rosemont's mining plan of operation on two separate grounds: The Service concluded that: (1) under § 612 of the Multiple Use Act, Rosement had the right to dump waste rock on National Forest land without regard to whether it had mining rights;

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 11**

and (2) under the Mining Law of 1872, Rosemont had valid mining rights on the 2,447 acres allowing it to use the land to dump waste rock.

The district court in *Rosemont* vacated the FEIS and ROD on summary judgment, and the Ninth Circuit affirmed that decision on appeal. 33 F.4th at 1202. The Ninth Circuit ruled that § 612 did not grant any rights beyond the Mining Law (which defendants conceded on appeal) and that Rosemont's mining claims were invalid under the Mining Law. *Id.* at 1208, 1214. The Court concluded that it did not know what the Forest Service would have done if it had understood the statutes' proper application. *Id.* at 1208. Namely, it did not know (1) whether the Service would have decided that Part 228A regulations under the Mining Act were applicable to Rosemont's plan, and if so (2) whether it would have construed those regulations to allow Rosemont to dump waste on the 2,447 acres for which it did not have valid claims. *Id.* It remanded to the Service to decide these issues in the first instance. *Id.*

This case is distinguishable from *Rosemont*. There is no assertion here that the Forest Service reached its decision based on an incorrect assumption about valid claims or otherwise as it did in the *Rosemont* case. Plaintiffs do not identify any such allegedly inaccurate assumption or factual conclusion. Further, unlike the scenario in *Rosemont* where the dumping on waste rock would be permanent, the Burntlog Route will be reclaimed at the Project's conclusion. Accordingly, there is no basis to conclude the Service's reliance on Part 228A regulations to approve the Burntlog Route was improper as in *Rosemont*. Accordingly, Plaintiffs are unlikely to succeed on the merits of their argument that the Service's approval of the Burntlog Route under Part 288A regulations was unlawful.

### 2. Borrow Sites

The parties likewise dispute the applicable regulatory scheme for the approval of several "borrow sites" along the Burntlog Route. The FEIS provides that "up to eight borrow sites would be established along the Burntlog Route . . . to meet construction and ongoing maintenance needs throughout the life of the mine and to support decommissioning following mine closure. Additionally, those same eight borrow areas would be utilized for staging equipment and supplies" (FS243749).

Initially, the Forest Service in its "Surface Use Determination" referenced "free use permits" for "minerals materials" under Part 228C regulations when explaining Perpetua's plan to establish the borrow sites (Dkt. 32-1 at 21) (citing FS111247 n.8). The Forest Service promulgated Part 228C regulations under the Materials Act, which was enacted to provide a method for the disposal of common variety minerals. *Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780, 785 (10th Cir. 2010). The Common Varieties Act amended the Materials Act to provide that gravel, among other minerals, is a common variety mineral. 30 U.S.C. § 611. Under these Acts and Part 228C regulations, the Forest Service may dispose of mineral materials, such as gravel. *Copar Pumice*, 603 F.3d at 785. Section 228.57 identifies how common minerals may be disposed, including through a "free use" permit. 36 C.F.R. § 228.57(a)-(e); *see also* 36 C.F.R. § 228.62 (addressing application for free use permit). "Generally, the disposal of [common variety minerals] occurs by contract let through competitive bidding." *Copar Pumice*, 603 F.3d at 786.

Later, however, the Forest Service relied on Part 228A in the FEIS and ROD to approve the borrow sites. (Dkt. 32-1 at 21 (citing FS404047); *see also* FS404062). Plaintiffs challenge the Service's reliance on Part 228A regulations, arguing it should have continued to rely on Part 228C regulations to determine whether to approve the sites. Defendants disagree that the Service relied on the wrong regulations and argues "the Service approved the use because [the borrow sites] and

the road it will support are 'reasonably incident' to extraction of antimony and gold" (Dkt. 41-2 at 20); *see* 36 C.F.R. § 228.3(a) (providing for all activities reasonably incident to mining including roads regardless of whether operations take place on or off mining claims).

The parties' dispute centers on their disparate descriptions of the borrow sites and the meaning of "disposal." Plaintiffs characterize the sites as "gravel mines" (Dkt. 32-1 at 20). They point to language in the Forest Service's Surface Use Determination stating that Perpetua "would use portable crushing and screening facilities" "to obtain proper sizing of the construction rock" (FS111247-48), and they argue that "to characterize this activity as something other than mining gravel is absurd" (Dkt. 53 at 18). Further, they contend that Perpetua's excavation, processing, and use of gravel on the Burntlog Route is the disposal of a common variety mineral within the meaning of Part 228C regulations, regardless of whether Perpetua "promises to put [the gravel] back elsewhere" (Dkt. 53 at 19).

Federal Defendants, in contrast, argue that Plaintiffs' characterization of the borrow sites as gravel mines is a wholly inaccurate description (Dkt. 34-2 at 23). They assert that the Project does not propose "gravel mines from which Perpetua will sell or otherwise dispose of sand, soil, and gravel"; rather, it proposes the "construction of an access route . . . with the reasonably incidental use of soil, sand, and gravel" from NFS lands (*id.* at 22, 24). Perpetua, likewise, argues that it will not "remov[e] or sell[] any borrow material"; "the material will remain on National Forest land to support road construction and maintenance"; "[a]fter operations cease, the borrow sources, used material, and roads will be reclaimed"; and as a result, Perpetua is "borrowing" the material rather than disposing of it; and "this use of borrow is 'reasonably incident' to the mining operation" and "falls more appropriately within the 228A regulations" (Dkt. 41-2 at 20-21).

Plaintiffs are unlikely to succeed on the merits of their argument that the borrow sites are actually gravel mines requiring approval under Part 228C regulations. Here, the Forest Service is not mining and disposing of gravel in the manner that the Common Varieties Act and Part 228C regulations contemplate. For example, the Service is not selling gravel to Perpetua and allowing it to remove gravel from National Forest land for Perpetua's commercial use. Instead, Perpetua will use gravel to construct and maintain a road necessary to the Project and that road will later be reclaimed. Under these circumstances, Plaintiffs are not likely to succeed on the merits of their argument. Rather, the road and the related borrow sites are reasonably incident to the Project. *See* 36 C.F.R. § 228.3(a) (providing for all activities reasonably incident to mining, including roads, regardless of whether operations take place on or off mining claims).

### 3. Burntlog Route and the Idaho Roadless Rule

Plaintiffs argue that the Forest Service's approval of the Burntlog Route violates the Idaho Roadless Rule, 36 C.F.R. § 294.20-29 (Dkt. 32-1 at 23). The Rule provides that "road construction and reconstruction are prohibited in Idaho Roadless Areas [except that] the Regional Forester may authorize a road to be constructed or reconstructed . . . if pursuant to statute. . . ." 36 C.F.R. § 294-23(a). Further, the Rule provides that "road construction and reconstruction are only permissible [if] the Regional Forester determines: . . . [a] road is needed pursuant to statute. . . ." *Id.* § 294-23(b).

Plaintiffs argue that because the Mining Laws do not convey "any rights to secondary access routes" and because "[c]onstruction and use of the Burntlog Route . . . requires approval under FLMPA Title V and the right-of-way regulations" (Dkt. 32-1 at 24). For the reasons discussed above, Plaintiffs are unlikely to succeed on the merits of this argument. Further, the Idaho Roadless Rule provides that "the final rule is clear that it does not intend to regulate mining

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 15**

activities conducted pursuant to the General Mining Law of 1872. The Agency has separate requirements relating to road construction and maintenance for locatable minerals at 36 C.F.R. § 228.8(f) that adequately provide for these protections." 73 Fed. Register 61456-01, 2008 WL 4580200, at *61469 (Oct. 16, 2008). Based on this language, there can be no real dispute that a road approved under the Mining Laws is exempted from the Idaho Roadless Rule.

Relatedly, Plaintiffs also argue that the Burntlog Route violates the Payette and Boise Forest Plans which provide that "road construction or reconstruction may only occur where *needed* to provide access related to reserved or outstanding rights, or to respond to statute or treaty" (Dkt. 32-1 at 28 (quoting FS3247)) (emphasis added). They focus on the term "needed"; state that the Forest Service approved the Burntlog Route because it is "associated with the 1872 Mining Law"; and argue that terms "associated" and "needed" are not the same (Dkt. at 28). Other than arguing the words "associated" and "needed" are different, Plaintiffs provide no basis to conclude that the Forest Service's approval of the Burntlog Route was unlawful. The Court finds this semantics argument unpersuasive.

