UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SAVE THE SOUTH FORK SALMON; IDAHO CONSERVATION LEAGUE; IDAHO RIVERS UNITED; EARTHWORKS; CENTER FOR BIOLOGICAL DIVERSITY; and AMERICAN RIVERS,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE; U.S. FISH AND WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE; U.S. DEPARTMENT OF AGRICULTURE; U.S. DEPARTMENT OF THE INTERIOR; U.S. DEPARTMENT OF COMMERCE; BROOKE ROLLINS, in her official capacity as U.S. Secretary of Agriculture; DOUG BURGUM, in his official capacity as U.S. Secretary of the Interior; and HOWARD LUTNICK, in his official capacity as U.S. Secretary of Commerce,<br><br>Federal Defendants,<br><br>and<br><br>PERPETUA RESOURCES IDAHO, INC.<br><br>Defendant-Intervenor. | ) | Case No. 1:25-cv-00086-AKB<br><br>**MEMORANDUM DECISION AND ORDER (DKTS. 31, 34, 41)** |

## INTRODUCTION

Plaintiffs, Save the South Fork Salmon, Idaho Conservation League, Idaho Rivers United, Earthworks, Center for Biological Diversity, and American Rivers, filed this action challenging Federal Defendants' approval of the Stibnite Gold Project (Project) under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 701-706 and other federal statutes (Dkt. 26 (amended complaint)). Perpetua Resources Idaho, Inc. (Perpetua) subsequently intervened (Dkt. 21). Pending before the Court are Plaintiffs' Motion for Summary Judgment (Dkt. 31); Federal Defendants' Motion for Summary Judgment (Dkt. 34); Perpetua's Motion for Summary Judgment (Dkt. 41); Plaintiffs' Motion to Stay Order and Grant of Injunction Pending Appeal (Dkt. 71); and Plaintiffs' Motion to Strike Federal Defendants' Extra-Record Evidence and New Argument (Dkt.91). For the reasons discussed below, the Court grants in part and denies in part the parties' summary judgment motions, and it denies the remaining motions as moot.

## BACKGROUND

### I. Factual Background

Mining in the Stibnite Mining District in Idaho began in the 1890s and continued until 1996 (FS243700, 03). The U.S. Forest Service's Final Environmental Statement (FEIS) describes the area's long-term mining history (FS243700-03). Further, it describes the negative impacts of that mining including, for example, releases of hazardous materials and alterations to habitat, including stream configurations (FS243703-04).

Perpetua submitted a plan to the Forest Service for the Stibnite Gold Project to resume mining in the area (Dkt. 34-1 at ¶ 8). The Project is located primarily on National Forest System (NFS) lands in the Boise and Payette National Forests at the headwaters of the East Fork South Fork Salmon River where Perpetua has mining claims. Perpetua's plan is both to resume mining gold, silver, and antimony and to address and remediate legacy mining impacts (FS243704).

Perpetua submitted its original plan for the Project in 2016 and a revised plan, ModPRO, in 2019 (FS243699). In August 2020, the Forest Service issued a Draft Environmental Impact Statement (DEIS) based on ModPRO (FS218337–220964). After the public comment period for

the DEIS, Perpetua submitted another modified plan, referred to as ModPRO2 or 2021 MMP (FS243699). The 2021 MMP proposed reduced surface disturbance and anticipated environmental impacts (*id.*). Following the receipt of 2021 MMP, the Forest Service issued a supplemental draft environmental impact statement in October 2022 (SDEIS) (*id.*).

In July 2024, the Forest Service prepared a Biological Assessment determining that the Project was likely to adversely affect bull trout, Northern American wolverine, and whitebark pine. The Service submitted this Biological Assessment to the FWS for consultation under the Endangered Species Act, 16 U.S.C. §§ 1531-44 (ESA). In September 2024, the FWS issued a Biological Opinion (BioOp) determining the Project would not jeopardize the continued existence of bull trout, wolverine, and whitebark pine but that the Project was reasonably certain to cause "incidental take" of these species.

Thereafter, the Forest Service issued its FEIS and draft Record of Decision in September 2024, and in January 2025, it issued its final Record of Decision (ROD). In February 2025, Plaintiffs, who include non-profit organizations dedicated to protecting the environment, filed this action against Defendants, including the Forest Service and the FWS. Subsequently, Perpetua intervened.

## II. Procedural Background

The parties filed cross-motions for summary judgment (Dkts. 31; 34, 41). Meanwhile, Plaintiffs and Perpetua entered a stipulation allowing certain limited initial activities under the Project to proceed (Dkt. 40; Dkt. 58 at 2 n.1). While the parties' summary judgment motions were still pending, Plaintiffs filed a preliminary injunction motion on May 8, 2026, in which they sought to enjoin Perpetua from moving forward with the Project (Dkt. 58). Perpetua proposed

commencement on May 30 of certain construction activities, which it characterized as "critical path activities."

Plaintiffs' preliminary injunction motion raised and focused on certain claims which the parties had already extensively briefed on summary judgment. Those claims related to Perpetua's anticipated critical path activities and included: (1) whether the Forest Service erred in approving the Burntlog Route and borrow sites under the General Mining Law of 1872, 30 U.S.C. §§ 21-54 and 36 C.F.R. Part 2228 Subpart A; (2) whether the Burntlog Route violated the Idaho Roadless Rule, 36 C.F.R. § 294.20-29; (3) whether FWS's jeopardy analyses for wolverine, bull trout, and whitebark pine and its incidental take statements (ITS) for wolverine and bull trout violated the ESA.

All the parties relied heavily on their summary judgment briefing in their preliminary injunction briefing. The Court heard oral argument on May 28, 2026, on the preliminary injunction motion, and on May 29, it issued a decision denying that motion (Dkt. 70). The Court addressed all the claims Plaintiffs raised in support of their preliminary injunction motion. In doing so, the Court considered both the parties' preliminary injunction briefing, their summary judgment briefing, and the related administrative record.

The Court ruled that Plaintiffs were not likely to succeed on the merits of any claims that they raised in support of their preliminary injunction motion, except for their argument that the FWS's ITSs for wolverine and bull trout did not adequately specify reasonable and prudent measures (RPMs) and terms and conditions (T&Cs) as the ESA requires (Dkt. 70 at 25-33, 39-43). The Court denied preliminary relief, however, because the information specifying those items already appeared in the FWS's BiOp or the administrative record, and as a result, Plaintiffs could not establish imminent irreparable harm related to Perpetua's proposed critical path activities

(Dkt. 70 at 44-50). Plaintiffs appealed the Court's denial (Dkt. 73; Ninth Circuit Case No. 26-3622).

Thereafter, on June 24, 2026, the Court heard oral argument on Plaintiffs' remaining claims, which the preliminary injunction ruling did not address. Those claims included: (1) whether the Forest Service violated the National Forest Management Act, 16 U.S.C. §§ 1600-14 (NFMA); (2) whether the Service violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-47 (NEPA); and (3) whether the Service unlawfully approved a special use permit for transmission lines in the Record of Decision (ROD).

During the June 2026 hearing, Defendants requested that the Court enter a summary judgment ruling on *all* Plaintiffs' claims, including those which the Court had previously addressed in its preliminary injunction ruling. Plaintiffs opposed that request, arguing that the Court lacked jurisdiction to enter a decision on the claims it previously considered because of the pending appeal of the Court's denial of Plaintiffs' preliminary injunction motion. The Court requested supplemental briefing on the issue, which the parties submitted (Dkts. 88, 89, 90). With this briefing, the FSW also submitted amended ITSs for wolverine and bull trout (Dkts. 88, 88-1, 89, 90). Plaintiffs move to strike the amended ITSs (Dkt. 91).

## JURISDICTION

As an initial matter, the Court addresses whether it has jurisdiction to enter summary judgment resolving this case in entirety. The Supreme Court held in *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), that "the filing of the notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." The Ninth Circuit has restated this rule as "the filing of a notice of interlocutory appeal divests the district court of jurisdiction over

the particular issues involved in that appeal." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir. 2001).

Under this rule, there is no dispute that the Court may enter summary judgment rulings on those claims which it did not address at the preliminary injunction stage. Plaintiffs argue, however, that "the Court should refrain from deciding the claims implicated in the pending preliminary injunction appeal" because "the Court lacks jurisdiction over matters that are the subject of the appeal" (Dkt. 89 at 6). Plaintiffs reason that when the Ninth Circuit "rules on the likelihood of success on those same claims, [it] will substantially affect, if not fully determine, the merits of those claims" and that if this Court issues a summary judgment ruling on those claims "it would be ruling on the very legal issues the Ninth Circuit will be deciding and will create the looming risk of inconsistent rulings" (Dkt. 89 at 5, 8).

Defendants counter that "none of the summary judgment issues . . . are 'issues involved in the appeal,'" because "the 'likelihood of success' on the merits is a distinct legal issue from a dispositive ruling on 'success on the merits'" (Dkt. 90 at 7-8). Defendants also note that the Ninth Circuit has repeatedly ruled that a final decision on the merits moots an appeal from an interlocutory order regarding a preliminary injunction ruling (Dkt. 88 at 5; Dkt. 90 at 11). For example, the Ninth Circuit explained that "when a case is dismissed while an appeal of an order on a preliminary injunction is pending, the preliminary injunction order 'merges' into the final judgment." *Nationwide Biweekly Administration, Inc. v. Owen*, 873 F.3d 716, 730 (9th Cir. 2017). It reasoned that when the final judgment on the merits is in favor of the same party who prevailed at the preliminary injunction stage, review of the plaintiff's probability of success on the merits would be a "futile exercise." *Id.* at 730-31; *see also Sierra Forest Legacy v. Rey*, 577 F.3d 1015,

1019 (2009). The Ninth Circuit frequently relies on the merger doctrine (*see, e.g.*, Dkt. 90 at 11) (citing cases).

The Court concludes it has jurisdiction to enter summary judgment on the merits of the case because the appeal will address only whether Plaintiffs are likely to succeed on the merits of some of their claims and not on the final merits of those claims. Although no case law directly addresses the scenario in this case, the Court agrees with the Defendants that the Ninth Circuit's reliance on the merger doctrine to moot appeals of preliminary orders followed by final judgment indicates the Court has jurisdiction to enter a final judgment.

Moreover, entry of a final judgment despite the pendency of an interlocutory appeal is appropriate in this case for several reasons. First, this case presents a unique posture where the parties had already fully submitted summary judgment on the record before Plaintiffs sought preliminary injunctive relief, and the Court considered that briefing to reach its prior ruling. Second, time is of the essence in this case. Undoubtedly, the parties need complete resolution before Perpetua's next phase of construction. A delay in resolving the case may result in more piecemeal requests for injunctive relief, which would be inefficient and confusing. Third, the Court is required to secure the just, speedy, and inexpensive determination of this action. Fed. R. Civ. P. 1. Fourth, Plaintiffs request that if the Court enters partial summary judgment on those claims which were not the subject of the preliminary injunction motion, it should find there is "no just reason for delay" to allow a timely appeal. To conclude there is no just reason to delay resolving some claims but not others would be nonsensical. And finally, the Court's ruling on the claims which it previously addressed at the preliminary injunction stage remain the same on the merits. For completeness sake, the Court reiterates those rulings below. In doing so, it does not intend to

alter the substance of its prior preliminary rulings, except to note they are now final rulings on the merits.

## LEGAL STANDARD

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, governs judicial review of agency actions. It provides that unless an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," the court must uphold the action. 5 U.S.C. § 706(2). "The arbitrary or capricious standard is a deferential standard under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

The court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). Even where an agency's action lacks clarity, if the court can discern its reasoning and that the record adequately supports that reasoning, then the agency's action is not arbitrary and capricious. *Id.*; *see also Jewell*, 747 F.3d at 606.

An agency's action is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. "The reviewing court should not attempt

itself to make up for such deficiencies: [The court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

## ANALYSIS

### I. National Forest Management Act

Plaintiffs allege that the Forest Service's actions and omissions in approving the Project violate the NFMA (Dkt. 26 at ¶¶ 183-198). The "NFMA provides for forest planning and management" and requires the Forest Service to develop a forest plan for each forest unit of the National Forest System. *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 681 (9th Cir. 2022). Any action the Service approves within a forest must follow the forest plan for that forest. *Id.* The Service's failure to comply with a forest plan violates NFMA. *Id.* Plaintiffs argue that the Service violated NFMA by approving the construction and location of roads, structures, and facilities, including a mine waste facility, contrary to the Payette and Boise Forest Plans[1] (Dkt. 32-1 at 25-28).

Both the Payette and Boise Forest Plans adopt Standards for Management Direction for Mineral and Geology Resources. These standards provide specific management directions to address concerns locating roads, structures, and facilities in protected riparian conservation areas (RCAs).[2] At issue here are MIST08, which provides direction for locating new structures, support facilities, and roads in RCAs, and MIST09, which provides direction for locating mine-waste facilities in RCAs (FS1328-29; FS3304-05). Plaintiffs argue that compliance with the standards in

---

1 Plaintiffs clarify that their challenge under the NFMA is a substantive challenge, not a procedural challenge (Dkt. 53 at 23).