In summary, Plaintiffs are not likely to succeed on the merits of their challenges to the Forest Service's approval of the Burntlog Route. They cite no authority prohibiting the Forest Service from approving an alternate route, which already partially exists and which it concluded is safer and less environmentally impactful than the existing route.

## B.    Compliance with Endangered Species Act

Plaintiffs also challenge the FWS's BiOp, including its jeopardy analyses for wolverine, bull trout, and whitebark pine and the incidental taking statements (ITSs) for wolverine and whitebark pine; they assert the BiOp violates the ESA. As discussed below, the Court concludes

Plaintiffs are not likely to succeed on the merits of their challenges to the FWS's jeopardy analyses. They are, however, likely to succeed on their challenges to the wolverine and bull trout ITSs.

Section 7 of the ESA imposes an affirmative duty on federal agencies, such as the Forest Service to prevent violations of Section 9. 16 U.S.C. § 1536(a)(2). This affirmative duty extends to "any action authorized, funded, or carried out by such agency," including authorizing mining activities on federal lands. *Id.* To determine whether an "action may affect listed species or critical habitat," the agency may be required to create a biological assessment that "evaluate[s] the potential effects of the action on listed and proposed species and . . . critical habitat and determine[s] whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12. If the agency finds evidence of an adverse impact on any issued species, it must initiate formal consultation with the FWS. 50 C.F.R. § 402.14.

If formal consultation is necessary, the FWS will issue a biological opinion summarizing the relevant findings and determining whether the proposed action is likely to jeopardize the continued existence of the species or adversely affect designated critical habitat. 16 U.S.C. § 1536(b). If so, the biological opinion must list any "reasonable and prudent alternatives" that, if followed, would not jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14. Additionally, the FWS must specify whether an "incidental taking" of protected species will occur, specifically "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of carrying out an otherwise lawful activity. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 17.3. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 17**

A determination that an incidental taking will result leads to the publication of an ITS, which identifies areas where members of a particular species are at risk. An ITS performs a specific legal function. It must (1) specify the impact of the taking on the species; (2) specify the reasonable and prudent measures (RPMs) necessary or appropriate to minimize that impact; and (3) sets forth the terms and conditions (T&Cs) with which the federal agency or applicant or both must comply to implement the RPMs. 16 U.S.C. § 1536(b)(4); *see also Arizona Cattle Growers' Assoc. v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1239 (9th Cir. 2001) (setting for ESA procedural requirements). An ITS generally sets a numerical or surrogate[2] "trigger" which, if reached, results in an unacceptable level of taking, invalidates the ESA safe harbor provision, and requires the parties to re-initiate consultation. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir. 2010). "If a surrogate is used, the agency must articulate a rational connection between the surrogate and the taking of the species." *Id.*

Plaintiffs assert the FWS's BiOp and ITSs regarding the Project's impacts on the wolverine, the whitebark pine, and bull trout habitat are "deficient" in violation of the ESA (Dkt 58-1 at 18-22). In support, they raise five arguments. First, the BioOp unlawfully "downplayed" the impacts on wolverines to reach a "no jeopardy" determination. Second, the ITS for wolverines is unlawful because it fails to include monitoring and reporting, fails to account for forms of take other than habitat loss, and fails to include RPMs and terms and conditions. Third, the BiOp's jeopardy analysis of the whitebark pine failed to add the effects of the action and cumulative effects to the environmental baseline. Fourth, the BiOp's jeopardy analysis ignored the

---

[2]     A surrogate trigger may be, for example, a change in an ecological condition affecting the species. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir. 2010).

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 18**

full extent of impacts to bull trout and failed to consider climate change effects. Fifth, the ITS for bull trout failed to include RPMs and terms and conditions and failed to set a meaningful take limit.

### 1.    The BiOp's Wolverine Jeopardy Analysis

FWS's BiOp concludes that "after reviewing the current status of North American wolverine, the environmental baseline in the action area, effects of the proposed action, and the cumulative effects, it is the [FWS's] biological opinion that the proposed action is not likely to jeopardize the continued existence of wolverine" (FWS337). Plaintiffs argue the FWS supports this conclusion with "only three paragraphs, which are riddled with errors, omissions, unsupported assumptions, and contradictions" (Dkt. 32-1 at 38). They challenge BiOp's conclusion as unlawful on three separate grounds.

### a.    Long-Term Effects

First, Plaintiffs dispute FWS's statement that "long-term effects are not expected to wolverines in the action area or statewide nor are measurable effects expected to the conservation or the recovery of the species" (Dkt. 32-1 at 39 (citing FWS-Stibnite-AR-000337)). Plaintiffs assert that this statement is "blatantly false"; it is contradicted by the record; and the Project's sixty to sixty-five-year lifetime[3] "is not short-term" (*id.*; Dkt. 58-1 at 19). Defendants respond that Plaintiffs improperly "cherry-pick[ed]" the last sentence in the FWS's conclusion summarizing its jeopardy analysis and ignore that the FWS's conclusion is "tied" to a "quantitative, scale-based analysis" (Dkt. 34-2 at 43-44; Dkt. 41-2 at 38).

---

[3]    Plaintiffs base a sixty to sixty-five-year lifetime on "20-25 years for construction and mining activities" and "up to 40 or more for monitoring and water treatment" (Dkt. 32-1 at 39).

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 19**

The Court agrees that Plaintiffs take the FWS's concluding sentence in its wolverine jeopardy analysis out of context. The FWS's analysis considered the effects of each aspect of the Project (mine site; roads; and utilities and facilities) during the Project's three phases (construction; operation; and closure and reclamation) and those effects on habitat loss; noise and disturbance; and water quality and contaminates (FWS322-35). Generally, the FWS's analysis concludes that wolverines "are sensitive to anthropogenic disturbances and development in denning habitat"; they have "low population densities and large home ranges"; they are "likely to move around the disturbance[s]"; and construction and operations are "not anticipated to impede dispersing individual's movements or affect gene flow between wolverine populations" (FWS-Stibnite-AR-000323; *see id.* (concluding effects for construction and operations the same)). Following these general findings, the FWS makes numerous specific findings, after detailed analyses, that various effects are expected to be insignificant, not anticipated, not expected, or discountable (*see* FWS-Stibnite-AR-000323--24, FWS-Stibnite-AR-000328-29, FWS-Stibnite-AR-000331-35).

Review of these findings show they are based on relevant data, and Plaintiffs generally do not argue otherwise, except for the two arguments addressed below about wolverine population size and climate change. Further, as Perpetua notes, Plaintiffs appear to confuse the duration of the effects' impact with the scope and intensity of those effects. Indeed, the FWS's analysis and its numerous findings that the effects are not significant address their scope and intensity. For that reason, FWS's use of the phrase "long-term" in its conclusion is not apropos of its specific findings. Regardless, the Court discerns that FWS means that because the effects are insignificant, long-term effects are not expected. Likewise, the Court is not persuaded that two statements the Forest Service made in the FEIS using the phrase "long-term" or "a long period of time" renders the FWS's finding that "long-term effects are not expected to wolverines in the action area or

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 20**

statewide" arbitrary and capricious (*see* Dkt. 32-1 at 39) (citing statements at FS244897, FS244959).

### b.      Population Size

Second, Plaintiffs argue that the FWS's jeopardy analysis "wholly ignored wolverine population size"; "never considered how directly or indirectly harming 16 wolverines could affect local, regional, or national populations," and "fail[ed] to properly analyze the environmental baseline" (Dkt. 32-1 at 40; *but see* Dkt. 58-1 at 19 (complaining FWS "failed to consider the impact of the Project on the *local* wolverine population")) (emphasis added). Defendants respond that the FWS addressed the population size by analyzing the baseline, status, occurrence, and effect scaling and by considering the Species Status Assessment for the North American Wolverine, March 1, 2018 (SSA) (FWS-Stibnite-AR-00023497-675) and Appendix D (FWS-Stibnite-AR-000419-46), which is attached to the BiOp and relies on the SSA (Dkt. 34-2 at 44-45; Dkt. 41-2 at 39-41).