2 RCAs provide buffers around streams, including 300 feet for perennial, 150 feet for intermittent and ephemeral, and between 50 to 300 feet for special aquatic features (Dkt. 41-2 at 22 n.4) (citing NMFS243).

the Payette and Boise Forest Plans requires the Forest Service to affirmatively show there are no alternatives to locating the "many component roads, facilities, and structures in RCAs" (Dkt. 32-1 at 26). Plaintiffs characterize the Service's obligation as to "first determine whether there is an actual lack of alternative" and "*only then* move to the next step of preventing, monitoring, and mitigating impacts" (Dkt. 53 at 27). They argue the Service skipped the first step of determining there is no alternative to placing each component of the Project in the RCAs.

In support, Plaintiffs rely on *Hells Canyon Pres. Council v. Haines*, No. CV05-1057-PK, 2006 WL 2252554 (D. Or. Aug. 4, 2006). They argue the Forest Service "made [the] same error" in *Hells Canyon* that it has made in this case (Dkt. 32-1 at 26). In *Hells Canyon*, plaintiffs challenged the record of decision for the North Fork Burnt River Mining Project alleging, among other things, that the Forest Service violated NFMA by failing to comply with standards under the forest plan for roads and settling ponds. *Id.* at *1. The record of decision at issue followed a single, final environmental impact statement that established the requirements for forty-nine mining operations, including some which had been previously approved "in the early 1980s" and which involved "747 miles of road." *Id.* at *2-3. The Service's position was that if a mining operation's plan conformed to the impact statement's requirements, then the plan would be approved. *Id.* at * 3. In addressing the plaintiffs' challenge under the NFMA, the magistrate court concluded that the Forest Service's analysis was inadequate, noting repeatedly that there was no evidence in the record that the Service analyzed whether alternatives existed. *Id.* at *8, 9. It concluded that "without more analysis, a reviewing court will not have a basis for rational review." *Id.* at *9.

Defendants argue that Plaintiffs rely on *Hells Canyon* to mischaracterize the Forest Service's obligations under the NFMA (Dkt. 34-2 at 27-28). They assert that the Service is not required to "individually document alternative locations for each individual segment" of the roads

and facilities in the RCAs (Dkt. 34-2 at 27-28). The Court agrees. It does not understand *Hells Canyon* to stand for the proposition, as Plaintiffs assert, that the Service must affirmatively show no alternative to each component of the Project, which is in an RCA.

The Ninth Circuit has clearly set forth the legal standard for reviewing whether the Forest Service's approval of a project meets its management standards under a forest plan in *Or. Nat. Desert Assoc. v. U.S.F.S.*, 957 F.3d 1024 (9th Cir. 2020). In that case, the Ninth Circuit recognized the Service's "substantive obligation to ensure that site-specific projects and activities be consistent with an approved forest plan." *Id.* at 1035 (cleaned up). It ruled that a reviewing court considers whether the Service "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [offered] an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 1034-35 (cleaned up). The reviewing court gives the Service "ample latitude in ensuring the consistency of its actions with Forest Plans," and it should only conclude the Service acted arbitrarily and capriciously if "the record plainly demonstrates [the Service] made a clear error in judgment." *Id.* at 1035. "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Id.* (cleaned up); *see also Elliott*, 25 F.4th at 682 (noting court will uphold agency's decision if path may reasonably be discerned).

This Court is bound by the Ninth Circuit's articulation of the applicable standard in *Or. Nat. Desert Assoc.*[3] Accordingly, Plaintiffs' argument that the Forest Service violated the NFMA

---

[3] Additionally, *Hells Canyon* is distinguishable from this case because, here, the Forest Service addressed Perpetua's mining operation plan, 2021 MMP, in a single FEIS and did not attempt, as it did in *Hells Canyon*, to pre-approve or retroactively approve numerous different

because it was required to exhaust all possible alternatives to show no alternatives exist is unpersuasive (Dkt. 32-1 at 26). The Ninth Circuit does not require an affirmative showing of no alternative for each component of a plan to satisfy the standards under a forest plan. Indeed, showing no alternative exists would impose an obligation on the Service to prove a negative, which obligation might prove boundless.

Moreover, Defendants identify the alternatives that the Forest Service considered, and they assert the Service reasonably concluded that the Project is consistent with MIST08 and MIST09. The Court agrees. In addition to the Johnson Creek Route and the Burntlog Route, the Service considered and eliminated eighteen other alternatives (FS243860—907). Among the alternatives the Service considered were locating structures, facilities, road, and mine-waste as required by MIST08 and MIST09 (*see* FS1328-29; FS3304-05). For example, the FEIS addressed facility location alternatives, including tailing storage facility alternatives; a worker housing facility alternative; and road access alternatives (FS243860—68). Based on these and other alternatives, the Service reasonably concluded that the Project was consistent with the forest plans, including MIST08 and MIST09. Accordingly, the Court grants Defendants summary judgment on Plaintiffs' claims that Defendants violated the NFMA (Dkt. 26 at ¶¶ 183-198).

## II. National Environmental Policy Act

Plaintiffs allege that the Forest Service violated NEPA by failing to consider a reasonable range of alternatives, to take a hard look at air emissions and the risk of hazardous spills, and to obtain baseline information on affected areas (Dkt. 26 at ¶¶ 220-238; Dkt. 32-1 at 28-35). "NEPA

---

mining operation plans as under a single FEIS. Undoubtedly, this sweeping effort factored into the magistrate court's decision to grant plaintiffs summary judgment and enjoin the Service in *Hells Canyon*. Moreover, *Hells Canyon*, a 2006 case, predates 36 C.F.R. § 291.15, which was promulgated in 2012 and governs project and activity consistency with the land management plan.

is a *purely procedural statute*." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Co.*, 605 U.S. 168, 180 (2025). "NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project." *Id.* In determining whether an agency's environmental impact statement complies with NEPA, a court affords "substantial deference to the agency." *Id.* "The only role for a court is to confirm that the agency has addressed environmental consequences and feasible alternatives to the relevant project." *Id.* (cleaned up).

Because a particular substantive outcome is not required, an environmental impact statement's adequacy is only relevant to whether the agency reasonably explained its final decision. *Id.* In reviewing an agency's identification of significant environmental impacts and feasible alternatives, the court must be "most deferential" to the agency's decision about "what qualifies as significant or feasible." *Id.* at 182. For example, a reviewing court should defer to an agency's decision about "how far to go in considering indirect environmental effects from the project." *Id.* In other words, a court "should afford substantial deference and should not micromanage [an agency's] choices so long as they fall within a broad zone of reasonableness." *Id.* at 183.

NEPA requires a federal agency to take a hard look at the environmental consequences of its actions. *N. Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 821 (9th Cir. 2025). A hard look includes "considering all foreseeable direct and indirect impacts." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). NEPA also requires that an agency assess the cumulative impacts, defined as the "incremental impact of the action when added to past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "[A]lthough NEPA requires an agency to analyze environmental impacts and prepare documents and make such analyses available for public inspection, NEPA does not require the agency to weigh

environmental consequences in any particular way." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025) (quotation omitted).

To satisfy the "hard look" requirement, an agency must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). To meet this requirement, "an agency may not rely on incorrect assumptions or data." *Native Ecosystems Council v. USFS*, 418 F.3d 953, 964 (9th Cir. 2005); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022) (agencies fail to take a "hard look" when there are "gaps and errors underlying the agencies' assumption[s]").

**A. Alternatives**

An environmental impact statement must describe and analyze every reasonable alternative within the range dictated by the proposal's nature and scope. *City of L.A., Cal. v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023). An agency should rigorously explore and objectively evaluate all reasonable and feasible alternatives but does not need to review remote and speculative ones. *Id.* Further, an environmental impact statement only needs to briefly discuss the reasons for eliminating an alternative from detailed examination. *Id.* "[T]here is no minimum number of alternatives that must be discussed." *Id.* at 847 (cleaned up). A plaintiff has the burden to show that an alternative is feasible. *N. Cascades Conservation Council*, 136 F.4th at 828; *City of L.A.*, 63 F.4th at 846; *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022).

Addressing Plaintiffs' assertion that the Forest Service failed to consider a reasonable range of alternatives requires an explanation of Perpetua's plan for the Project and the Service's development of the FEIS approving the Project. Perpetua submitted its original plan to the Forest Service in 2016 and a revised plan in 2019 (FS-243699). In August 2020, the Forest Service issued

the DEIS based on the 2019 plan (FS-218337-220964). The DEIS considered five alternatives: Alternative 1, which was based on Perpetua's proposed plan of operations; Alternative 2, which was based on Perpetua's anticipated revision to its original plan; Alternative 3, which proposed alternate locations for storage facilities; Alternative 4, which proposed using the existing Johnson Creek route to access the mine; and Alternative 5, which proposed no action (FS-18350-64, FS-243699).

Then, in 2021, Perpetua submitted the 2021 MMP, which the DEIS had anticipated and which Alternative 2 addressed. The post-DEIS plan "reduced new surface disturbance and anticipated environmental impacts" that Alternative 3 had proposed (FS-243699). As a result, the Forest Service's subsequent SDEIS eliminated Alternatives 1 and 3 based on 2021 MMP (*id.*).

Plaintiffs argue that the Forest Service acted arbitrarily and capriciously by "abandoning" these two alternatives, which it describes as relating to "the mining portion" of Perpetua's proposal (Dkt. 32-1 at 31). This argument, however, mischaracterizes the record. As the FEIS explains, two alternatives were eliminated because Alternative 1 was based on the 2019 plan, which was no longer the applicable plan, and 2021 MMP addressed the effects that Alternative 3 was intended to address. Accordingly, the Service did not arbitrary and capriciously "abandon" these alternatives. Further, that the Service did not consider in detail more alternatives is not a basis to conclude the Service was arbitrary and capricious. "[T]here is no minimum number of alternatives" an agency must discuss. *City of L.A.*, 63 F.4th at 847; *see also N. Cascades Conservation Council*, 136 F.4th at 827-28 (concluding Forest Service sufficiently analyzed viable alternatives by analyzing no-action and proposed action alternatives and discussing but rejecting from detailed study eleven other alternatives).

Plaintiffs also challenge the Forest Service's failure to consider "other" alternatives in detail and argue that the Service "cannot reasonably argue that there is not a single viable alternative to giving Perpetua everything it wants at the mine site" (Dkt. 32-1 at 31, 33). Contrary to Plaintiffs' argument, however, the Service screened out duplicative alternatives and applied reasonable criteria to assess proposed alternatives, including whether the proposed alternative: (1) met the Project's purpose and need, (2) reduced environmental effects to at least one resource, (3) was technically feasible, and (4) was economically feasible (FS-243732-33). Applying these screening criteria, the Forest Service considered eighteen proposed alternatives but eliminated them from detailed study for failure to meet the criteria (FS-243860-67). Plaintiffs neither dispute the reasonableness of these criteria nor the Forest Service's application of them. Rather, they only generally challenge the Service's consideration of three alternatives.

First, Plaintiffs argue that the Service rejected the offsite ore processing alternative by merely "speculat[ing]" that it "would be the same under Perpetua's proposal" (Dkt. 32-1 at 31). The record does not support Plaintiffs' characterization. In considering the alternative, the FEIS acknowledges the advantages of processing ore offsite, including reducing "the amount of reagents transported and used" at the Project, reducing the number of employees traveling to the site, and eliminating the need to store tailings at the site (FS-243862). It balanced these advantages against the disadvantages, including that: (1) transporting "approximately 22,000 tons" of ore per day would require "approximately 550 round trips daily during the 15 years of mine operations"; (2) this increased transportation would "greatly increase the air emissions and transportation impacts" and "dramatically increase operational costs"; and (3) "there is currently no commercial milling operation in the Western U.S. that could economically process the ore" (*id.*). Contrary to

Plaintiffs' assertion, this balancing analysis is not speculative. Rather, the disadvantages of offsite ore processing provide a reasonable basis for the Service's rejection of that alternative.

Second, Plaintiffs argue the Forest Service "completely misconstrued" the "antimony mining emphasis alternative" (Dkt. 32-1 at 32). A commenter proposed this alternative, stating that the Service "should develop an alternative emphasizing antimony recovery . . . focused on only developing the ore that contains high antimony mineral grades" (FS-245536). The Service responded that "gold value dominates over antimony and silver value" and that the proposed alternative would not meet the Project's purpose and need to economically mine the three metals" and was "purely conjectural," "remote," and "speculative" (*id.*).