Although the BiOp does not expressly mention the total population of wolverine in the lower forty-eight states, which is estimated to be 318, the SSA expressly identifies this number (FWS-Stibnite-AR-00023558). Further, the FWS's BiOp identified sixteen individual wolverines in or adjacent to the action area, including four within the mine site boundary and one of which was a "resident reproductive female" (FWS-Stibnite-AR-000319). Contrary to Plaintiffs' argument, the FWS did not conclude the Project will harm these sixteen individual wolverines (*see* Dkt. 32-1 at 40) (arguing FWS never analyzed or considered how harming sixteen wolverines would affect local, regional, or national populations). Rather, it concluded that "adverse effects will be limited to individual denning wolverines and their young, as dispersing and resident wolverines are expected to avoid increased human presence and move freely to other suitable and denning habitat in and beyond the action area" (FWS-Stibnite-AR-000337).

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 21**

Similarly, the FWS concluded "the loss of habitat will be localized throughout the action area" and provided the following analysis regarding the loss of denning habitat in the action area and in Idaho:

> The loss of modeled suitable and denning habitat from the proposed action will be 0.7% of all suitable and denning habitat in the action area (2,341.6 / 340,606.7). The loss of denning habitat from all proposed action activities will be 0.3% of denning habitat within the action area (779.3 / 231,053.9) and only 0.02% of all denning habitat in Idaho (779.3 / 3,431,818).

(FWS-Stibnite-AR-000336).

Plaintiffs complain that this analysis does not account for the potential effects on the national wolverine population (Dkt. 53 at 36), but as they note, making that determination is a matter of simple math: Assuming the Project caused a 100 percent take of all sixteen affected wolverine in the action area, then 5 percent of the estimated national population would be adversely impacted. The FWS, however, did not find all sixteen wolverine would be harmed. Rather, it found that "adverse effects will be limited to individual denning wolverines and their young" (FWS337). For this reason, analyzing the take of sixteen wolverines in the action area with the national population is not clear error.

Further, because FWS did not conclude the Project would cause a significant amount of take, Plaintiffs' reliance on *American Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32 (D.C. Cir. 2018), is misplaced. In that case, the D.C. Circuit concluded that the biological opinion was not legally sufficient because it did not provide "a basis for its finding of no jeopardy that the local populations are insignificant to the larger populations." *Id.* at 48. That ruling, however, was based on the biological opinion's estimate that "ninety to one hundred percent of several species" would be taken. *Id.* at 48. Here, the FWS did not make any such estimate.

### c. Climate Change

Third, Plaintiffs argue that the FWS failed "to 'add' the effects of the Project together with *future* climate effects in order to accurately assess jeopardy"; the BiOp does not "discuss the implications of climate change on wolverine habitat in and around the Project area"; and in the coming decades, the Project and climate change will harm wolverines, but the FWS failed to consider those combined effects. (Dkt. 32-1 at 42, Dkt. 53 at 37; Dkt. 58-1 at 19). Defendants dispute Plaintiffs' assertion.[4] Again, they point to the FWS's reliance on Appendix D (Dkt. 34-2 at 45; Dkt. 41-2 at 41).

Appendix D contains a detailed analysis of the effects of climate change on wolverines. The analysis focuses on climate change's impact on snow, which is an important aspect of wolverine habitat (FWS-Stibnite-AR-000317) (noting wolverines use areas in high elevations with more snow and den in snow). It relies on various scientific models to analyze snowpack and snow cover projections and to interpret future snow projections and percentage change, among other things (FWS-Stibnite-AR-000442-446). Further, it makes numerous findings including, for example, that climate change is "largely irreversible"; "[k]ey uncertainties" remain regarding whether "climate-related factors have the potential to impact wolverines at the population level in the contiguous United States"; "[w]olverine populations in the contiguous United States are small, fragmented, and relatively isolated"; "[s]mall, isolated populations are more vulnerable to extinction through interactions between environmental, genetic, and demographic factors"; "wolverine habitats are projected to become smaller and more fragmented in the future as the result of climate change and

---

[4]     For example, Federal Defendants state that "FWS grounded wolverine habitat and denning in persistent-spring-snow science, incorporated [its] climate projections, quantified and added Project effect to that climate baseline at the action-area and statewide scales, and adopted denning-season measures keyed to the same climate proxy" to explain "why the additive effects would not jeopardize the wolverine" and to reach "climate-aware jeopardy analysis" (Dkt. 34-2 at 46).

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 23**

human disturbance"; "the core attributes related to adaptive capacity exhibited by wolverines may limit the ability of this species to adapt and persist in the face of projected environmental change"; "[d]ispersal between currently occupied core habitats may become more difficult in the future with anticipated increases in human development in the valleys between the alpine core areas and increased backcountry winter recreation in core habitats; "the best available information suggests that habitat loss as a result of climate change and other stressors are likely to impact the viability of wolverines in the contiguous U.S. through the remainder of this century" (FWS 442, 445, 446).

FWS's BiOp expressly states it relies on the SSA information contained in Appendix D (FWS-Stibnite-AR-000316). Further, the BiOp analyzes the climate in the action area, including a five-mile buffer (FWS-Stibnite-AR-000317). Based on this information, FWS finds that "climate change has the potential to exacerbate effects from other stressors such as multi-lane roads, backcountry winter recreation, and human development, all of which could impact genetic diversity and small population dynamics" for the distinct population segment (DPS) of North American wolverines (*id.*). It then discusses and analyzes the wolverine habitat in the action area in the context of climate (FWS-Stibnite-AR-000317-319), and it concludes:

> The primary threats to wolverine range[-]wide are climate change and inadequate regulatory mechanisms related to climate change, and secondary threats are harvest (trapping) and small population size (USFWS 2023d, entire). The proposed action and its effects to wolverines are not considered among the primary threats to wolverine. *While the proposed action will not ameliorate threats acting on wolverine, neither will it exacerbate those threats range[-]wide.*

(FWS-Stibnite-AR-000336) (emphasis added).

In other words, FWS considered both the combined effects of the Project and ongoing climate change to find the effects of the Project will not exacerbate the threats climate change poses to wolverine. Contrary to Plaintiffs' assertion, the BiOp's analysis of the cumulative effects

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 24**

of climate change on wolverine is more than "lip service." Meanwhile, Plaintiffs do not address Appendix D's climate change analysis or cite any authority that FWS cannot rely on prior studies or incorporate them into the BiOp as an Appendix in support of its jeopardy analysis.

In summary, the Court finds that Plaintiffs are not likely to succeed on the merits of their challenge to the FWS's jeopardy analysis for wolverine. FWS examined relevant data and articulated a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. This analysis included the combined effects of the Project, including climate change. While Plaintiffs disagree with the FWS's conclusion, that disagreement is inadequate to conclude FWS was arbitrary and capricious.

### 2.     The ITS for Wolverine

Plaintiffs also challenge the ITS for wolverines. It states that the Forest Service "finds incidental take of North American wolverine is reasonably certain to occur in the form of injury and mortality via den abandonment. . . ." (FWS-Stibnite-AR-000338). It concludes, however, that "it is not practical to express the amount of this incidental take in terms of a number of individual wolverines" because "[w]olverines are not easily detected or observed in the wild"; they "may react differently to disturbance, with some being more tolerant of human disturbances than others"; and "[n]ot all female wolverines and kits . . . will be adversely impacted to the extent where take is likely to occur" (*id.*). For these reasons, the ITS relies on a surrogate take limit using acreage and states that an "incidental take will occur in the form of injury or mortality to wolverines via disturbance of 779.3 acres of denning habitat within the action area" (FWS-Stibnite-AR-000339). Plaintiffs argue "FWS's use of this surrogate was unlawful for multiple reasons" (Dkt. 32-1 at 43; Dkt. 58-1 at 19).

Plaintiffs challenge FWS's surrogate take limit on three grounds, including that ITS fails to set a clear standard for determining take exceedance, fails to quantify all types of take, and fails to specify RPMs and T&Cs adequately. For the reasons discussed below, the Court finds that Plaintiffs are not likely to succeed on the merits of their argument that FWS failed to quantify all types of take for wolverine. However, Plaintiffs are likely to succeed on the merits of their argument that the ITS fails to set a clear standard for determining take exceedance and to specify RPMs and T&Cs adequately.

### a.   Monitoring and Reporting

Plaintiffs argue the ITS "fails to include any monitoring and reporting related to the take limit in violation of the requirement that a surrogate take limit set 'a clear standard for determining when the level of anticipated take has been exceeded'" (Dkt. 32-1 at 43) (quoting 50 C.F.R. § 402.14(i)(1)(i)). Although Plaintiffs acknowledge the ITS "includes a few miscellaneous monitoring and reporting requirements," it argues "the monitoring FWS required is not in any way connected to the take limit." (Dkt. 32-1 at 44).