Plaintiffs now explain that the proposed alternative was to target "only the gold and silver deposits that also contain antimony," which the Service never considered (Dkt. 32-1 at 32). The Court does not read the commenter's proposal as Plaintiffs now characterize it. Regardless, even with Plaintiffs' clarification, Plaintiffs fail to address how such an alternative is not remote and speculative. Rather, they provide only a single paragraph addressing the alternative (*id.*). Because the Service is not required to review remote, speculative alternatives, and Plaintiffs do not show why their proposed antimony mining alternative is feasible, the Service's rejection of the alternative was not unreasonable.

Third, Plaintiffs challenge the Forest Service's rejection of alternatives "to avoid locating roads, structures, and facilities in the RCAs" (Dkt. 32-1 at 32). The FEIS examined numerous alternatives including, for example, alternative locations for facilities for tailing storage, power transmission, and worker housing (FS-243863-65 at § 2.6.3). It considered "six potential transportation and access road components options" in addition to its detailed consideration of the

Johnson Creek and Burntlog Routes (FS-243865-66 at § 2.6.4). In total, the Service considered and eliminated eighteen alternatives under the applicable criteria (FS-243860-67).

Plaintiffs argue generally that "merely considering the possibility of alternatives but then rejecting them and not including them in the [FEIS], does not count toward considering a reasonable range of alternatives under NEPA" (Dkt. 32-1 at 32). This assertion, however, is contrary to the rule that the Service only needs to briefly discuss the reasons for eliminating an alternative from detailed examination and does not need to consider any minimum number of alternatives. *City of L.A.*, 63 F.4th at 843, 847. Plaintiffs cite no authority for their quantitative argument that the Service's consideration and elimination of alternatives does not "count" for purposes of considering a reasonable range of alternatives.

Finally, Plaintiffs criticize the Forest Service for rejecting "many alternatives on economic grounds," arguing that the Service ignored feasibility and "conflated feasibility with Perpetua's interest in maximizing profits" (Dkt. 32-1 at 32). Plaintiffs, however, do not identify any specific alternative which they contend the Service rejected for purposes of "maximizing" Perpetua's profit (*id.*). Absent more, the Court cannot evaluate Plaintiffs' economic challenge. Moreover, the Service is authorized and required to consider both "the purpose and need of the proposal" and whether a proposed alternative is "technically and economically feasible." *See* 42 U.S.C. § 4332(C)(iii) (directing agency to consider reasonable range of alternatives including whether they "are technically and economically feasible and meet the purpose and need of the proposal). To the extent the Forest Service rejected alternatives as economically infeasible, such a rejection is not unreasonable absent a showing to the contrary. Moreover, Plaintiffs have not made any attempt to meet their burden of showing any alternative the Service rejected is feasible. *See N.*

*Cascade Conservation Council*, 136 F.4th at 828 (ruling plaintiff has burden to show alternative is feasible); *Audubon Soc'y of Portland*, 40 F.4th at 984 (same).

**B. Hard Look at Effects**

"NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quotation omitted). "Under this deferential standard, we must defer to an agency's decision that is fully informed and well-considered, but we need not forgive a clear error of judgment." *Id.* (quotation and citation omitted).

**1. Air Emissions**

Plaintiffs argue that "the Forest Service violated NEPA's 'hard look' mandate by grossly underestimating the potential air pollution from the Project" (Dkt. 32-1 at 33). Plaintiffs' argument focuses on the difference between the Idaho Department of Environmental Quality's (IDEQ) Permit to Construct (PTC) for the Project, which allows Perpetua to haul "up to 180,000 tons" of ore per day (FS-101446-47 ("Statement of Basis" for PTC)), and Perpetua's 2021 MMP, which proposes a "highest total mining rate" of 99,500 tons per day (FS-244497). Plaintiffs assert that because nothing imposes a lower rate than 180,000 tons, the Service "artificially deflated its assessment of air quality impacts" (Dkt. 53 at 32).

In response, Perpetua explains that under the Clean Air Act, 42 U.S.C. §§ 7401, *et. seq.*, IDEQ was required to analyze the Project's potential to emit air pollution meaning "the *maximum capacity* of a stationary source to emit a pollutant under its physical and operational design." 40 C.F.R. § 51.165(a)(1)(iii) (emphasis added). In contrast, NEPA requires the Forest Service to consider the Project's "*reasonably foreseeable* environmental effects" 42 U.S.C. § 4332(C)(i) (emphasis added). The FEIS notes this distinction, and it concludes the 2021 MMP's proposed

99,500 tons is "reasonably foreseeable" whereas the IDEQ's reliance on 180,000 tons was "to ensure ease of permitting and not representative of real-world operations" (FS-244497).

Plaintiffs do not address the distinction under the law between NEPA and the Clean Air Act. Further, they do not provide any argument or analysis explaining why the 2021 MMP's proposal of 99,500 tons is not reasonably foreseeable, as the Service concludes. Plaintiffs' argument that "nothing in Perpetua's proposal, the FEIS, the ROD, or any other state or federal permit proposes a lower haul rate" than 180,000 tons (Dkt. 53 at 32) ignores that the Forest Service's analysis was required to rely on that tonnage. The 2021 MMP proposes a mining rate of 99,500 tons for the Project, and the FEIS and ROD approve the Project; if the Project were to exceed the scope of the FEIS and ROD, as Plaintiffs fear, then the Service would likely be required to re-evaluate the Project. That the Service analyzed the potential air pollution based on the reasonably foreseeable mining rate under the 2021 MMP is not a failure to take a hard look at those effects. Moreover, as Perpetua notes, the Service did not limit its analysis to 99,500 tons per day but provided an "in-depth analysis of air quality impacts based on hourly, daily, and annual emissions (Dkt 57 at 19) (citing FS-244504-27).

**2. Hazardous Spills**

Plaintiffs also argue that the Forest Service violated the hard look requirement when considering hazardous spills by grossly underestimating the hazardous spill rate and by failing to calculate "the number of potential spills" (Dkt. 32-2 at 35). They assert the Service performed an inadequate analysis, and they propose a different analysis (*id.*). Defendants respond that the Service included a detailed description of the potentially affected area for hazardous spills, including the likelihood and the potential effects, and described that analysis (*see, e.g.*, FS-

244614–21). They assert that Plaintiffs' desire for a different scientific methodology does not establish a NEPA violation (Dkt. 34-2 at 41).

On reply, Plaintiffs do not address either Defendants' response or the FEIS's analysis of hazardous spills. Instead, they assert that their "central argument" is that "the agency failed to respond to comments pointing to substantive errors" and that "simply ignoring substantive points from public comments" violates NEPA's hard look mandate (Dkt. 53 at 33). As Defendants note, however, the Service responded to public comments about hazardous spills by including a "discussion of quantitative risk of spills" and a "revised incident risk analysis for hazardous materials," including "an analysis of longer transportation routes on existing highways . . . and predicted incident rates along those highways" in the FEIS (FS-245648-49) (responding to comments). Plaintiffs' argument ignores these responses and fails to explain why they are inadequate. Accordingly, Plaintiffs' argument that Defendants did not respond to public comment is unpersuasive. The Court grants Defendants summary judgment on Plaintiffs' claims that the Project violates NEPA (Dkt. 26 at ¶¶ 220-238).

## III. Approval of the Project's Infrastructure

Plaintiffs argue the Court should "reverse the FEIS and ROD because the Forest Service erred as a matter of law in approving the Project's off-site infrastructure," including the Burntlog Route, "gravel mines" and transmission lines (Dkt. 26 at ¶¶ 161-171; *id.* at ¶¶ 199-208; *id.* at ¶¶ 209-214; Dkt. 32-1 at 14). Plaintiffs also allege that the Forest Service's approval of the Burntlog Route violates the Idaho Roadless Rule, 36 C.F.R. § 294.20-29 (*id.* at ¶¶ 172-182).

### A. Burntlog Route Access

The Forest Service evaluated in detail two possible access routes to the mine: the Johnson Creek Route, which currently provides access to the mine, and the Burntlog Route, which Perpetua

would construct to provide new access (Dkt. 31-1 at ¶ 15; Dkt. 34-1 at ¶¶ 18-23; Dkt. 41-1 at ¶ 18). According to the FEIS, the Burntlog Route would connect Warm Lake Road, Meadow Creek Lookout Road, Thunder Mountain Road, and two new road segments, totaling approximately fifteen miles (FS243748). The Forest Service approved the Burntlog Route (Dkt. 41-1 at ¶ 18).

The parties dispute whether the Forest Service applied the correct regulatory scheme to approve the Burntlog Route. In approving Perpetua's plan, the Service relied on the General Mining Law of 1872, 30 U.S.C. §§ 21-54, and on 36 C.F.R. Part 228 Subpart A (FS420772). The Service promulgated these Part 228A regulations under the Organic Act to implement the Mining Law. *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202, 1211 (9th Cir. 2022) ("*Rosemont*"). Part 228A regulations apply to the "use of the surface of National Forest System lands *in connection with operations* authorized by the United States mining laws . . . to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1 (emphasis added).

Part 228A regulations define mining "operations" to include "[a]ll function, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, *including roads and other means of access on lands* . . . regardless of whether said operations take place on or off mining claims." *Id.* § 228.3(a) (emphasis added). Part 228A also provides for roads in other regulations. For example, § 228.8(f) governs an operator's construction and maintenance of roads. Further, § 228.12 provides that "an operator is entitled to access in connection with operations, but no road . . . shall be constructed . . . until the operator has received approval of an operating plan . . . ."

Defendants assert the Forest Service correctly relied on the Part 228A regulations in approving the Burntlog Route. Plaintiffs disagree, arguing that the Service must comply with 36

C.F.R. Part 251 Subpart B. The Service promulgated Part 251B regulations under Federal Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1761-1771, which authorizes rights-of-way on public lands and empowers the Secretary of the Interior to grant permission for roads. Section 251.50 provides the scope of the regulations and states that "all uses of National Forest System lands, improvements, and resources, *except those authorized by regulations governing . . . minerals (part 228)* are designated 'special uses.'" 36 C.F.R. § 251.50(a) (emphasis added).

The Forest Service "has broader regulatory authority under Part 251B than under Part 228A." *Ctr. for Biological Diversity*, 33 F.4th at 1228 (J. Forrest, dissenting). For example, under Part 251B, the Service will only grant a special-use application if it does not create an exclusive or perpetual right, does not involve the disposal of solid waste or hazardous materials, and is not contrary to the public interest. *Id.* The regulatory schemes under Part 251B and Part 228A are mutually exclusive because Part 251B expressly excludes activities which Part 228A authorizes. *Id.* at 1232.

Resolving Plaintiffs' claim requires interpreting the regulations. "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Elliott*, 25 F.4th at 676 (quotations omitted). The starting point of the analysis is the regulation's language. *Id.* The court gives each word its ordinary, contemporary, common meaning. *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017). "If the regulation is unambiguous, its plain meaning controls unless such reading would lead to absurd results." *United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004).

Here, the plain language of Part 228A regulations unambiguously provides for the construction of a road to access a mine. Section 228.3(a) clearly defines "operations" to include

"roads and other means of access" as an activity in connection with mining. Meanwhile other Part 228A regulations govern the construction and maintenance of such a road. *See* 36 C.F.R. § 228.8(f) (governing operator's construction and maintenance of roads); § 228.12 (providing operator is entitled to access and may construct road upon approval of plan). In contrast, Part 251B unambiguously and expressly excludes from its scope all uses authorized under Part 228A.

Based on the plain, unambiguous language of both Part 228A and Part 251B regulations, the Court disagrees that the Forest Service erred by relying on Part 228A regulations to approve the Burntlog Route. Further, the Court disagrees that approval of the Burntlog Route is unlawful under Part 228A regulations because "nothing in the Mining Law confers upon [Perpetua] the right to construct a second access route over federal lands" (Dkt. 32-1 at 17m 24). The Mining Law's silence about access rights does not require that an existing route must be used or foreclose an alternative access route to a mining claim, and Plaintiffs cite no authority for this proposition.

Moreover, Plaintiffs' characterization of the Burntlog Route access as a "new" route is not entirely accurate; although it will provide new access to the mining site, at least portions of the route already exist, will be improved, and will be connected by a new portion of road. Under these circumstances, the Forest Service was within its discretion to conclude the Burntlog Route is the preferred route because it is a safer, less environmentally impactful alternative to the Johnson Creek Route, a conclusion which Plaintiffs do not challenge. (*See* FS243749) ("The Burntlog Route would avoid environmental human health and safety risks associated with the Johnson Creek Route.").

Further, Plaintiffs' reliance on *Rosemont* to argue that Part 228A regulations are inapplicable is misplaced. In that case, Rosemont had valid mining rights on land to pit mine copper. It proposed dumping 1.9 billion tons of waste rock near its pit on 2,447 acres of National

Forest land. The Forest Service approved Rosemont's mining plan of operation on two separate grounds: The Service concluded that (1) under § 612 of the Multiple Use Act, Rosemont had the right to dump waste rock on National Forest land without regard to whether it had mining rights; and (2) under the Mining Law of 1872, Rosemont had valid mining rights on the 2,447 acres, allowing it to use the land to dump waste rock.