The Ninth Circuit addressed the adequacy of an incidental take statement in *Wild Fish*, including whether that statement had adequate monitoring requirements. 628 F.3d at 531. The statement anticipated that up to twenty threatened migratory bull trout would be injured each year during the operation of the Leavenworth National Fish Hatchery by disrupting their breeding behavior. *Id.* at 516, 531. The Ninth Circuit noted, however, that "the twenty-bull trout limit [was] not accompanied by a monitoring and reporting requirement, leaving unanswered which agency, the consulting or the action agency, was responsible for monitoring, reporting, and reinitiating consultation when the trigger was met. *Id.* at 531. Further, it noted that "the ESA's implementing regulations provide that 'in order to monitor the impacts of incidental take, the Federal agency or

any applicant must report the progress of the action and its impact on the species to the Service *as specified in the incidental take statement*.'" *Id.* (quoting 50 C.F.R. § 402.14(i)(3)). Based on this language, it ruled that "the regulation makes clear that the Service is responsible for *specifying in the statement* how the action agency is to monitor and report the effects of the action on listed species." *Id.* at 531-32 (emphasis added). Because the statement did not specify monitoring and reporting requirements, the Ninth Circuit held that it "failed to establish a meaningful trigger for renewed consultation after the take exceeded authorized levels." *Id.* at 532; *see also WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1065 (D. Mont. 2018) ("An incidental take statement must include reporting requirements that, once executed, permit the Service to determine whether reinitiation requirements have been triggered.").

Here, the wolverine ITS includes the following reporting and monitoring requirements: (1) the Forest Service shall notify the FWS "if any wolverine is observed" in the action area; (2) the FWS shall be notified "if dead, injured, or sick endangered or threatened species are detected and/or salvaged; and (3) the Forest Service "shall promptly notify the Service of any emergency or unanticipated situations arising that may be detrimental to wolverine relative to the proposed activity. As the Plaintiffs note, however, these requirements do not relate to the surrogate take of 779.3 acres. Monitoring whether a wolverine is actually taken and reporting that take will not establish whether the trigger has occurred, namely, whether more than 779.3 acres of denning habitat has been disturbed.

Defendants' responses do not resolve this problem. Perpetua argues that "the record[] imposes extensive and thorough monitoring requirements" (Dkt. 41-2). In support, Defendants point to various documents in the record, including the BiOp, the BiOp's incorporation of the draft

Environmental Monitoring and Management Plan (EMMP),[5] the Biological Assessment, and the ROD (Dkt. 34-2 at 47-48; Dkt. 41-2 at 51). None of these documents, however, explain how denning habitat acreage will be monitored and reported to determine if the trigger has occurred and who will do that monitoring and reporting.[6] Moreover, contrary to *Wild Fish*, whatever guidance is contained within these documents, it is not specified in the ITS. 628 F.3d at 531-32 (quoting 50 C.F.R. § 402.14(i)(3) and ruling incidental take statement must specify monitoring and reporting in statement). For this reason, Plaintiffs are likely to succeed on their argument that the ITS does not establish a meaningful trigger for renewed consultation.

b.       **Quantification of All Takes**

Second, Plaintiffs argue that "ITS violates the ESA if it sets a take limit based on only some types of take but fails to quantify the amount of other types of take (Dkt. 32-1 at 44; Dkt. 58-1 at 19). Specifically, Plaintiffs contend the ITS fails to account for take associated with human presence, noise, light, collisions, and grooming the Cabin Creek Road (Dkt. 32-1 at 45; Dkt. 58-1 at 20). As noted above, the Forest Service finds incidental take of wolverine "is reasonably certain to occur in the form of injury and mortality via den abandonment (FWS-Stibnite-AR-000338). The ITS notes the "footprint of human activity" will be responsible for this harm (FWS-Stibnite-AR-

---

[5]      The EMMP is located at FWS2119-2179.

[6]      On reply, the Federal Defendants explain that "the BiOp provides that an Interested Agency Review Board (including FWS) will provide oversight of the Project's environmental compliance and will receive and review proposed-action design reports, *as-built drawings*, and monitoring reports—all mechanisms that, as a practical matter, capture and verify the ground-disturbance footprint relevant to ITS's acreage-based surrogate" (Dkt. 56 at 26) (citing FWS129-30). This language, however, does not require consideration of the trigger for renewed consultation.

000329). It describes these adverse effects to be primarily noise, lighting, collision, and winter recreation and notes that both the Burntlog Route and Cabin Creek Road will contribute to these effects (FWS-Stibnite-AR-000329-30).

Notably, the ITS does not attribute adverse effects to the Cabin Creek Road that are distinct from those attributable to the operation otherwise. Rather, the Cabin Creek Road will, like other aspects of the operation, contribute to human disturbances like road traffic, noise, lighting, and winter recreation. These are the same adverse effects associated with human presence likely to cause an incidental take in the form of den abandonment.

Contrary to Plaintiffs' assertion, this case is factually distinct from *Ctr. For Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020). In that case, the Ninth Circuit addressed the construction of an offshore oil drilling and production facility on threatened polar bears. *Id.* at 731, 741. FWS's biological opinion provided a numerical cap on the amount of take, namely, "injury or death to one or more polar bear triggers re-consultation." *Id.* at 749. FWS also "contemplated that nonlethal harassment of polar bears may raise to the level of 'take.'" *Id.* It did not, however, quantify the amount of take that harassment might cause. *Id.* Because FWS contemplated that harassment as a trigger for re-consultation but did not quantify the related nonlethal take, the Ninth Circuit held that the incidental take statement was arbitrary and capricious in violation of the ESA. *Id.* at 750.

Here, in contrast to *Bernhardt*, FWS did not provide a numerical cap on the amount of take but rather concluded it was impractical to quantify a numerical take (FWS-Stibnite-AR-000338). Instead, as noted, it used a surrogate take quantified in acreage, determining that "incidental take will occur in the form of injury or mortality to wolverines via disturbance of 779.3 acres of denning habitat within the action area" (FWS-Stibnite-AR-000339). Because the Cabin Creek Road

MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 29

presents the same adverse effects as the other aspects of the operation—human disturbance causing den abandonment—it is not another type of take; rather, it is the same type of take. Accordingly, FWS reasonably included the acreage associated with the Cabin Creek Road in the total take acreage of 779.3, a number which Plaintiffs do not challenge.

For these reasons, Plaintiffs are not reasonably likely to succeed on the merits of their argument that FWS did not quantify take related to the Cabin Creek Road. Moreover, Perpetua represents that limited critical path activities identified in response to Plaintiffs' preliminary injunction motion will not involve any activity on the Cabin Creek Road.

### c.      RPMs

Third, Plaintiffs argue that the ITS "failed to include any reasonable and prudent measures and associated terms and conditions to minimize take" (Dkt. 32-1 at 46). The ESA provides that after the FWS consults with the Forest Service and concludes the taking of an endangered species is authorized, the FWS "shall provide [the Forest Service] and the applicant . . . with a written statement that--(i) specifies the impact of such incidental taking on the species [and] (ii) specifies those reasonable and prudent measures [the FWS] considers necessary and appropriate to minimize that impact. 16 U.S.C. § 1536(b)(4)(C)(i), (ii). Further, the applicable regulations provide that the FWS "will provide with [its] biological opinion a statement concerning incidental take that . . . [s]ets forth the terms and conditions (including, but not limited, to reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified. . . ."

Despite the requirement that FWS provide the Forest Service and Perpetua a written statement specifying RPMs and T&Cs to implement them, the wolverine ITS provides that:

7.6.3 Reasonable and Prudent Measures

> The Service [FWS] finds that compliance with the proposed action outlined in the Assessment, including proposed environmental design features [EDFs], is essential to minimizing the impact of incidental take of wolverines. If the proposed action, including EDFs, is not implemented as described in the Assessment and this Opinion, there may be effects of the action that were not considered in this Opinion, and reinitiation of consultation may be warranted.

> The Service [FWS] believes the measures proposed by the Forest [Service] are sufficient to minimize potential impact to North American wolverine caused by the proposed action.

(FWS-Stibnite-AR-000339).