The district court in *Rosemont* vacated the FEIS and ROD on summary judgment, and the Ninth Circuit affirmed that decision on appeal. 33 F.4th 1202. The Ninth Circuit ruled that § 612 did not grant any rights beyond the Mining Law (which defendants conceded on appeal) and that Rosemont's mining claims were invalid under the Mining Law. *Id.* at 1208, 1214. The Court concluded that it did not know what the Forest Service would have done if it had understood the statute's proper application. *Id.* at 1208. Namely, it did not know (1) whether the Service would have decided that Part 228A regulations under the Mining Act were applicable to Rosemont's plan, and if so (2) whether it would have construed those regulations to allow Rosemont to dump waste on the 2,447 acres for which it did not have valid claims. *Id.* It remanded to the Service to decide these issues in the first instance. *Id.*

This case is distinguishable from *Rosemont*. There is no assertion here that the Forest Service reached its decision based on an incorrect assumption about valid claims or otherwise as it did in the *Rosemont* case. Plaintiffs do not identify any such allegedly inaccurate assumption or factual conclusion. Further, unlike the scenario in *Rosemont* where dumping waste rock would be permanent, the Burntlog Route will be reclaimed at the Project's conclusion. Accordingly, there is no basis to conclude the Service's reliance on Part 228A regulations to approve the Burntlog Route was improper as in *Rosemont*. Accordingly, the Court concludes that the Service's approval of the Burntlog Route under Part 288A regulations was lawful.

**B. Burntlog Route and the Idaho Roadless Rule**

Plaintiffs also allege that the Forest Service's approval of the Burntlog Route violates the Idaho Roadless Rule, 36 C.F.R. § 294.20-29 (Dkt. 26 at ¶¶ 172-182; Dkt. 32-1 at 23). The Rule provides that "road construction and reconstruction are prohibited in Idaho Roadless Areas [except that] the Regional Forester may authorize a road to be constructed or reconstructed . . . if pursuant to statute . . . ." 36 C.F.R. § 294-23(a). Further, the Rule provides that "road construction and reconstruction are only permissible [if] the Regional Forester determines: . . . [a] road is needed pursuant to statute . . . ." *Id.* § 294-23(b).

Plaintiffs argue that the Mining Laws do not convey "any rights to secondary access routes" and that "[c]onstruction and use of the Burntlog Route . . . requires approval under FLMPA Title V and the right-of-way regulations" (Dkt. 32-1 at 24). For the reasons discussed above, the Court disagrees. Further, the Idaho Roadless Rule provides that "the final rule is clear that it does not intend to regulate mining activities conducted pursuant to the General Mining Law of 1872. The Agency has separate requirements relating to road construction and maintenance for locatable minerals at 36 C.F.R. § 228.8(f) that adequately provide for these protections." 73 Fed. Register 61456-01, 2008 WL 4580200, at *61469 (Oct. 16, 2008). Based on this language, there can be no real dispute that a road approved under the Mining Laws is exempted from the Idaho Roadless Rule.

Relatedly, Plaintiffs also argue that the Burntlog Route violates the Payette and Boise Forest Plans which provide that "road construction or reconstruction may only occur where *needed* to provide access related to reserved or outstanding rights, or to respond to statute or treaty" (Dkt. 32-1 at 28) (quoting FS3247) (emphasis added). They focus on the term "needed"; state that the Forest Service approved the Burntlog Route because it is "associated with the 1872 Mining

Law"; and argue that terms "associated" and "needed" are not the same (Dkt. at 28). Other than arguing the words "associated" and "needed" are different, Plaintiffs provide no basis to conclude that the Forest Service's approval of the Burntlog Route was unlawful. The Court finds this semantics argument unpersuasive. Accordingly, the Court rejects Plaintiffs' challenges to the Forest Service's approval of the Burntlog Route and grants Defendants summary judgment on Plaintiffs' second claim for relief (Dkt. 26 at ¶¶ 172-82).

### C. Borrow Sites

Plaintiffs allege that the Forest Service's approval of "gravel mines (borrow pits)" violates the 1947 Materials Act, the 1955 Common Variety Act, and the Organic Act (Dkt. 26 at ¶¶ 199-208). At issue is the applicable regulatory scheme for the approval of several "borrow sites" along the Burntlog Route. The FEIS provides that "up to eight borrow sites would be established along the Burntlog Route . . . to meet construction and ongoing maintenance needs throughout the life of the mine and to support decommissioning following mine closure. Additionally, those same eight borrow areas would be utilized for staging equipment and supplies" (FS243749).

Initially, the Forest Service in its "Surface Use Determination" referenced "free use permits" for "minerals materials" under Part 228C regulations when explaining Perpetua's plan to establish the borrow sites (Dkt. 32-1 at 21) (citing FS111247 n.8). The Service promulgated Part 228C regulations under the Materials Act, which was enacted to provide a method for the disposal of common variety minerals. *Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780, 785 (10th Cir. 2010). The Common Varieties Act amended the Materials Act to provide that gravel, among other minerals, is a common variety mineral. 30 U.S.C. § 611. Under these Acts and Part 228C regulations, the Service may dispose of mineral materials, such as gravel. *Copar Pumice*, 603 F.3d at 785. Section 228.57 identifies how common minerals may be disposed, including through a

"free use" permit. 36 C.F.R. § 228.57(a)-(e); *see also* 36 C.F.R. § 228.62 (addressing application for free use permit). "Generally, the disposal of [common variety minerals] occurs by contract let through competitive bidding." *Copar Pumice*, 603 F.3d at 786.

Later, however, the Forest Service relied on Part 228A in the FEIS and ROD to approve the borrow sites. (Dkt. 32-1 at 21 (citing FS404047); *see also* FS404062). Plaintiffs challenge the Service's reliance on Part 228A regulations, arguing it should have continued to rely on Part 228C regulations to determine whether to approve the sites. Defendants disagree that the Service relied on the wrong regulations and argues "the Service approved the use because [the borrow sites] and the road it will support are 'reasonably incident' to extraction of antimony and gold" (Dkt. 41-2 at 20); *see* 36 C.F.R. § 228.3(a) (providing for all activities reasonably incident to mining, including roads, regardless of whether operations take place on or off mining claims).

The parties' dispute centers on their disparate descriptions of the borrow sites and the meaning of "disposal." Plaintiffs characterize the sites as "gravel mines" (Dkt. 32-1 at 20). They point to language in the Forest Service's Surface Use Determination stating that Perpetua "would use portable crushing and screening facilities" "to obtain proper sizing of the construction rock" (FS111247-48), and they argue that "to characterize this activity as something other than mining gravel is absurd" (Dkt. 53 at 18). Further, they contend that Perpetua's excavation, processing, and use of gravel on the Burntlog Route is the disposal of a common variety mineral within the meaning of Part 228C regulations, regardless of whether Perpetua "promises to put [the gravel] back elsewhere" (Dkt. 53 at 19).

Federal Defendants, in contrast, argue that Plaintiffs' characterization of the borrow sites as gravel mines is a wholly inaccurate description (Dkt. 34-2 at 23). They assert that the Project does not propose "gravel mines from which Perpetua will sell or otherwise dispose of sand, soil,

and gravel"; rather, it proposes the "construction of an access route . . . with the reasonably incidental use of soil, sand, and gravel" from NFS lands (*id.* at 22, 24). Perpetua, likewise, argues that it will not "remov[e] or sell[] any borrow material"; "the material will remain on [NFS] land to support road construction and maintenance"; "[a]fter operations cease, the borrow sources, used material, and roads will be reclaimed"; and as a result, Perpetua is "borrowing" the material rather than disposing of it; and "this use of borrow is 'reasonably incident' to the mining operation" and "falls more appropriately within the 228A regulations" (Dkt. 41-2 at 20-21).

The Court disagrees with Plaintiffs' characterization of the borrow sites as gravel mines requiring approval under Part 228C regulations. Here, the Forest Service is not mining and disposing of gravel in the manner that the Common Varieties Act and Part 228C regulations contemplate. For example, the Service is not selling gravel to Perpetua and allowing it to remove gravel from NFS lands for Perpetua's commercial use. Instead, Perpetua will use gravel to construct and maintain a road necessary to the Project and that road will later be reclaimed. Under these circumstances, the borrow sites are not fairly characterized as gravel mines. Rather, the road and the related borrow sites are reasonably incident to the Project. *See* 36 C.F.R. § 228.3(a) (providing for all activities reasonably incident to mining, including roads, regardless of whether operations take place on or off mining claims).

**D. Transmission Lines**

Plaintiffs allege that the Forest Service violated the FLMPA, the Organic Act and the implementing regulations by unlawfully approving a special use permit for transmission lines in the ROD (Dkt. 26 at ¶¶ 209-214; Dkt. 32-1 at 21-23). The 2021 MMP proposes that Idaho Power construct or rebuild 72.8 miles of transmission lines and associated facilities to serve the Project, and the FEIS analyzed the potential effects of the proposed transmission lines and facilities

(FS243754-68). The ROD states that the "decision includes approval of a special use authorization for Idaho Power" to upgrade portions of an existing power transmission line, to install a new line, and to install substations and support infrastructure (FS240773) and that "this decision covers the special use authorization for the transmission line provided the application adheres to the scope of analysis in the Stibnite Gold Project FEIS" (FS240774).

Based on these two statements in the ROD, Plaintiffs argue that the Forest Service "illegally jumped the gun and approved the special use authorization for the transmission line right-of-way before it even had an application" (Dkt. 32-1 at 23). Federal Defendants respond that Plaintiffs misunderstand the approval process; Idaho Power submitted its application to construct and operate the transmission lines in February 2025 (FS421637-882); the Service is currently considering that application; and any challenge to the Service's forthcoming decision is premature (Dkt. 34-2 at 25). Perpetua similarly argues that any challenge to the special use permit is not ripe for judicial review (Dkt. 41-2 at 19). At oral argument on June 24, 2026, the Service's counsel represented that the Service had not yet issued a special use permit to Idaho Power.

Other than the ROD's singular reference to "approval," Plaintiffs offer no proof to support their assertion that the Forest Service has already approved a special use permit for Idaho Power. The Court declines Plaintiffs' invitation to "declare" the ROD "unlawful" and "vacate its approval of the transmission line" (Dkt. 53 at 22). Rather than an unlawful approval, the Court construes the ROD's use of the term "approval" as an unfortunate word choice. Elsewhere, the ROD acknowledges that Idaho Power must apply for a special use authorization; Part 251 regulations will apply to that application; [4] and the application must adhere to the scope of the FEIS's analysis

---

[4] The parties agree 36 C.F.R. Part 251 regulations, promulgated under the Federal Land Policy Management Act, 43 U.S.C. §§ 1761-1771, apply to the proposed special use authorization

(FS420805). For this reason, the Court rejects Plaintiffs' characterization of Defendants' explanation of the application's status as a post-hoc rationalization for the ROD's use of the term "approval" (Dkt. 34-2 at 25; Dkt. 53 at 22). Based on the context, the Forest Service clearly understands that Idaho Power must apply for a special use authorization in compliance with Part 251 regulations and the FEIS. Furthermore, Plaintiffs do not challenge the FEIS's consideration of the transmission line's impacts or cite any authority that the consideration was unlawful.

Because the Forest Service has not yet reached a final decision on Idaho Power's pending application, whether the Service failed to complied with Part 251 regulations or otherwise violated the law is not ripe for review. *See, e.g.*, *Montana Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 (9th Cir. 2014) (ruling challenge to anticipated approval of application not ripe for review). That the issue is not ripe for review is further highlighted by the fact that Plaintiffs submit evidence beyond the administrative record to challenge the application and that Idaho Power, the applicant, is not party to this lawsuit (*see* Dkt. 56 at 17 n.3).

Plaintiffs' argument that the approval of transmission lines would violate 36 C.F.R. § 294.25 Mineral Activities in Idaho Roadless Area is also unpersuasive. Their argument focuses on the rule's language that "nothing in this subpart shall affect mining activities conducted pursuant to the General Mining Law of 1872." *Id.* During oral argument, Plaintiffs' counsel argued that building transmission lines and selling power to Perpetua is not pursuant to the Mining Law. The Court disagrees. As Perpetua's counsel noted, the Project cannot feasibly operate without

---

for Idaho Power to construct and operate the transmission lines (*see, e.g.*, Dkt. 34-2 at 24) (citing 36 C.F.R. § 251.53(a)(4)).

electricity. For that reason, the transmission lines and facilities are fairly construed as mining activities under the Mining Law.