Plaintiffs argue this language fails to adequately specify RPMs and T&Cs. In support, they rely on *Ctr. for Biological Diversity v. Culver*, No. 21-cv-07171-SI, 2024 WL 4505468, (N.D. Cal. Oct. 22, 2024) (Dkt. 32-1 at 46). In that case, a district court addressed the Bureau of Land Management's (BLM) approval of land management plans designating off-highway vehicles routes in the Western Mojave Desert where threatened desert tortoise live. *Id.* at *1. Plaintiffs challenged the ITS for tortoise because, among other things, it did not contain any RPMs or T&Cs to implement those measures. *Id.* at *64. Defendants argued in response that there is no legal requirement that the ITS must contain RPMs and T&Cs, but rather those items are entirely discretionary. *Id.*

The *Culver* court rejected Defendants' arguments as contradicted by the plain language of the ESA and implementing regulations. *Id.* First, the court concluded that while § 1536(b)(4)(C)— "confers discretion on the FWS to determine *what* the RPMs and T&Cs are ([i.e.,] 'measure that the Secretary considers necessary and appropriate to minimize [an incidental taking] impact'), the statute imposes a mandatory duty to provide ('shall provide') a 'written statement' that contains the elements set forth in subsection (C)(i)-(iv)." *Id.* Second, the court concluded the implementing regulation, 50 C.F.R. § 404.14(i), requires that an ITS contain RPMs and T&Cs. *Id.* Third, it found

this conclusion was in accord with both Ninth Circuit case law and with the FWS's ESA Handbook (*Id.* at \*65) (citing *Or. Nat. Resources Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007)). Accordingly, the court rejected defendants' argument that "RPMS and terms and conditions were not necessary because they were 'baked into' the project." *Id.*

Defendants argue that the ITS in this case is distinguishable because, unlike the ITS in *Culver* which contained no RPMs or terms and conditions, the wolverine ITS includes RPMs and terms and conditions by "cross-referencing" or "incorporating" the EDFs in the Forest Service's biological assessment (Dkt. 34-2 at 49-50; Dkt. 41-2 at 51-52). Defendants assert that under § 1536(b)(4)(C) and *Loper Bright v. Raimondo*, 603 U.S. 369 (2024), "Congress delegated discretion to FWS to identify those measure that *FWS*—not Plaintiffs—deem necessary or appropriate, and Congress placed no other limits on FWS's decision-making" (Dkt. 34-2 at 50).

The Court agrees with Defendants that FWS has discretion to determine the required RPMs and T&Cs. Likewise, the *Culver* court appears to agree. *See* 2024 WL 4505468 at \*64 (noting ESA "confers discretion on FWS to determine *what* the RPMs and terms and conditions are"). That the FWS has this discretion, however, begs the question of whether it must specifically articulate the RPMs and terms and conditions in the ITS. The *Culver* court's analysis supports the proposition that FWS shall specify these items in the ITS. As a practical matter, requiring FWS to include these prospective items specifically in the ITS is better practice than requiring the Forest Service and Perpetua to hunt and peck through the biological assessment for EDFs, which Defendants contend are the RPMs and terms and conditions in this case. For these reasons, the Court finds Plaintiffs are likely to succeed on the merits of their argument that the wolverine ITS fails to adequately specify RPMs and T&Cs.

### 3.    The BiOp's Jeopardy Analysis for Bull Trout

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 32**

Plaintiffs challenge FWS's jeopardy analysis for bull trout under the ESA. Bull trout are a threatened species which inhabit streams in the action area, including the upper East Fork of the South Fork of the Salmon River (Dkt. 31-1 at ¶¶ 34-35). FWS's BiOp concludes that "after reviewing the current status of bull trout, the environmental baseline in the action area, effects of the proposed action, and cumulative effects, it is [FWS's] biological opinion that the proposed action is not likely to jeopardize the continued existence of bull trout (FWS261). Plaintiffs assert this conclusion violates the ESA. In support, they argue that FWS's jeopardy analysis "ignor[es] the full extent of impacts to bull trout" and that it fails "to consider claim change effects to bull trout" (Dkt. 32-1 at 49-50).

### a.    Extent of Impact

Plaintiffs argue that FWS based its jeopardy analysis on "incomplete arithmetic" (Dkt. 58-1 at 21). They characterize the analysis as relying on "a fictitious assertion" that the Project will "only impact 402 bull trout" and "comparing that number to the state-wide bull trout population" (Dkt. 32-1 at 50). Specifically, they focus on the statement in the analysis's conclusion that:

> The proposed action is expected to result in injury and mortality to 629 bull trout (402 in the Stibnite project area and 227 in the Lemhi restoration project area). In Idaho, it is estimated that there are 1.13 million bull trout within all recovery units. The potential loss of 629 bull trout represents 0.06% of bull trout in the State.

(Dkt. 53 at 45) (citing FWS-Stibnite-AR-000262)) (citation omitted). They contend that 402 injured or killed bull trout includes only one category of take, i.e., fish handling, and ignores the remaining four categories: habit loss, sediment delivery, chemical contaminants, and physical barriers (Dkt. 32-1 at 49; Dkt. 53 at 45).

Defendants dispute Plaintiffs' characterization of FWS's jeopardy analysis, arguing it is based on comprehensive, detailed science. Defendants explain that FWS used individual numbers

to identify fish handling because literature identified the mortality percentage for electrofishing (i.e., the process of temporarily stunning fish to handle them) and that although "the science did not exist to allow FWS to identify mortality with the same precision" in other categories of take, it identified those other categories and analyzed the anticipated mortality (Dkt. 34-2 at 53; *see also* FWS-Stibnite-AR-000270 (calculating 402 and 227)). Further, they assert that "Plaintiffs rely on selective citations and ignore the record demonstrating that FWS [considered] comparisons to core-area, recovery-unit, *and* rangewide bull trout populations (Dkt. 41-2 at 47).

The Court finds that Plaintiffs are not likely to succeed on the merits of their argument that FWS did not consider the full extent of the Project's impact on bull trout. Plaintiffs focus on two sentences in the conclusion of FWS's jeopardy analysis is not an accurate characterization of the record. For example, contrary to Plaintiffs' assertion, FWS analyzed anticipated take from habitat loss, including increased stream temperatures (FWS-Stibnite-AR-000263-42); sediment delivery (FWS-Stibnite-AR-000265-66); chemical contaminants, including copper, arsenic, antimony, mercury (FWS-Stibnite-AR-000266-67); physical barriers (FWS-Stibnite-AR-000267-68), and fish handling and salvage in the Stibnite Project Area and Lemhi Restoration Project Area (FWS-Stibnite-AR-000268-74). In some instances, FWS quantified the take (*see* FWS-Stibnite-AR-000214 (potential take of 111 bull trout); FWS264 (estimate take of 32 bull trout); FWS-Stibnite-AR-000265 (estimate take of 155 bull trout)). FWS summarized these and other adverse effects in Table 42 (FWS-Stibnite-AR-000256-260).

Further, the Court disagrees that FWS limited its analysis to a comparison to a statewide impact. Rather, FWS concluded that "adverse effects from the proposed action are localized and limited to . . . the Upper EFSFSR, Sugar Creek, Burntlog Creek, Trapper Creek, and Riordan Creek local populations, which represent 5 out of 27 local populations (18.5%) in the core area. . . . For

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 34**

these reasons, [FWS] does not anticipate effects to the survival and recovery of the South Fork Salmon River core area, Upper Snake recovery unit, or the coterminous rangewide population" (FWS262; *see also* FWS260 ("[FWS] does not expect effects at the South Fork Salmon River core area, Super Snake recovery unit, or rangewide levels.")). FWS analyzed these areas at length, including "stream or stream complexes," population numbers, migration behaviors, and other stream-by-stream conditions (FWS-Stibnite-AR-000137-44). For these reasons, the Court discerns that FWS did not limit its analysis to a fish-handling take of 402 bull trout in the Project area compared to the bull trout statewide population as Plaintiffs assert.

b.    **Climate Change**

Plaintiffs also challenge FWS's jeopardy analysis for failing to assess "bull trout impacts in relation to stream temperature and climate change" (Dkt. 58-1 at 21). Regarding climate change, the BiOp provides:

> Because the operating lifetime of the proposed action will be approximately 15 years following a three-year construction period, effects of climate change during the operating lifetime will be limited by that duration. Therefore, there is less potential for climate change to affect proposed action operational components than components associated with mine closure and restoration. As such, the climate change risks associated with the post-closure components of the proposed action were prioritized and incorporated into the designs of the restored stream channels and their associated riparian shading so that the stream channels will respond to variable climatic conditions in a manner similar to natural drainages.