## IV. Endangered Species Act

Plaintiffs challenge the FWS's BiOp's jeopardy analyses for wolverine, bull trout, and whitebark pine (Dkt. 26 at ¶¶ 239-258 (Claim 8); Dkt 58-1 at 18-22). They assert the BiOp violates the ESA. Section 7 of the ESA imposes an affirmative duty on federal agencies, such as the Forest Service, to prevent violations of Section 9. 16 U.S.C. § 1536(a)(2). This affirmative duty extends to "any action authorized, funded, or carried out by such agency," including authorizing mining activities on federal lands. *Id.* To determine whether an "action may affect listed species or critical habitat," the agency may be required to create a biological assessment that "evaluate[s] the potential effects of the action on listed and proposed species and . . . critical habitat and determine[s] whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12. If the agency finds evidence of an adverse impact, it must initiate formal consultation with the FWS. 50 C.F.R. § 402.14.

If formal consultation is necessary, the FWS will issue a biological opinion summarizing the relevant findings and determining whether the proposed action is likely to jeopardize the continued existence of the species or adversely affect designated critical habitat. 16 U.S.C. § 1536(b). If so, the biological opinion must list any "reasonable and prudent alternatives" that, if followed, would not jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14. Additionally, the FWS must specify whether an "incidental taking" of protected species will occur, specifically "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of carrying out an otherwise lawful activity. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 17.3. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). A determination that an incidental taking will result leads to the publication of an incidental take statement (ITS), which identifies areas where members of a particular species are at risk.

**A. BiOp's Wolverine Jeopardy Analysis**

Plaintiffs argue that the BioOp's jeopardy analysis for wolverine unlawfully "downplayed" the impacts to reach a "no jeopardy" determination. The BiOp concludes that "after reviewing the current status of North American wolverine, the environmental baseline in the action area, effects of the proposed action, and the cumulative effects, it is the [FWS's] biological opinion that the proposed action is not likely to jeopardize the continued existence of wolverine" (FWS-Stibnite-AR-337). Plaintiffs argue the FWS supports this conclusion with "only three paragraphs, which are riddled with errors, omissions, unsupported assumptions, and contradictions" (Dkt. 32-1 at 38). They challenge BiOp's conclusion as unlawful on three separate grounds.

**1. Long-Term Effects**

First, Plaintiffs dispute FWS's statement that "long-term effects are not expected to wolverines in the action area or statewide nor are measurable effects expected to the conservation or the recovery of the species" (Dkt. 32-1 at 39) (citing FWS-Stibnite-AR-000337). Plaintiffs assert that this statement is "blatantly false"; it is contradicted by the record; and the Project's sixty to sixty-five-year lifetime[5] "is not short-term" (*id.*; Dkt. 58-1 at 19). Defendants respond that Plaintiffs improperly "cherry-pick[ed]" the last sentence in the FWS's conclusion summarizing its

---

5 Plaintiffs base a sixty to sixty-five-year lifetime on "20-25 years for construction and mining activities" and "up to 40 or more for monitoring and water treatment" (Dkt. 32-1 at 39).

jeopardy analysis and ignore that the FWS's conclusion is "tied" to a "quantitative, scale-based analysis" (Dkt. 34-2 at 43-44; Dkt. 41-2 at 38).

The Court agrees that Plaintiffs take the FWS's concluding sentence in its wolverine jeopardy analysis out of context. The FWS's analysis considered the effects of each aspect of the Project (mine site, roads, and utilities and facilities) during the Project's three phases (construction, operation, and closure and reclamation) and those effects on habitat loss, noise and disturbance, and water quality and contaminates (FWS-Stibnite-AR-322-35). Generally, the FWS's analysis concludes that wolverines "are sensitive to anthropogenic disturbances and development in denning habitat"; they have "low population densities and large home ranges"; they are "likely to move around the disturbance[s]"; and construction and operations are "not anticipated to impede dispersing individual's movements or affect gene flow between wolverine populations" (FWS-Stibnite-AR-000323; *see id.* (concluding effects for construction and operations the same)). Following these general findings, the FWS makes numerous specific findings, after detailed analyses, that various effects are expected to be insignificant, not anticipated, not expected, or discountable (*see* FWS-Stibnite-AR-000323-24, 328-29, 331-35).

Review of these findings show they are based on relevant data, and Plaintiffs generally do not argue otherwise, except for the two arguments addressed below about wolverine population size and climate change. Further, as Perpetua notes, Plaintiffs appear to confuse the duration of the effects' impact with the scope and intensity of those effects. Indeed, the FWS's analysis and its numerous findings that the effects are not significant address their scope and intensity. For that reason, FWS's use of the phrase "long-term" in its conclusion is not apropos of its specific findings. Regardless, the Court discerns that FWS means that because the effects are insignificant, long-term effects are not expected. Likewise, the Court is not persuaded that two statements the

Forest Service made in the FEIS using the phrase "long-term" or "a long period of time" renders the FWS's finding that "long-term effects are not expected to wolverines in the action area or statewide" arbitrary and capricious (*see* Dkt. 32-1 at 39) (citing statements at FS244897, FS244959).

**2. Population Size**

Second, Plaintiffs argue that the FWS's jeopardy analysis "wholly ignored wolverine population size"; "never considered how directly or indirectly harming 16 wolverines could affect local, regional, or national populations," and "fail[ed] to properly analyze the environmental baseline" (Dkt. 32-1 at 40; *but see* Dkt. 58-1 at 19 (complaining FWS "failed to consider the impact of the Project on the *local* wolverine population")) (emphasis added). Defendants respond that the FWS addressed the population size by analyzing the baseline, status, occurrence, and effect scaling and by considering the Species Status Assessment for the North American Wolverine, March 1, 2018 (SSA) (FWS-Stibnite-AR-00023497-675) and Appendix D (FWS-Stibnite-AR-000419-46), which is attached to the BiOp and relies on the SSA (Dkt. 34-2 at 44-45; Dkt. 41-2 at 39-41).

Although the BiOp does not expressly mention the total population of wolverine in the lower forty-eight states, which is estimated to be 318, the SSA expressly identifies this number (FWS-Stibnite-AR-00023558). Further, the BiOp identified sixteen individual wolverines in or adjacent to the action area, including four within the mine site boundary and one of which was a "resident reproductive female" (FWS-Stibnite-AR-000319). Contrary to Plaintiffs' argument, the FWS did not conclude the Project will harm these sixteen individual wolverines (*see* Dkt. 32-1 at 40) (arguing FWS never analyzed or considered how harming sixteen wolverines would affect local, regional, or national populations). Rather, it concluded that "adverse effects will be limited to individual denning wolverines and their young, as dispersing and resident wolverines are

expected to avoid increased human presence and move freely to other suitable and denning habitat in and beyond the action area" (FWS-Stibnite-AR-000337).

Similarly, the FWS concluded that "the loss of habitat will be localized throughout the action area" and provided the following analysis regarding the loss of denning habitat in the action area and in Idaho:

> The loss of modeled suitable and denning habitat from the proposed action will be 0.7% of all suitable and denning habitat in the action area (2,341.6 / 340,606.7). The loss of denning habitat from all proposed action activities will be 0.3% of denning habitat within the action area (779.3 / 231,053.9) and only 0.02% of all denning habitat in Idaho (779.3 / 3,431,818).

(FWS-Stibnite-AR -000336).

Plaintiffs complain that this analysis does not account for the potential effects on the national wolverine population (Dkt. 53 at 36), but as they note, making that determination is a matter of simple math: Assuming the Project caused a 100 percent take of all sixteen affected wolverine in the action area, then 5 percent of the estimated national population would be adversely impacted. The FWS, however, did not find all sixteen wolverine would be harmed. Rather, it found that "adverse effects will be limited to individual denning wolverines and their young" (FWS-Stibnite-AR-337). For this reason, the fact that FWS did not specifically analyze the take of sixteen wolverines in the action area with the national population is not clear error.

Further, because FWS did not conclude the Project would cause a significant amount of take, Plaintiffs' reliance on *American Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32 (D.C. Cir. 2018), is misplaced. In that case, the D.C. Circuit concluded that the biological opinion was not legally sufficient because it did not provide "a basis for its finding of no jeopardy that the local populations are insignificant to the larger populations." *Id.* at 48. That ruling, however, was

based on the biological opinion's estimate that ninety to one hundred percent of several species would be taken. *Id.* at 47. Here, the FWS did not make any such estimate.

**3. Climate Change**

Third, Plaintiffs argue that the FWS failed "to 'add' the effects of the Project together with *future* climate effects in order to accurately assess jeopardy"; the BiOp does not "discuss the implications of climate change on wolverine habitat in and around the Project area"; and in the coming decades, the Project and climate change will harm wolverines, but the FWS failed to consider those combined effects (Dkt. 32-1 at 42, Dkt. 53 at 37; Dkt. 58-1 at 19). Defendants dispute Plaintiffs' assertion.[6] Again, they point to the FWS's reliance on Appendix D (Dkt. 34-2 at 45; Dkt. 41-2 at 41).

Appendix D contains a detailed analysis of the effects of climate change on wolverines. The analysis focuses on climate change's impact on snow, which is an important aspect of wolverine habitat (FWS-Stibnite-AR-000317) (noting wolverines use areas in high elevations with more snow and den in snow). Appendix D relies on various scientific models to analyze snowpack and snow cover projections and to interpret future snow projections and percentage change, among other things (FWS-Stibnite-AR -000442-446). Further, it makes numerous findings including, for example, that climate change is "largely irreversible"; "[k]ey uncertainties" remain regarding whether "climate-related factors have the potential to impact wolverines at the population level in the contiguous United States"; "[w]olverine populations in the contiguous United States are small, fragmented, and relatively isolated"; "[s]mall, isolated populations are more vulnerable to extinction

---

[6] For example, Federal Defendants state that "FWS grounded wolverine habitat and denning in persistent-spring-snow science, incorporated [its] climate projections, quantified and added Project effect to that climate baseline at the action-area and statewide scales, and adopted denning-season measures keyed to the same climate proxy" to explain "why the additive effects would not jeopardize the wolverine" and to reach "climate-aware jeopardy analysis" (Dkt. 34-2 at 46).

through interactions between environmental, genetic, and demographic factors"; "wolverine habitats are projected to become smaller and more fragmented in the future as the result of climate change and human disturbance"; "the core attributes related to adaptive capacity exhibited by wolverines may limit the ability of this species to adapt and persist in the face of projected environmental change"; "[d]ispersal between currently occupied core habitats may become more difficult in the future with anticipated increases in human development in the valleys between the alpine core areas and increased backcountry winter recreation in core habitats; and "the best available information suggests that habitat loss as a result of climate change and other stressors are likely to impact the viability of wolverines in the contiguous U.S. through the remainder of this century" (FWS-Stibnite-AR- 442, 445, 446).

FWS's BiOp expressly states it relies on the SSA information contained in Appendix D (FWS-Stibnite-AR-000316). Further, the BiOp analyzes the climate in the action area, including a five-mile buffer (FWS-Stibnite-AR-000317). Based on this information, FWS finds that "climate change has the potential to exacerbate effects from other stressors such as multi-lane roads, backcountry winter recreation, and human development, all of which could impact genetic diversity and small population dynamics for the distinct population segment (DPS) of North American wolverines" (*id.*). It then discusses and analyzes the wolverine habitat in the action area in the context of climate (FWS-Stibnite-AR-000317-319), and it concludes:

> The primary threats to wolverine range wide are climate change and inadequate regulatory mechanisms related to climate change, and secondary threats are harvest (trapping) and small population size (USFWS 2023d, entire). The proposed action and its effects to wolverines are not considered among the primary threats to wolverine. *While the proposed action will not ameliorate threats acting on wolverine, neither will it exacerbate those threats range wide.*

(FWS-Stibnite-AR -000336) (emphasis added).

In other words, FWS considered both the combined effects of the Project and ongoing climate change to find the effects of the Project will not exacerbate the threats climate change poses to wolverine. Contrary to Plaintiffs' assertion, the BiOp's analysis of the cumulative effects of climate change on wolverine is more than "lip service." Meanwhile, Plaintiffs do not address Appendix D's climate change analysis or cite any authority that FWS cannot rely on prior studies or incorporate them into the BiOp as an Appendix in support of its jeopardy analysis.

In summary, the Court finds that FWS examined relevant data and articulated a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. This analysis included the combined effects of the Project, including climate change. While Plaintiffs disagree with the FWS's conclusion, that disagreement is inadequate to conclude FWS was arbitrary and capricious.

### B. BiOp's Jeopardy Analysis for Bull Trout

Plaintiffs argue that the BiOp's jeopardy analysis regarding bull trout violates the ESA. Bull trout are a threatened species which inhabit streams in the action area, including the upper East Fork of the South Fork of the Salmon River (Dkt. 31-1 at ¶¶ 34-35). The BiOp concludes that "after reviewing the current status of bull trout, the environmental baseline in the action area, effects of the proposed action, and cumulative effects, it is [FWS's] biological opinion that the proposed action is not likely to jeopardize the continued existence of bull trout (FWS-Stibnite-AR-000261). Plaintiffs argue that this jeopardy analysis "ignor[es] the full extent of impacts to bull trout" and fails "to consider climate change effects to bull trout" (Dkt. 32-1 at 49-50).