(FWS-Stibnite-AR-000164). Further, the BiOp applies NOAA Fisheries' climate-resilience guidance and uses  the Bureau of Reclamation's West-Wide Climate and Hydrology Assessment (BOR 2021, entire) to forecast future trends in stream flow and temperature as affected by climate change through 2100 (*id.*). The BiOp finds that "based on this assessment, the effects of climate change will primarily manifest as the following risk pathways[:] drier dry extremes, decreased minimum flows, runoff starting earlier in the year, increased water temperature, and increased wildfire effects,

which will significantly decrease the quality of bull trout habitat over time" (FWS-Stibnite-AR-000165).

Plaintiffs criticize FWS's climate change analysis because its "[s]tream temperature modeling . . . *omits*, climate change dynamics" (Dkt. 58-1 at 21). In support, they rely on *Willamette Riverkeeper v. Nat'l Marine Fisheries Serv.*, 763 F. Supp. 3d 1203 (D. Ore. 2025), and *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224 (E.D. Wash. 2016). In both cases, the district court ruled the National Marine Fisheries Service's (NMFS) biological opinions were arbitrary and capricious because they failed to consider the potential effects of climate change on stream flows. *Willamette Riverkeeper*, 763 F. Supp. 3d at 1237; *Wild Fish*, 221 F. Supp. At 1234.

In *Willamette Riverkeeper*, the court addressed NMFS's BiOp regarding the release of hatchery-raised summer steelhead and considered the plaintiffs' argument that the "BiOp fail[ed] to evaluate how the projections of 'serious implications' from climate change will affect already depressed winter steelhead populations in degraded habitat." 763 F. Supp. 3d at 1237. The BiOp stated that "climate change is 'projected to have serious negative implication'" for steelhead; "conditions . . . 'are going to change substantially' in the next 100 years, including higher temperatures, less precipitation, less snow, earlier snowmelt, and possible storm increases"; "climate change will cause even greater increases in stream temperatures"; and "'expected effects of climate change will only worsen' key limiting factors related to freshwater habitat, including 'summer time water quality issues and poor overwinter survival of fry.'" *Id.*

For these reasons, the BiOp in *Willamette Riverkeeper* concluded that "the winter steelhead will be impacted by climate change, but that due to their life history and distribution, effects are not likely to be extreme as for Spring Chinook." The court ruled that this explanation was "insufficient to describe the effects of climate change on the winter steelhead" because it failed "to

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 36**

evaluate the consequences to winter steelhead of projected worsening conditions" and "to put into the calculus the winter steelhead population numbers and assess whether they can sustain impacts from the release of hatchery summer steelhead on top of climate change effects." *Id.* at 1237-38 (cleaned up).

The court in *Wild Fish* considered whether NMFS's BiOp in that case adequately considered climate change in analyzing the effects of the Leavenworth National Fish Hatchery on Chinook salmon and steelhead in Icicle Creek. 221 F. Supp. 3d at 1233. In analyzing climate change, the BiOp included "a detailed discussion of the effects of climate change"; used "models [to] predict a significant reduction in total snowpack and low-elevation snowpack, affecting streamflow and water temperatures"; but "used historical stream-flow data from 1994 to 2014 in the analysis." When the plaintiffs challenged this analysis, the defendants responded that NMFS did not need to consider climate change in its analysis." *Id.* The court rejected this argument, stating that "the problem here is that NMFA included no discussion whatsoever of the potential effects of climate change in the BiOp's analysis of the Hatchery's *future* operation and water use" *Id.* (emphasis added). Rather, "NMFS discusse[d] the effects of climate change generally and then proceed[ed] with analysis on the apparent assumption that there will be no change to the hydrology of Icicle Creek." *Id.* 1233-34. The court ruled that NMFS's conclusion that "climate change is less likely to affect Icicle Creek analysis" was "conclusory and unconnected to the analysis of the Hatchery's operation and water use.

In response to Plaintiffs' argument that the FWS's stream temperature model omits climate change dynamics, Defendants respond that FWS "acknowledged model uncertainties and limitations"; "noted greater uncertainty for later-year predictions"; "required added monitoring and measures during the closure and reclamation phases" because of the uncertainty; and

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 37**

"concluded that, although some effects persist more than 20 years at the mine site, effects at the core habitat use area/core habitat unit scales are localized and 'insignificant'" (Dkt. 34-2 at 54-56). Further, they respond that FWS "acknowledged model uncertainties and limitation" and used assumptions likely to overestimate rather than underestimate the effects "to account for the kinds of uncertainties inherent in long-range climate to bull trout" (Dkt. 34-2 at 55; Dkt. 41-2 at 49 (citing FWS168 (acknowledging uncertainties and adopting "reasonably cautious and prudent approach for assessing impacts" by overestimating rather than underestimating impacts); *see also* FWS-Stibnite-AR-000173-75 (discussing uncertainties)).

This case is distinguishable from *Willamette Riverkeeper* and *Wild Fish*. Unlike NMFS in those cases, FWS considered the future impact of climate change, acknowledged uncertainties in determining those impacts, and overestimated effects because of those uncertainties. The Court concludes that FWS examined relevant data and articulated a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

In summary, the Court finds that Plaintiffs are not likely to succeed on the merits of their challenge to the FWS's jeopardy analysis for bull trout. FWS examined relevant data and articulated a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. This analysis included the extent of impacts and combined effects of the Project, including climate change. While Plaintiffs disagree with the FWS's conclusion, that disagreement is inadequate to conclude FWS was arbitrary and capricious.

### 4.    The ITS for Bull Trout

Plaintiffs also challenge the ITS for bull trout violates the ESA. In support, it raises two arguments. First, they assert that the ITS failed to include RPMs and T&Cs to minimize take of bull trout (Dkt. 32-1 at 53). Second, they assert the ITS provides an inadequate temperature take

limit (*id.* at 54). The Court finds that Plaintiffs are likely to succeed on the merits of these two arguments.

### a.    RMPs and Terms and Conditions

The bull trout ITS sets forth nine RPMs and related T&Cs (FWS-Stibnite-AR-000275-76). Plaintiffs characterize the RPMs as "bald statement[s] that take be minimized without providing any direction how to do so" (Dkt. 32-1 at 61) and the T&Cs as "merely require[ing] [the] development of a monitoring plan" (Dkt. 53 at 49). Plaintiffs' description of the ITS is apt.

The RPMs are simple declarative sentences such as "minimize the take resulting from sediment delivery" and "minimize the potential for incidental take from physical barriers (*see* FWS-Stibnite-AR-000275-76). The ninth RPM, however, provides "Ensure activity compliance through implementation of Environmental Design Features" as detailed in Appendix B of the Forest Service's Biological Assessment (FWS-Stibnite-AR-000276).

Appendix B is lengthy (fifty-six pages) and provides some definitive details about certain measures but leaves others unresolved (*see* FS13859-915; *compare, e.g.*, FS153863 ("During operations, Perpetua *will implement* measures to monitor stream flows and water quality conditions at key locations as defined in Table 4-1 of the Water Resources Monitoring Plan") *with* FS153871 ("At one week prior to the spawning period, if adults present in the resting pool below the fishway have not entered the fishway over a 48-hour period and proceeded up the fishway[,] they will be collected and transported upstream without further delay.")). Further, measures are mixed in with explanations of plant operations, making clear directives difficult to locate (*see, e.g.*, FS153871 (discussing turbidity).

Contrary to the RPMs, some of the T&Cs are specific, for example the T&C regarding electrofishing is very specific (FWS-Stibnite-AR-000277). Several T&Cs, however, only

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 39**

contemplate the development of a plan and refer to tables which appear either in the BiOp or in the Forest Service's Biological Assessment, including the T&Cs for baseflow depletions, stream temperatures, sediment delivery, and chemical concentrations (FWS-Stibnite-AR-000276). These T&Cs generally refer to tables either within the BiOp or in the Forest Service's Biological Assessment (*id.*).

Defendants assert that they may generally incorporate by reference other record documents to specify RMPs and T&Cs (Dkt. 34-2 at 56; Dkt. 41-2 at 54). For example, the Federal Defendants claim the RPMs and T&Cs "adopted specific design measures from the Forest Service's biological assessment and impose enforceable, not-to-exceed performance standards (Dkt. 34-2 at 56) (citing generally to ITS at FWS-Stibnite-AR-000275-78 which, in turn, cites to other documents throughout the record). Similarly, Perpetua argues that there are "[d]ozens of 'environmental design features" that FWS "plainly concluded [were measures] essential to minimize take and other impacts" (Dkt. 41-2 at 54) (citing FWS128-33 (BiOp providing partial summary of Appendix B). In support, Perpetua cites the Water Quality Protection section of its Fisheries and Aquatic Resources Mitigation Plan, which the ITS does not appear to incorporate (Dkt. 41-2 at 54).