#### 1. Extent of Impact

Plaintiffs argue that FWS based its jeopardy analysis on "incomplete arithmetic" (Dkt. 58-1 at 21). They characterize the analysis as relying on "a fictitious assertion" that the Project will

"only impact 402 bull trout" and "comparing that number to the state-wide bull trout population" (Dkt. 32-1 at 50). Specifically, they focus on the statement in the analysis's conclusion that:

> The proposed action is expected to result in injury and mortality to 629 bull trout (402 in the Stibnite project area and 227 in the Lemhi restoration project area). In Idaho, it is estimated that there are 1.13 million bull trout within all recovery units. The potential loss of 629 bull trout represents 0.06% of bull trout in the State.

(Dkt. 53 at 45) (citing FWS-Stibnite-AR-000262) (citation omitted). They contend that 402 injured or killed bull trout includes only one category of take, i.e., fish handling, and ignores the remaining four categories: habit loss, sediment delivery, chemical contaminants, and physical barriers (Dkt. 32-1 at 49; Dkt. 53 at 45).

Defendants dispute Plaintiffs' characterization of FWS's jeopardy analysis, arguing it is based on comprehensive, detailed science. Defendants explain that FWS used individual numbers to identify fish handling because literature identified the mortality percentage for electrofishing (i.e., the process of temporarily stunning fish to handle them) and that although "the science did not exist to allow FWS to identify mortality with the same precision" in other categories of take, it identified those other categories and analyzed the anticipated mortality (Dkt. 34-2 at 53; *see also* FWS-Stibnite-AR-000270 (calculating 402 and 227)). Further, they assert that "Plaintiffs rely on selective citations and ignore the record demonstrating that FWS [considered] comparisons to core-area, recovery-unit, *and* range wide bull trout populations" (Dkt. 41-2 at 47).

The Court disagrees with Plaintiffs that FWS did not consider the full extent of the Project's impact on bull trout. Plaintiffs focus on two sentences in the conclusion of FWS's jeopardy analysis is not an accurate characterization of the record. For example, contrary to Plaintiffs' assertion, FWS analyzed anticipated take from habitat loss, including increased stream temperatures (FWS-Stibnite-AR-000263-42); sediment delivery (FWS-Stibnite-AR-000265-66); chemical contaminants, including copper, arsenic, antimony, mercury (FWS-Stibnite-AR-000266-

67); physical barriers (FWS-Stibnite-AR-000267-68); and fish handling and salvage in the Stibnite Project Area and Lemhi Restoration Project Area (FWS-Stibnite-AR-000268-74). In some instances, FWS quantified the take (*see* FWS-Stibnite-AR-000214 (potential take of 111 bull trout), 264 (estimate take of 32 bull trout), 265 (estimate take of 155 bull trout)). FWS summarized these and other adverse effects in Table 42 (FWS-Stibnite-AR-000256-260).

Further, the Court disagrees that FWS limited its analysis to a comparison to a statewide impact. Rather, FWS concluded that "adverse effects from the proposed action are localized and limited to . . . the Upper EFSFSR, Sugar Creek, Burntlog Creek, Trapper Creek, and Riordan Creek local populations, which represent 5 out of 27 local populations (18.5%) in the core area. . . . For these reasons, [FWS] does not anticipate effects to the survival and recovery of the South Fork Salmon River core area, Upper Snake recovery unit, or the coterminous rangewide population" (FWS-Stibnite-AR-000262; *see also* FWS-Stibnite-AR-000260 ("[FWS] does not expect effects at the South Fork Salmon River core area, Super Snake recovery unit, or rangewide levels.")). FWS analyzed these areas at length, including "stream or stream complexes," population numbers, migration behaviors, and other stream-by-stream conditions (FWS-Stibnite-AR-000137-44). For these reasons, the Court discerns that FWS did not limit its analysis to a fish-handling take of 402 bull trout in the Project area compared to the bull trout statewide population as Plaintiffs assert.

**2. Climate Change**

Plaintiffs also challenge FWS's jeopardy analysis for failing to assess "bull trout impacts in relation to stream temperature and climate change" (Dkt. 58-1 at 21). Regarding climate change, the BiOp provides:

> Because the operating lifetime of the proposed action will be approximately 15 years following a three-year construction period, effects of climate change during the operating lifetime will be limited by that duration. Therefore, there is less potential for climate change to affect proposed action operational components

> than components associated with mine closure and restoration. As such, the climate change risks associated with the post-closure components of the proposed action were prioritized and incorporated into the designs of the restored stream channels and their associated riparian shading so that the stream channels will respond to variable climatic conditions in a manner similar to natural drainages.

(FWS-Stibnite-AR-000164). Further, the BiOp applies NOAA Fisheries' climate-resilience guidance and uses the Bureau of Reclamation's West-Wide Climate and Hydrology Assessment (BOR 2021, entire) to forecast future trends in stream flow and temperature as affected by climate change through 2100 (*id.*). The BiOp finds that "based on this assessment, the effects of climate change will primarily manifest as the following risk pathways[:] drier dry extremes, decreased minimum flows, runoff starting earlier in the year, increased water temperature, and increased wildfire effects, which will significantly decrease the quality of bull trout habitat over time" (FWS-Stibnite-AR-000165).

Plaintiffs criticize FWS's climate change analysis because its "[s]tream temperature modeling . . . *omits*, climate change dynamics" (Dkt. 58-1 at 21). In support, they rely on *Willamette Riverkeeper v. Nat'l Marine Fisheries Serv.*, 763 F. Supp. 3d 1203 (D. Or. 2025), and *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224 (E.D. Wash. 2016). In both cases, the district court ruled the National Marine Fisheries Service's (NMFS) biological opinions were arbitrary and capricious because they failed to consider the potential effects of climate change on stream flows. *Willamette Riverkeeper*, 763 F. Supp. 3d at 1237; *Wild Fish*, 221 F. Supp. at 1234.

In *Willamette Riverkeeper*, the court addressed NMFS's biological opinion regarding the release of hatchery-raised summer steelhead and considered the plaintiffs' argument that the biological opinion "to evaluate how the projections of 'serious implications' from climate change will affect already depressed winter steelhead populations in degraded habitat." 763 F. Supp. 3d at 1237. The biological opinion stated that "climate change is 'projected to have serious negative implication'" for steelhead; "conditions . . . 'are going to change substantially' in the next

100 years, including higher temperatures, less precipitation, less snow, earlier snowmelt, and possible storm increases"; "climate change will cause even greater increases in stream temperatures"; and "'expected effects of climate change will only worsen' key limiting factors related to freshwater habitat, including 'summer time water quality issues and poor overwinter survival of fry.'" *Id.*

For these reasons, the biological opinion in *Willamette Riverkeeper* concluded that "the winter steelhead will be impacted by climate change, but that due to their life history and distribution, effects are not likely to be as extreme as for Spring Chinook." *Id.* The court ruled that this explanation was "insufficient to describe the effects of climate change on the winter steelhead" because it failed "to evaluate the consequences to winter steelhead of projected worsening conditions" and "to put into the calculus the winter steelhead population numbers and assess whether they can sustain impacts from the release of hatchery summer steelhead on top of climate change effects." *Id.* at 1237-38 (cleaned up).

The court in *Wild Fish* considered whether NMFS's biological opinion in that case adequately considered climate change in analyzing the effects of the Leavenworth National Fish Hatchery on Chinook salmon and steelhead in Icicle Creek. 221 F. Supp. 3d at 1233. In analyzing climate change, the biological opinion included "a detailed discussion of the effects of climate change"; used "models [to] predict a significant reduction in total snowpack and low-elevation snowpack, affecting streamflow and water temperatures"; but "used historical stream-flow data from 1994 to 2014 in the analysis." *Id.* When the plaintiffs challenged this analysis, the defendants responded that NMFS did not need to consider climate change in its analysis." *Id.* The court rejected the argument, stating that "the problem here is that NMFA included no discussion whatsoever of the potential effects of climate change in the [biological opinion's] analysis of the

Hatchery's *future* operation and water use" *Id.* (emphasis added). Rather, "NMFS discusse[d] the effects of climate change generally and then proceed[ed] with analysis on the apparent assumption that there will be no change to the hydrology of Icicle Creek." *Id.* at 1233-34. The court ruled that NMFS's conclusion that "climate change is less likely to affect Icicle Creek analysis" was "conclusory and unconnected to the analysis of the Hatchery's operation and water use.

Here, in response to Plaintiffs' argument that the FWS's stream temperature model omits climate change dynamics, Defendants respond that FWS "acknowledged model uncertainties and limitations"; "noted greater uncertainty for later-year predictions"; "required added monitoring and measures during the closure and reclamation phases" because of the uncertainty; and "concluded that, although some effects persist more than 20 years at the mine site, effects at the core habitat use area/core habitat unit scales are localized and 'insignificant'" (Dkt. 34-2 at 54-56). Further, they respond that FWS "acknowledged model uncertainties and limitation" and used assumptions likely to overestimate rather than underestimate the effects "to account for the kinds of uncertainties inherent in long-range climate to bull trout" (Dkt. 34-2 at 55; Dkt. 41-2 at 49 (citing FWS-Stibnite-AR-000168 (acknowledging uncertainties and adopting "reasonably cautious and prudent approach for assessing impacts" by overestimating rather than underestimating impacts); *see also* FWS-Stibnite-AR-000173-75 (discussing uncertainties)).

This case is distinguishable from *Willamette Riverkeeper* and *Wild Fish*. Unlike the NMFS in those cases, FWS considered the future impact of climate change, acknowledged uncertainties in determining those impacts, and overestimated effects because of those uncertainties. The Court concludes that FWS examined relevant data and articulated a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. This analysis included the extent of impacts and combined effects of the Project, including climate change. While Plaintiffs

disagree with the FWS's conclusion, that disagreement is inadequate to conclude FWS was arbitrary and capricious. In summary, the Court rejects Plaintiffs' challenge to the FWS's jeopardy analysis for bull trout.

### C. BiOp's Jeopardy Analysis for Whitebark Pine

Plaintiffs argue that the BiOp's jeopardy analysis of the whitebark pine failed to add the effects of the action and cumulative effects to the environmental baseline. Whitebark pine is a wide-ranging five-needle pine found at cold and windy high elevations across western North America and is a threatened species (FWS-Stibnite-AR-000299). FWS concluded that the Project "is not anticipated to produce measurable effects on current blister rust infections or mountain pine beetle activity in the action area" and that the Project's effects "are not considered among the primary stressors to whitebark pine and are not expected to exacerbate the species' primary stressors at the population level." (FWS-Stibnite-AR-000314).

Plaintiffs argue that "the BiOp simply recites the primary threats to whitebark pine, including climate change, blister rust, pine beetle, and altered fire regimes"; "assesses the Project's impact's in isolation from those threats"; and fails to "'add' the effects of the action, cumulative effects, and the environmental baseline to assess jeopardy" as required by 50 C.F.R. § 402.14(g)(4) (Dkt. 58-1; *see also* Dkt. 32-1 at 47-48). Defendants respond that FWS did not consider Project effects in isolation. Rather, FWS identified the existing stressors affecting whitebark pine, evaluated the Project's additional effects on individual trees, occupied habitat, modeled suitable habitat, seedlings, seedbanks, the Burntlog Route, and associated borrow sources, and considered environmental design features intended to avoid or minimize those effects (FWS-Stibnite-AR-000307-309, 312, 314-315).

The Court disagrees that the FWS failed to appropriately assess the Project's effects on whitebark pine. The ESA required FWS to evaluate the Project's effects in light of the species' status and environmental baseline; it did not require FWS to use any particular formulation or perform a separate arithmetic summation of every existing stressor and Project effect. The BiOp reflects that FWS considered both the existing stressors and the Project's additional effects and then explains why it concluded those effects would remain localized and would not affect whitebark pine numbers, reproduction, or distribution at the action-area, Forest, analysis-unit, or rangewide scales (*id.*). Although Plaintiffs may disagree with the weight FWS gave those effects, FWS is entitled to deference to weigh the effects and scale consequences. Plaintiffs' disagreement with FWS's conclusion is not a basis to conclude FWS was arbitrary and capricious.

Based on the foregoing, the Court grants Defendants summary judgment on Plaintiffs' eighth claim for relief (Dkt. 26 at ¶¶ 239-258) to the extent that claim asserts the FWS's BiOp analyses for wolverine, bull trout, and whitebark pine violate the ESA and EPA.