FWS's trout bull ITS suffers from the same defects as its wolverine ITS. The ESA imposes a mandatory duty on FWS to provide a written statement containing the elements in 16 U.S.C. § 1536(b)(4)(C), including to specify RPMs and set forth T&Cs. *See Culver*, 2024 WL 4505468, at *64-65 (explaining concluding statute, regulations, Ninth Circuit case law, and FWS's ESA Handbook require this conclusion); *see also* 50 C.F.R. § 404.14(i) (requiring agency to specify RPMs and T&Cs). That Defendants can identify statements in the record that might support or flesh out the ITS's RPMs and T&Cs does not satisfy FWS's mandatory duty. Again, Perpetua's arguments that "nothing in the ESA or its regulations requires FWS to impose any particular 'terms

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 40**

and conditions'" and "the ESA leaves the choice of *which* terms to impose to the agency's well-informed discretion" (Dkt. 41-2 at 53) beg the question of whether the chosen provisions are adequately specified in the ITS. Further, Perpetua's argument that "adaptive management is a recognized, effective tool to minimize take" (*id*.) ignores that the "monitoring plans" to which the T&Cs refers have yet to be developed and articulated.

### b.    Temperature Take

The ITS provides a surrogate take limit for bull trout based on water temperature. It states that "authorized take will be exceeded if measured increases in water temperature, which we will use as a surrogate for quantifying the take of individual bull trout, exceed the predicted increases in water temperature in each of the affected stream reaches shown in Table 35" (FWS-Stibnite-AR-000265). Table 35 identifies four streams and shows the stream flow changes for those streams (FWS-Stibnite-AR-000215). In turn, the T&Cs provide that a monitoring plan will be developed "to ensure that stream temperatures do not exceed the predicted temperatures described for each affected stream reach during the construction, operation, and post-closure mine phases as shown in Table 24" (FWS-Stibnite-AR-000276). Table 24 identifies seven streams and the maximum weekly temperature for each in July and September during the mine years 6, 12, 18, 22, 27, 32, 52, and 112 (FWS-Stibnite-AR-000178).

Plaintiffs challenge this take limit as inadequate, noting that "there are major gaps between take limit checkpoints, ranging from 5-year gaps to as long as a 60-year-gap" and that "if stream temperature rises above acceptable levels soon after the Project starts or soon after one of the checkpoints," the limit would not be triggered for five years or more (Dkt. 32-1 at 54). Plaintiffs argue that this surrogate trigger violates 50 C.F.R. § 402.14 (*id.*).

Defendants provide a somewhat incomprehensible response. Federal Defendants' brief highlights the problem with the ITS's take limit: It represents that the "ITS expressly stated that 'authorized take will be exceeded if measured increases in water temperature . . . exceed the predicted increases in water temperature in each of the affected stream reaches show in [the tables]'"[7] (Dkt. 34-2 at 57 (citing FWS265). They argue "[t]hat is a continuous trigger based on field measurements" (*id.*) In support, they identify other tables, including Table 24 and some in the Biological Assessment apparently not mentioned in the ITS (Dkt. 34-2 at 58).

For the reasons discussed above, the Court finds that Plaintiffs are likely to succeed on their arguments that FWS failed to adequately specify the RPMs and T&Cs, including for ensuring the stream temperatures do not exceed the take limit.

### 5.     The BiOp's Jeopardy Analysis for Whitebark Pine

Whitebark pine is a wide-ranging five-needle pine found at cold and windy high elevations across western North America and is a threatened species (FWS-Stibnite-AR-000299). FWS concluded that the Project "is not anticipated to produce measurable effects on current blister rust infections or mountain pine beetle activity in the action area" and that the Project's effects "are not considered among the primary stressors to whitebark pine and are not expected to exacerbate the species' primary stressors at the population level." (FWS-Stibnite-AR-000314).

Plaintiffs challenge FWS's jeopardy analysis for whitebark pine under the ESA. They argue that "the BiOp simply recites the primary threats to whitebark pine, including climate change, blister rust, pine beetle, and altered fire regimes"; "assesses the Project's impact's in isolation from those threats"; and fails to "'add' the effects of the action, cumulative effects, and

---

[7]     The language replaced by the bracketed language is only Table 35, described above.

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 42**

the environmental baseline to assess jeopardy" as required by 50 C.F.R. § 402.14(g)(4) (Dkt. 58-1; *see also* Dkt. 32-1 at 47-48). Defendants respond that FWS did not consider Project effects in isolation. Rather, FWS identified the existing stressors affecting whitebark pine, evaluated the Project's additional effects on individual trees, occupied habitat, modeled suitable habitat, seedlings, seedbanks, the Burntlog Route, and associated borrow sources, and considered environmental design features intended to avoid or minimize those effects. (FWS-Stibnite-AR-000307 to 000309, 000312, 000314 to 000315).

At this stage, Plaintiffs have not shown they are likely to succeed on that challenge. The ESA required FWS to evaluate the Project's effects in light of the species' status and environmental baseline; it did not require FWS to use any particular formulation or perform a separate arithmetic summation of every existing stressor and Project effect. The BiOp reflects that FWS considered both the existing stressors and the Project's additional effects, and then explained why it concluded those effects would remain localized and would not affect whitebark pine numbers, reproduction, or distribution at the action-area, Forest, analysis-unit, or rangewide scales. (FWS-Stibnite-AR-000307 to 000309, 000312, 000314 to 000315).

For these reasons, the Court finds Plaintiffs are not likely to prevail on their challenge to FWS's whitebark pine jeopardy analysis. Although Plaintiffs may disagree with the weight FWS gave those effects, FWS is entitled to deference to weigh of the effects and scale consequences. Plaintiffs' disagreement with FWS's conclusion is not a basis to conclude FWS was arbitrary and capricious.

### B.    Imminent Irreparable Harm

Although Plaintiffs have shown some likelihood of success on the merits regarding defects with FWS' wolverine and bull trout ITS, Plaintiffs must still make a clear showing that irreparable

harm is likely absent preliminary relief. *Winter*, 555 U.S. at 7, 22, 24; *Lopez*, 680 F.3d at 1072. As previously noted, there is no presumption of irreparable harm from an ESA procedural violation. *Cottonwood*, 789 F.3d at 1091. The relevant question is, therefore, not whether Plaintiffs have identified deficiencies which FWS may need to correct, but whether the critical-path activities which Perpetua proposes to undertake beginning on May 30, 2026, are likely to cause imminent irreparable harm.

### 1.    The ITS Defects Do Not Themselves Establish Irreparable Harm

The Court's analysis of Plaintiffs' likelihood of success on the merits identifies issues with the bull trout and wolverine ITSs, and it focuses its imminent irreparable injury analysis on those issues. Because the Court has not found Plaintiffs likely to succeed on their whitebark pine no-jeopardy challenge, alleged interim harm to whitebark pine does not support preliminary injunctive relief.

For wolverine, the likely defect is that the ITS does not specify monitoring and reporting requirements tied to the 779.3-acre denning-habitat surrogate and does not specify RPMs and T&Cs sufficient to make the take authorization operational. For bull trout, the likely defects include the temperature-surrogate defect and T&Cs that defer key compliance details to future monitoring plans that will be developed or rely on environmental design features, best management practices, or other Project measures without clearly specifying these provisions in the T&Cs.

A likely ITS defect is not the same as likely irreparable harm, however. The BiOp has been issued and remains operative. The Court is not vacating it at this preliminary stage. If Plaintiffs prevail on the merits, the Court will determine the proper final remedy, including whether vacatur, remand without vacatur, clarification, or other relief is appropriate. *See California Communities*

*Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992–94 (9th Cir. 2012); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 944–45 (D. Or. 2016); *see also Willamette Riverkeeper*, 763 F. Supp. 3d at 1203. However, if the only issue on which Plaintiffs prevail on the merits is that the ITSs fail to adequately specify RPMs and T&Cs, the Court will not likely vacate the BiOp because the information necessary to specify those items appears to be in the BiOp or administrative record already. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (noting courts consider "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed.").  Resolving the defects appears to be a matter of summarizing the information under the appropriate headings in the BiOp whereas vacatur would immediately disrupt the existing regulatory framework while that correction is made.