**D. Incidental Take Statements for Wolverine and Bull Trout**

Plaintiffs also allege that the FWS's ITSs (incidental take statements) for wolverine and bull trout violate the ESA and the APA (Dkt. 26 at 239-258 (Claim 8)). An ITS performs a specific legal function. It must (1) specify the impact of the taking on the species; (2) specify the RPMs (reasonable and prudent measures) necessary or appropriate to minimize that impact; and (3) set forth the T&Cs (terms and conditions) with which the federal agency or applicant or both must comply to implement the RPMs. 16 U.S.C. § 1536(b)(4); *see also Arizona Cattle Growers' Assoc. v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1239 (9th Cir. 2001) (setting forth ESA procedural requirements). An ITS generally sets a numerical or a surrogate "trigger" which, if reached, results in an unacceptable level of taking, invalidates the ESA safe harbor provision, and requires the

parties to re-initiate consultation. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir. 2010). For example, a surrogate trigger may be a change in an ecological condition affecting the species. *Id.* "If a surrogate is used, the agency must articulate a rational connection between the surrogate and the taking of the species." *Id.*

**1. Wolverine ITS**

The wolverine ITS states that the FWS "finds incidental take of North American wolverine is reasonably certain to occur in the form of injury and mortality via den abandonment. . . ." (FWS-Stibnite-AR-000338). It concludes, however, that "it is not practical to express the amount of this incidental take in terms of a number of individual wolverines" because "[w]olverines are not easily detected or observed in the wild"; they "may react differently to disturbance, with some being more tolerant of human disturbances than others"; and "[n]ot all female wolverines and kits . . . will be adversely impacted to the extent where take is likely to occur" (*id.*). For these reasons, the ITS relies on a surrogate take limit using acreage and states that an "incidental take will occur in the form of injury or mortality to wolverines via disturbance of 779.3 acres of denning habitat within the action area" (FWS-Stibnite-AR-000339). Plaintiffs argue "FWS's use of this surrogate was unlawful for multiple reasons" (Dkt. 32-1 at 43; Dkt. 58-1 at 19).

Plaintiffs challenge FWS's surrogate take limit in the wolverine ITS on three grounds, including that: (1) it fails to quantify all types of take; (2) it fails to set a clear standard for determining take exceedance; and (3) it fails to specify RPMs and T&Cs adequately. For the reasons discussed, the Court concludes that the ITS quantified the take associated with the Cabin Creek Road but that it fails to establish a clear standard for determining take exceedance and to adequately specify RPMs and T&Cs.

**a. Quantification of Take**

Plaintiffs note that "an ITS violates the ESA if it sets a take limit based on only some types of take but fails to quantify the amount of other types of take" (Dkt. 32-1 at 44; Dkt. 58-1 at 19). They argue that the wolverine ITS fails to account for take associated with human presence, noise, light, collisions, and grooming the Cabin Creek Road (Dkt. 32-1 at 45; Dkt. 58-1 at 20). As noted above, the FWS finds incidental take of wolverine "is reasonably certain to occur in the form of injury and mortality via den abandonment (FWS-Stibnite-AR-000338). The ITS notes the "footprint of human activity" will be responsible for this harm (FWS-Stibnite-AR-000329). It describes these adverse effects to be primarily noise, lighting, collision, and winter recreation and notes that both the Burntlog Route and Cabin Creek Road will contribute to these effects (FWS-Stibnite-AR-000329-30).

Federal Defendants respond that the FWS analyzed non-habitat stressors that Plaintiffs identify and minimized those stressors via environmental design features (Dkt. 34-2 at 49). Review of the cited record indicates the FWS considered the take associated with those stressors (*id.*) Notably, the adverse effects attributable to the Cabin Creek Road are not distinct from those attributable to the Project's construction and operation. Rather, the Cabin Creek Road will, like other aspects of the Project, contribute to human disturbances like road traffic, noise, and lighting. These are the same adverse effects associated with human presence which are likely to cause an incidental take in the form of den abandonment. For this reason, the ITS also accounts for the take associated with the Cabin Creek Road by considering the adverse effects generally associated with the Project's construction, operation and with winter recreation.

Contrary to Plaintiffs' assertion, this case is factually distinct from *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020). In that case, the Ninth Circuit addressed the

effects of the construction of an offshore oil drilling and production facility on threatened polar bears. *Id.* at 731, 741. FWS's biological opinion provided a numerical cap on the amount of take, namely, injury or death to one or more polar bears triggers re-consultation. *Id.* at 749. FWS also "contemplated that nonlethal harassment of polar bears may raise to the level of 'take.'" *Id.* It did not, however, quantify the amount of take that harassment might cause. *Id.* Because FWS contemplated harassment as a trigger for re-consultation but did not quantify the related nonlethal take, the Ninth Circuit held that the incidental take statement was arbitrary and capricious in violation of the ESA. *Id.* at 750.

Here, in contrast to *Bernhardt*, FWS did not provide a numerical cap on the amount of take but rather concluded it was impractical to quantify a numerical take (FWS-Stibnite-AR-000338). Instead, as noted, it used a surrogate take quantified in acreage, determining that "incidental take will occur in the form of injury or mortality to wolverines via disturbance of 779.3 acres of denning habitat within the action area" (FWS-Stibnite-AR-000339). Because the FWS considered the non-habitat stressors Plaintiffs identify and the Cabin Creek Road presents the same adverse effects as the other aspects of the Project's construction and operation—human disturbance causing den abandonment—it is not another type of take; rather, it is the same type of take. Accordingly, FWS reasonably included the acreage associated with the Cabin Creek Road in the total take acreage of 779.3, a number which Plaintiffs do not challenge. For these reasons, the Court concludes the ITS adequately accounts for take.

**b. Monitoring and Reporting**

Plaintiffs argue the wolverine ITS "fails to include any monitoring and reporting related to the take limit in violation of the requirement that a surrogate take limit set 'a clear standard for determining when the level of anticipated take has been exceeded'" (Dkt. 32-1 at 43) (quoting

50 C.F.R. § 402.14(i)(1)(i)). Although Plaintiffs acknowledge the ITS "includes a few miscellaneous monitoring and reporting requirements," they argue that "the monitoring FWS required is not in any way connected to the take limit" (Dkt. 32-1 at 44).

The Ninth Circuit addressed the adequacy of an incidental take statement in *Wild Fish*, including whether that statement had adequate monitoring requirements. 628 F.3d at 531. The statement anticipated that up to twenty threatened migratory bull trout would be injured each year during the operation of the Leavenworth National Fish Hatchery by disrupting their breeding behavior. *Id.* at 516, 531. The Ninth Circuit noted, however, that "the twenty-bull trout limit [was] not accompanied by a monitoring and reporting requirement, leaving unanswered which agency, the consulting or the action agency, was responsible for monitoring, reporting, and reinitiating consultation when the trigger was met. *Id.* at 531.

Further, the Ninth Circuit noted in *Wild Fish* that "the ESA's implementing regulations provide that 'in order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service *as specified in the incidental take statement*.'" *Id.* (quoting 50 C.F.R. § 402.14(i)(3)). Based on this language, it ruled that "the regulation makes clear that the Service is responsible for *specifying in the statement* how the action agency is to monitor and report the effects of the action on listed species." *Id.* at 531-32 (emphasis added). Because the statement did not specify monitoring and reporting requirements, the Ninth Circuit held that it "failed to establish a meaningful trigger for renewed consultation after the take exceeded authorized levels." *Id.* at 532; *see also WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1065 (D. Mont. 2018) ("An incidental take statement must include reporting requirements that, once executed, permit the Service to determine whether reinitiation requirements have been triggered.").

Here, the wolverine ITS includes the following reporting and monitoring requirements: (1) the Forest Service shall notify the FWS "if any wolverine is observed" in the action area; (2) the FWS shall be notified "if dead, injured, or sick endangered or threatened species are detected and/or salvaged;" and (3) the Forest Service "shall promptly notify the Service of any emergency or unanticipated situations arising that may be detrimental to wolverine relative to the proposed activity." As Plaintiffs note, however, these requirements do not relate to the surrogate take of 779.3 acres. Monitoring whether a wolverine is actually taken and reporting that take will not establish whether the trigger has occurred, namely, whether more than 779.3 acres of denning habitat has been disturbed.

Defendants' responses do not resolve this problem. Perpetua argues that "the record[] imposes extensive and thorough monitoring requirements" (Dkt. 41-2). In support, Defendants point to various documents in the record, including the BiOp, the BiOp's incorporation of the draft Environmental Monitoring and Management Plan (EMMP),[7] the Biological Assessment, and the ROD (Dkt. 34-2 at 47-48; Dkt. 41-2 at 51). None of these documents, however, clearly articulate how denning habitat acreage will be monitored and reported to determine if the trigger has occurred and who will do that monitoring and reporting.[8] Moreover, contrary to *Wild Fish*, whatever guidance is contained within these documents, it is not specified in the ITS. 628 F.3d at

[7] The EMMP is located at FWS-Stibnite-AR-2119-2179.

[8] On reply, Federal Defendants explain that "the BiOp provides that an Interested Agency Review Board (including FWS) will provide oversight of the Project's environmental compliance and will receive and review proposed-action design reports, *as-built drawings*, and monitoring reports—all mechanisms that, as a practical matter, capture and verify the ground-disturbance footprint relevant to ITS's acreage-based surrogate" (Dkt. 56 at 26) (citing FWS129-30). This language, however, does not require consideration of the trigger for renewed consultation.

531-32 (citing 50 C.F.R. § 402.14(i)(3) and ruling incidental take statement must specify monitoring and reporting in statement). For this reason, the Court concludes the ITS does not establish a meaningful trigger for renewed consultation.

**c. RPMs**

Plaintiffs argue that the ITS "failed to include any reasonable and prudent measures and associated terms and conditions to minimize take" (Dkt. 32-1 at 46). The ESA provides that after the FWS consults with the Forest Service and concludes the taking of an endangered species is authorized, the FWS "shall provide [the Forest Service] and the applicant . . . with a written statement that--(i) specifies the impact of such incidental taking on the species [and] (ii) specifies those reasonable and prudent measures that [FWS] considers necessary and appropriate to minimize that impact." 16 U.S.C. § 1536(b)(4)(C)(i), (ii). Further, the applicable regulations provide that the FWS "will provide with [its] biological opinion a statement concerning incidental take that . . . [s]ets forth the terms and conditions (including, but not limited, to reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified. . . ." 50 C.F.R. § 404.14(1)(iv).

Despite the requirement that FWS provide the Forest Service and Perpetua a written statement specifying RPMs and T&Cs, the wolverine ITS provides that:

> **7.6.3 Reasonable and Prudent Measures**
> The Service [FWS] finds that compliance with the proposed action outlined in the Assessment, including proposed environmental design features [EDFs], is essential to minimizing the impact of incidental take of wolverines. If the proposed action, including EDFs, is not implemented as described in the Assessment and this Opinion, there may be effects of the action that were not considered in this Opinion, and reinitiation of consultation may be warranted.
>
> The Service [FWS] believes the measures proposed by the Forest [Service] are sufficient to minimize potential impact to North American wolverine caused by the proposed action.

(FWS-Stibnite-AR-000339).[9]

Plaintiffs argue this language fails to adequately specify RPMs and T&Cs. In support, they rely on *Ctr. for Biological Diversity v. Culver*, No. 21-cv-07171-SI, 2024 WL 4505468 (N.D. Cal. Oct. 22, 2024) ("*Culver*") (Dkt. 32-1 at 46). In that case, a district court addressed the Bureau of Land Management's (BLM) approval of land management plans designating off-highway vehicle routes in the Western Mojave Desert where threatened desert tortoise live. *Id.* at *1. Plaintiffs challenged the ITS for tortoise because, among other things, it did not contain any RPMs or T&Cs to implement those measures. *Id.* at *64. Defendants argued in response that there is no legal requirement that the ITS must contain RPMs and T&Cs, but rather those items are entirely discretionary. *Id.*

The *Culver* court rejected Defendants' arguments as contradicted by the plain language of the ESA and implementing regulations. *Id.* First, the court concluded that while § 1536(b)(4)(C) "confers discretion on the FWS to determine *what* the RPMs and T&Cs are ([i.e.,] 'measures that the Secretary considers necessary and appropriate to minimize [an incidental taking] impact'), the statute imposes a mandatory duty to provide ('shall provide') a 'written statement' that contains the elements set forth in subsection (C)(i)-(iv)." *Culver*, 2024 WL 4505468, at *64. Second, the court concluded the implementing regulation, 50 C.F.R. § 404.14(i), requires that an ITS contain RPMs and T&Cs. *Culver*, 2024 WL 4505468, at 64. Third, it found this conclusion was in accord with both Ninth Circuit case law and with the FWS's ESA Handbook *Id.* at *65 (citing *Or. Nat. Resources Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007)). Based on these authorities, the

---

9 Notably, the ITS does not have a section entitled terms and conditions (*see* FWS-Stibnite-AR-000339) (omitting 7.6.4).