For purposes of a preliminary injunction, the question is whether Plaintiffs have shown that Perpetua's interim work, which it has identified as critical-path activities, is likely to cause irreparable harm notwithstanding the existing ITSs, FWS's no-jeopardy findings, and the protective measures in the BiOp and the administrative record. That posture matters because Section 7 of the ESA permits incidental take where FWS has concluded the action is not likely to jeopardize the species and where the action agency and the applicant comply with the ITS. 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i). A likely ITS defect may mean the ITS must be corrected before activities beyond those which Perpetua has identified as critical-path activities may proceed. It does not follow that every take authorized under the existing ITS is irreparable harm for purposes of injunctive relief under Rule 65.

To be clear, the Court is not ruling that an injury to an individual listed species can never be irreparable. The Ninth Circuit does not require an extinction-level threat before ESA injunctive

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 45**

relief may issue. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994); *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785–87 (9th Cir. 1995). But Plaintiffs must still show a definitive and likely future harm, not merely a speculative harm. *Nat'l Wildlife Fed'n*, 23 F.3d at 1512.

Here, the no-jeopardy findings are not dispositive, but they are highly relevant. To "jeopardize the continued existence" of a listed species means to engage in an action reasonably expected to reduce appreciably the likelihood of both survival and recovery by reducing reproduction, numbers, or distribution. 50 C.F.R. § 402.02. The Court has found Plaintiffs are not likely to succeed on their challenges to FWS's no-jeopardy analyses. Accordingly, at this stage, the administrative record continues to support FWS's technical conclusion that the Project's anticipated effects, including authorized incidental take and the incorporated protective measures, are not likely to appreciably reduce the survival or recovery of the threatened species.

### 2.    Plaintiffs Have Not Shown Likely Interim Harm to Wolverine

Plaintiffs have shown that Perpetua intends to begin physical work in the action area and that FWS analyzed access-road construction and Burntlog geophysical investigation as part of a Project component that will disturb wolverine denning and suitable habitat. FWS found that access-road construction and geophysical investigation would disturb 427 acres of wolverine denning and suitable habitat, including 332.6 acres of denning habitat, and used disturbance of 779.3 acres of denning habitat as the wolverine take surrogate. (FWS-Stibnite-AR-000323 to 000324; FWS-Stibnite-AR-000338 to 000339).

That Project-component showing does not establish likely imminent harm from the specific interim work. Plaintiffs have not connected Perpetua's identification of critical-path activities to begin on May 30, 2026, to the specific mapped denning-habitat areas used for the surrogate. They

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 46**

have not provided a segment-by-segment overlay, construction-sequencing map, acreage calculation, or declaration showing which portions of work to begin on May 30 will occur in denning habitat, how much surrogate acreage will be disturbed, or when any such disturbance will occur.

The materials Plaintiffs cite show why they are concerned about the Burntlog Route generally. FWS's persistent-spring-snow-cover analysis explains how denning habitat was modeled, and the route maps show the general Burntlog alignment. (FWS-Stibnite-AR-000317 to 000318; FS-250050). Those materials do not identify which imminent work areas overlap denning-habitat pixels or surrogate acreage. Perpetua's activity-specific evidence reinforces the gap: the Burntlog geotechnical investigation is described as approximately 0.6 acres of disturbance at discrete locations, some of which are near water or wetlands, but Plaintiffs have not shown those locations overlap wolverine denning habitat. (FS-153477). Similarly, Plaintiffs have not shown that other near-term road, borrow, camp, or facility work will disturb denning-habitat surrogate acreage in a manner likely to cause imminent harm. (Dkt. 62 at 13-14; Dkt. 62-1 ¶ 12; Dkt. 62-2 ¶¶ 6, 13-18).

Plaintiffs also have not shown likely imminent den abandonment. FWS stated that geophysical investigation along the Burntlog Route will occur from June through November before road construction and does not overlap with the wolverine denning period, and that pile burning for road construction will occur outside the January 15 to May 15 denning season. (FWS-Stibnite-AR-000323 to 000324). Because FWS used denning-habitat disturbance as a surrogate, Plaintiffs did not need to prove active den abandonment if they could show imminent disturbance of surrogate habitat. But they have not made that more targeted showing either.

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 47**

The defect with the wolverine ITS does not fill the gap. That defect may require FWS to clarify or supplement the ITS for future work activities. But Plaintiffs have not shown that, during the interim period, Perpetua will likely disturb denning-habitat acreage counted toward the surrogate in a manner causing irreparable harm to wolverine. Regardless, Perpetua has committed to reporting the acreage of denning habitat disturbance to the Forest Service and FWS every thirty days (Dkt. 69 at ¶ 3).

**3.    Plaintiffs Have Not Shown Likely Interim Harm to Bull Trout**

While Plaintiffs' bull trout showing is stronger, they still fail to make a clear showing of irreparable harm. The BiOp recognizes that work to complete Burntlog Route may involve fish-passage improvements, dewatering, fish salvage, culvert and bridge work, sediment and turbidity, and related aquatic effects. (FS-420853 to 420854; FWS-Stibnite-AR-000233 to 000234; FWS-Stibnite-AR-000256 to 000259). FWS, however, analyzed the relevant effects from these activities, found them localized to specified local populations, and concluded they would not affect survival and recovery at the core-area, recovery-unit, or range-wide levels. (FWS-Stibnite-AR-000256 to 000262). Specifically, it concluded that "there will be limited, if any effects to water temperature along the Burntlog Route . . .; the proposed action will maintain the baseline condition (FA/FR) of the temperature" (FWS-Stibnite-AR-000176).

The BiOp also explains that the effects would not jeopardize bull trout or destroy or adversely modify designated critical habitat if Perpetua follows protective measures. It identifies those protective measures, albeit not in the ITS, including timing restrictions, fish-passable designs, sediment and erosion controls, dewatering and work-area isolation, staged rewatering, turbidity monitoring, fish-handling and salvage requirements, electrofishing restrictions, block-net inspection, and reporting to FWS. (FWS-Stibnite-AR-000128 to 000129; FWS-Stibnite-AR-

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 48**

000268 to 000269; FWS-Stibnite-AR-000276 to 000277). Although that defect may require FWS to clarify or supplement the ITS as a merits remedy, Defendants are able to and have identified these measures in the record (*see, e.g.,* Dkt. 69 at ¶¶ 15-17). Plaintiffs dispute whether those measures are legally sufficient and adequately specified in the ITS, but they have not shown that the measures identified in the BiOp and administrative record are likely insufficient to avoid irreparable bull-trout harm during the interim period.

For this reason, Plaintiffs have not made a clear showing of irreparable harm. Because anticipated, minimized, and authorized incidental take is not enough to show harm, Plaintiffs must show that Perpetua's critical-path activities are likely to cause irreparable harm to bull trout as a species or to Plaintiffs' concrete interests. The defects in the bull trout ITS do not give rise to that harm. Rather, at this preliminary stage, the Court can discern that the BiOp identifies the protective measures for minimizing take.

In summary, Plaintiffs have shown likely success or serious questions on discrete ITS defects, but they have not shown Perpetua's critical-path activities are likely to cause irreparable harm. Instead of focusing on Perpetua's critical-path activities, Plaintiffs' imminent, irreparable harm arguments focus on "Perpetua's commencement of 'full construction'" including, for example, "surface disturbance . . . throughout the rest of the mine site," "mine construction activities," and "dozens" of unspecified "Project actions" (Dkt. 58-1 at 22, 24-25).

Because a clear showing of irreparable harm is a necessary element for injunctive relief, the Court denies Plaintiffs' Motion for Preliminary Injunction. Because it denies the motion, the Court does not need to analyze the balance of equities, the public interest, the scope of relief, or whether a bond is necessary. This ruling is based on the present preliminary-injunction record and

**MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 49**

does not resolve the merits of Plaintiffs' ESA claims or the final remedy that may be appropriate if Plaintiffs prevail.

Because Plaintiffs failed to make a clear showing of imminent, irreparable harm, their motion for preliminary injunction is denied.

## ORDER

1. Plaintiffs' Motion for Preliminary Injunction (Dkt. 58) is **DENIED**.

2. The Court **GRANTS IN PART** Perpetua Resources Idaho, Inc.'s Motion to Strike Declarations submitted with Plaintiffs' Motion for Preliminary Injunction (Dkt. 60).

DATED: May 29, 2026

Amanda K. Brailsford
U.S. District Court Judge

MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 58) AND MOTION TO STRIKE (DKT. 60) - 50