*Culver* court rejected defendants' argument that "RPMs and terms and conditions were not necessary because they were 'baked into' the project." *Id.*

Here, Defendants argue that the wolverine ITS is distinguishable because, unlike the ITS in *Culver* which contained no RPMs or T&Cs, the wolverine ITS includes RPMs and T&Cs by "cross-referencing" or "incorporating" the Environmental Design Features in the Forest Service's biological assessment" (Dkt. 34-2 at 49-50; Dkt. 41-2 at 51-52). Defendants assert that under § 1536(b)(4)(C) and *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), "Congress delegated discretion to FWS to identify those measures that *FWS*—not Plaintiffs—deem necessary or appropriate, and Congress placed no other limits on FWS's decision-making" (Dkt. 34-2 at 50).

The Court agrees with Defendants that FWS has discretion to determine the required RPMs and T&Cs. Likewise, the *Culver* court appears to agree. *See* 2024 WL 4505468 at *64 (noting ESA "confers discretion on FWS to determine *what* the RPMs and terms and conditions are"). That the FWS has this discretion, however, begs the question of whether it must specifically articulate the RPMs and T&Cs in the ITS. The *Culver* court's analysis supports the proposition that FWS shall specify these items in the ITS. As a practical matter, requiring FWS to include these prospective items specifically in the ITS is better practice than requiring the Forest Service and Perpetua to hunt and peck through the biological assessment for EDFs, which Defendants contend are the RPMs and T&Cs. For these reasons, the Court concludes that the wolverine ITS fails to adequately specify RPMs and T&Cs.

### 2. The ITS for Bull Trout

Plaintiffs also argue that the ITS for bull trout violates the ESA. In support, they raise two arguments. First, they assert that the ITS failed to include RPMs and T&Cs to minimize take of

bull trout (Dkt. 32-1 at 53). Second, they assert the ITS provides an inadequate temperature take limit (*id.* at 54). The Court agrees that the ITS is deficient in these two respects.

**a. RMPs and T&Cs**

The bull trout ITS sets forth nine RPMs and related T&Cs (FWS-Stibnite-AR-000275-76). Plaintiffs characterize the RPMs as "bald statement[s] that take be minimized without providing any direction how to do so" (Dkt. 32-1 at 61) and the T&Cs as "merely requir[ing] [the] development of a monitoring plan" (Dkt. 53 at 49). Plaintiffs' description of the ITS is apt.

The RPMs are simple declarative sentences such as "minimize the take resulting from sediment delivery" and "minimize the potential for incidental take from physical barriers (*see* FWS FWS-Stibnite-AR-000275-76). The ninth RPM, however, incorporates other information, providing: "Ensure activity compliance through implementation of Environmental Design Features" as detailed in Appendix B of the Forest Service's Biological Assessment (FWS-Stibnite-AR-000276). Appendix B is lengthy (fifty-six pages) and provides some definitive details about certain measures but leaves others unresolved (*see* FS13859-915; *compare, e.g.*, FS153863 ("During operations, Perpetua *will implement* measures to monitor stream flows and water quality conditions at key locations as defined in Table 4-1 of the Water Resources Monitoring Plan") *with* FS153871 ("At one week prior to the spawning period, if adults present in the resting pool below the fishway have not entered the fishway over a 48-hour period and proceeded up the fishway[,] they will be collected and transported upstream without further delay.")). Further, measures are mixed in with explanations of the Project's plant operations, making clear directives difficult to locate (*see, e.g.*, FS153871) (discussing turbidity).

Contrary to the RPMs, some of the T&Cs are specific; for example the T&C regarding electrofishing is very specific (FWS-Stibnite-AR-000277). Several T&Cs, however, only

contemplate the development of a plan and generally refer to tables which appear either in the BiOp or in the Forest Service's Biological Assessment, including the T&Cs for baseflow depletions, stream temperatures, sediment delivery, and chemical concentrations (FWS-Stibnite-AR-000276).

Defendants assert that they may generally incorporate by reference other record documents to specify RMPs and T&Cs (Dkt. 34-2 at 56; Dkt. 41-2 at 54). For example, Federal Defendants claim the RPMs and T&Cs "adopted specific design measures from the Forest Service's biological assessment and impose enforceable, not-to-exceed performance standards" (Dkt. 34-2 at 56) (citing generally to FWS000275-78 which, in turn, cites other documents throughout the record). Similarly, Perpetua argues that there are "[d]ozens of 'environmental design features" that FWS "plainly concluded [were measures] essential to minimize take and other impacts" (Dkt. 41-2 at 54) (citing FWS-Stibnite-AR-128-33 (BiOp providing partial summary of Appendix B)). In support, Perpetua cites the Water Quality Protection section of its Fisheries and Aquatic Resources Mitigation Plan, which the ITS does not appear to incorporate (Dkt. 41-2 at 54).

For these reasons, FWS's trout bull ITS suffers from the same defects as its wolverine ITS—it fails to adequately specify RMPs and T&Cs. The ESA imposes a mandatory duty on FWS to provide a written statement containing the elements in 16 U.S.C. § 1536(b)(4)(C), including to specify RPMs and to set forth T&Cs. *See Culver*, 2024 WL 4505468, at *64-65 (explaining statute, regulations, Ninth Circuit case law, and FWS's ESA Handbook require this conclusion); *see also* 50 C.F.R. § 404.14(i) (requiring agency to specify RPMs and T&Cs). That Defendants can identify statements in the record that might support or flesh out the ITS's RPMs and T&Cs does not satisfy FWS's mandatory duty. Again, Perpetua's arguments that "nothing in the ESA or its regulations requires FWS to impose any particular 'terms and conditions'" and "the ESA leaves the choice of

*which* terms to impose to the agency's well-informed discretion" (Dkt. 41-2 at 53) beg the question of whether the chosen provisions are adequately specified in the ITS. Further, Perpetua's argument that "adaptive management is a recognized, effective tool to minimize take" (*id.*) ignores that the "monitoring plans" to which the T&Cs refer have yet to be developed and articulated.

**b. Temperature Take**

The bull trout ITS provides a surrogate take limit based on water temperature. It states that "authorized take will be exceeded if measured increases in water temperature, which we will use as a surrogate for quantifying the take of individual bull trout, exceed the predicted increases in water temperature in each of the affected stream reaches shown in Table 35" (FWS-Stibnite-AR-000265). Table 35 identifies four streams and shows the stream flow changes for those streams (FWS-Stibnite-AR-000215). In turn, the T&Cs provide that a monitoring plan will be developed "to ensure that stream temperatures do not exceed the predicted temperatures described for each affected stream reach during the construction, operation, and post-closure mine phases as shown in Table 24" (FWS-Stibnite-AR-000276). Table 24 identifies seven streams and the maximum weekly temperature for each in July and September during the mine years 6, 12, 18, 22, 27, 32, 52, and 112 (FWS-Stibnite-AR--Stibnite-AR-000178).

Plaintiffs challenge this take limit as inadequate, noting that "there are major gaps between take limit checkpoints, ranging from 5-year gaps to as long as a 60-year-gap" and that "if stream temperature rises above acceptable levels soon after the Project starts or soon after one of the checkpoints," the limit would not be triggered for five years or more (Dkt. 32-1 at 54). Plaintiffs argue that this surrogate trigger violates 50 C.F.R. § 402.14 (*id.*).

The Court agrees the bull trout ITS does not adequately specify a temperature take. Federal Defendants' brief highlights the problem with the ITS's take limit. Their brief represents that the

"ITS expressly stated that 'authorized take will be exceeded if measured increases in water temperature . . . exceed the predicted increases in water temperature in each of the affected stream reaches show in [the tables].'" (Dkt. 34-2 at 57) (citing FWS-Stibnite-AR-000265). The bracketed language in the brief—referring to "the tables"—however, replaces only the ITS's singular reference to Table 35 described above. In other words, Federal Defendants acknowledge *other* tables, which are not identified in the ITS, are required to establish the temperature take, including Table 24 and other information in the Biological Assessment which the ITS also does not specify (*see* Dkt. 34-2 at 58).

Based on the foregoing, the Court grants Plaintiffs summary judgment on their eighth claim for relief to the extent it alleges that the FWS's ITSs for wolverine and bull trout violated the ESA and APA.

## V. Remedy

In summary, the Court concludes that the Defendants' approval of the Project did not violate the applicable environmental laws—with one exception. As discussed, the FWS's ITSs for wolverine and bull trout are arbitrary and capricious in violation of the ESA and the APA.

Each party requests that the Court grant it summary judgment on the entirety of Plaintiffs' claims and that it enter a final judgment (Dkt. 32-1 at 50; Dkt. 34-2 at 50; Dkt. 56 at 33). For the reasons discussed above, the Court grants Defendants summary judgment on all Plaintiffs' claims for relief, except for a portion of Plaintiffs' eighth claim for relief. The Court grants Defendants summary judgment on the eighth claim for relief only to the extent it challenges FWS's BiOp as unlawful. To the extent that claim alleges FWS's wolverine and bull trout ITSs are unlawful, the Court grants Plaintiffs' summary judgment on that portion of their eighth claim.

The only remaining issue is the appropriate remedy to address the deficiencies in the ITSs. In their supplemental briefing about remedies, Plaintiffs assert that vacatur is the appropriate remedy based on the "legal violations and errors Plaintiffs' raise" (Dkt. 76 at 10). They do not address, however, whether vacatur remains the appropriate remedy if the only violation is that the wolverine and bull trout ITSs are deficient. Federal Defendants argue if the Court concludes—as it does here—that the ITSs are deficient, then "the proper course would be to allow FWS to provide the clarity via an ITS revision on a limited remand before entering any adverse merits judgment or remedy," or alternatively, "through remand, without vacatur of the agency's decision" (Dkt. 78 at 17). Meanwhile, Perpetua argues that "the only appropriate remedy is remand without vacatur" (Dkt. 79 at 9).

The parties agree that a two-part analysis governs whether remand without vacatur is appropriate (Dkt. 76 at 8; Dkt. 78 at 18). Determining whether to vacate an unlawful agency action depends on the seriousness of the deficiencies and the disruptive consequences of an interim change. *Allied Signal, Inc. v. U.S. Nuclear Regulatory Com'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *see also Montana Wildlife Fed. v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (relying on two-factor test articulated in *Allied Signal*).

Here, the deficiencies in the ITS do not appear to be serious because FWS represents they can be easily remedied (Dkt. 78-1) (Wise declaration explaining actions FWS would take to remedy defects). As the Court indicated in its decision denying Plaintiffs' request for preliminary injunctive relief, resolving the defects appears to be a matter of specifically identifying and summarizing information which is already in the administrative record.

Meanwhile, the disruptive consequences of vacating the agency's decision would be significant for the reasons Perpetua articulates (Dkt. 79 at 22-28). Defendants have already

invested numerous years in preparation for approving the Project. The cost of a delay in the Project's implementation would be very significant to both Perpetua and the local community, which has prepared to support the Project, and the United States' independent supply of antimony would be delayed (*id.*). Because FWS represents it can remedy the ITSs' defects quickly based on the existing administrative record, and the disruptive consequences of vacating the agency's decision would be serious, the Court remands without vacatur to allow FWS to issue amended ITSs for wolverine and bull trout which comply with the ESA as articulated herein.

The Court acknowledges that FWS has already prepared amended ITSs and filed them in this case (Dkt. 88-1). The Court denies, however, Federal Defendants' request to supplement the administrative record and consider the amended ITSs in lieu of remand (*see* Dkt. 88 at 7-9). Although Federal Defendants represent that "the amended ITSs provide clarification and do not alter FWS's existing analysis," the administrative record is extremely voluminous in this case and the amended ITSs are over 50-pages long. The Court is in no position to independently review the amended ITSs against the administrative record to conclude that the amendments are as represented and not a new agency action. As Plaintiffs note, they have not had an opportunity to respond to the amended ITSs. The Court concludes that a limited remand is necessary to provide Plaintiffs an adequate opportunity to review and respond to the amendments.

**ORDER**

1. Plaintiffs' Motion for Summary Judgment (Dkt. 31) is **GRANTED** and **DENIED** in part.

2. Federal Defendants' Motion for Summary Judgment (Dkt. 34) is **GRANTED** and **DENIED** in part.

3. Defendant-Intervenor Perpetua Resources Idaho, Inc.'s Motion for Summary Judgment (Dkt. 41) is **GRANTED** and **DENIED** in part.

4. Plaintiffs' Motion for Immediate Stay of Order (Dkt. 70) and Grant of Injunction Pending Appeal is **DENIED** as MOOT.

5. Plaintiffs' Motion to Strike Federal Defendants' Extra-Record Evidence & New Argument (Dkt. 91) is **DENIED** as MOOT.

6. The Court orders a limited **REMAND** for the FWS to issue amended incidental take statements for wolverine and bull trout.

7. A final judgment will issue.

**DATED:** August 18, 2026

Amanda K. Brailsford
U.S. District Court Judge